**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MAC FUNDING CORPORATION,                          )
                                                  )
                    Plaintiff,                    )
                                                  )
          v.                                      )          Case No.:   FILED: JULY 23, 2008
                                                  )                      08CV4179
ASAP GRAPHICS, INC., and                          )                      JUDGE DER-YEGHIAYAN
AMES FRIEDMAN,                                    )                      MAGISTRATE JUDGE KEYS
                    Defendants.                   )                      TG

## COMPLAINT

NOW COMES, MAC FUNDING CORPORATION, by and through its attorneys, REIN

F. KRAMMER and MASUDA, FUNAI, EIFERT & MITCHELL, LTD., and for its Complaint,

states as follows:

## THE PARTIES

1.    Plaintiff, MAC FUNDING CORPORATION ("MAC Funding") was and now is a

corporation incorporated under the laws of the State of Delaware, having its principal place of

business in Wood Dale, Illinois.


2.    Defendant, ASAP GRAPHICS, INC. ("ASAP") is, on information and belief, a

corporation incorporated under the laws of the State of Florida, having its principal place of

business in the State of Florida.

3.    Defendant, AMES FRIEDMAN, is, on information and belief, a citizen and resident of the State of Florida.

4.    This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332(a)(1) since the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00 and is between citizens of different states.  Venue is proper pursuant to 28 U.S.C. §1391.  Additionally, the Equipment Lease Agreement, Security Agreements and Guaranties (each as defined herein) that are the subject of this suit each contain a forum selection clause, designating, at Plaintiff MAC Funding's election, this judicial district as the proper jurisdiction and venue of any action brought by MAC Funding.

## COUNT I

## CLAIM ON LEASE AGREEMENT

5.    MAC Funding realleges and reincorporates as if fully set forth herein the allegations of paragraphs 1 through 4, inclusive.

6.    ASAP and MAC Funding entered into an Equipment Lease Agreement, identified as Lease No. SUL 0209, dated on or about December 9, 2003, which has thereafter been modified by the parties in writing (collectively, the "Lease Agreement") for the lease of one Mitsubishi Diamond 3000S-6 Six (6) Color Sheetfed Printing Press, complete with all standard accessory equipment and all attachments, accessions, additions, improvements and replacements thereto and therefor (the subject press, and all standard accessory equipment and attachments, accessions, additions, improvements and replacements subject to the Lease Agreement are

2

collectively referred to herein as the "Subject Equipment"). A copy of the Lease Agreement is attached hereto and incorporated herein as Group Exhibit "1."

7.    The Lease Agreement required ASAP to make certain lease rental payments to MAC Funding.  Under the Lease Agreement, ASAP was to make weekly rental payments from June 18, 2007 through December 13, 2007 in the amount of $7,000.00.  From January 7, 2008 through May 12, 2008, ASAP was to make weekly rental payments in the amount of $9,000.00. Recently, the weekly rental payments due under the Lease Agreement increased to $9,800.00.

8.    ASAP has failed to make the required payments under the Lease Agreement and ASAP is delinquent and in arrears under the Lease Agreement in the sum of $478,673.24 as of July 7, 2008 (exclusive of certain costs and expenses).  Demand has been made for payment of the delinquent balance.

9.    Notwithstanding such demand, ASAP has not cured said breach under the Lease Agreement.  MAC Funding has satisfied its obligations under the Lease Agreement.

10.    Paragraph 16 of the Lease Agreement provides that ASAP shall be in default upon failure to pay when due any rent or other amount due under the Lease Agreement. As a result thereof, ASAP is in default under the Lease Agreement.

11.    Paragraph 17 of the Lease Agreement provides that, upon default by ASAP, MAC Funding may declare all sums due and to become due immediately due and payable.

12.    Paragraph 17 of the Lease Agreement allows MAC Funding to recover from ASAP its reasonable attorneys' fees and costs.

13.    As a result of the default by ASAP, there is due and owing from ASAP to MAC Funding under the Lease Agreement, after an acceleration of future principal amounts due, the sum of $1,807,738.65 as of July 7, 2008, plus attorneys' fees and costs as permitted by law.

**WHEREFORE,** MAC FUNDING CORPORATION prays for judgment as follows:

A.    A judgment against the defendant ASAP GRAPHICS, INC., in an amount in excess of $1,807,738.65, plus attorneys' fees and costs as provided in the Lease Agreement, plus interest and costs as allowed by law; and

B.    Such other and further relief as the Court may deem just and equitable.

## COUNT II

## CLAIM ON SECURITY AGREEMENTS

14.    MAC Funding realleges and reincorporates as if fully set forth herein the allegations of Paragraphs 1 through 13 inclusive.

15.    Furthermore, on or about December 9, 2003 and June 18, 2007, ASAP and MAC Funding entered into blanket security agreements whereby ASAP granted to MAC Funding security interests in all of the assets of ASAP including, but not limited to, cash, accounts receivable, personal property, machinery, equipment, books and records, and instruments (collectively, the "ASAP Assets").  A copy of such blanket Security Agreements are attached

hereto and incorporated herein as Group Exhibit "2" (the "Security Agreements").  Paragraph 3.1 of each of the Security Agreements provide that ASAP shall be in default under the Security Agreements if it fails to pay any indebtedness when due or fails to perform any duty or obligation required to be performed by ASAP under the Security Agreements or under the terms of any other agreement between MAC Funding and ASAP.  By reason of its defaults and failure to pay under the Lease Agreement, ASAP is also in default under the terms of the Security Agreements.

16.    Furthermore, Paragraph 3.3 of each of the Security Agreements provide that, in the event of default by ASAP, MAC Funding shall, if it so elects, declare that the unpaid balance of the indebtedness, obligations and liabilities secured thereby be accelerated and become immediately due and payable.

17.    MAC Funding has declared that the unpaid balance of the indebtedness, obligations, and liabilities are accelerated and immediately due and payable, but ASAP has neglected or refused to pay such unpaid balance.

18.    MAC Funding has performed its obligations under the Security Agreements.

19.    Paragraphs 4.9 and 4.10 of each of the Security Agreements allow MAC Funding to recover from ASAP its attorneys' fees, additional interest, costs and expenses incurred in this matter.

20.    As a result of the default of ASAP, there is due and owing from ASAP to MAC Funding as of July 7, 2008 the sum of $1,807,738.65, plus attorneys' fees, and additional interest and costs as provided in the Lease Agreement and Security Agreements.

**WHEREFORE**, MAC FUNDING CORPORATION prays for judgment as follows:

A.    A judgment against Defendant, ASAP GRAPHICS, INC., in an amount in excess of $1,807,738.65, plus costs, attorneys' fees and additional sums as provided in the Lease Agreement and Security Agreements; and

B.    Such other and further relief as the Court may deem just and equitable.

## COUNT III

## CLAIM ON GUARANTIES

MAC Funding complains of Defendant AMES FRIEDMAN as follows:

21.    Plaintiff MAC Funding realleges and reincorporates as if fully set forth herein the allegations of paragraphs 1 through 20 inclusive.

22.    On or about December 9, 2003, September 16, 2005, and June 18, 2007, AMES FRIEDMAN ("Friedman") executed guaranties of ASAP's obligations contained in the Lease Agreement and Security Agreements (the "Guaranties"). A copy of the Guaranties are attached hereto as Group Exhibit "3."

23.     Pursuant to the terms of the Guaranties, Friedman unconditionally guaranteed to MAC Funding the full and prompt payment and performance by ASAP of all obligations due and owing to MAC Funding under the Lease Agreement and Security Agreements.  MAC Funding has satisfied its obligations under the terms of the Guaranties.

24.     The Lease Agreement and Security Agreements are each in default, and there remains past due and owing to MAC Funding the sum of $478,673.24 thereunder.  Pursuant to the Lease Agreement and Security Agreements, MAC Funding has accelerated the total balance due under the Lease Agreement and Security Agreements in the amount of $1,807,738.65.

25.     Accordingly, there is due and owing from Friedman to MAC Funding the sum of $1,807,738.65 as of July 7, 2008, plus attorneys' fees as provided in the Lease Agreement, Security Agreements and the Guaranties, and costs for this suit.

**WHEREFORE,** MAC FUNDING CORPORATION prays:

A.      That judgment be entered against AMES FRIEDMAN in an amount in excess of $1,807,738.65, plus attorneys' fees as provided in the Lease Agreement, Security Agreements and the Guaranties, and costs of this suit; and

B.      For such other and further relief as the Court may deem just and equitable.

## COUNT IV

### INJUNCTIVE RELIEF

MAC Funding complains of Defendants ASAP and FRIEDMAN as follows:

26.     Plaintiff MAC Funding realleges and reincorporates herein as if fully set forth, the allegations of paragraphs 1 through 25, inclusive.

27.     Paragraph 14 of the Lease Agreement provides that title to the Subject Equipment shall remain with MAC Funding.

28.     The Subject Equipment and the ASAP Assets are subject to depreciation and deterioration, thus rendering them less marketable and impairing the value of MAC Funding's interest in the Subject Equipment and ASAP Assets.

29.     Upon information and belief, ASAP does not have the ability to pay for the amounts due and owing to MAC Funding, as it has failed to meet its debts in the ordinary course of business by failing to pay MAC Funding the monthly payments due under the Lease Agreement and the amounts due under the Security Agreements.

30.     The continued possession and retention by ASAP, as well as the depreciation in value, of the Subject Equipment and the ASAP Assets are thus causing irreparable and continuing injury to MAC Funding for which MAC Funding has no adequate remedy at law.

31.     Paragraph 17 of the Lease Agreement and Paragraph 3.3 of the Security Agreements each provide respectively that, upon default, MAC Funding will have the right to, inter alia, enter into any premises and repossess the Subject Equipment and ASAP Assets.

Accordingly, MAC Funding is entitled to possession of the Subject Equipment and ASAP Assets.

**WHEREFORE,** MAC FUNDING CORPORATION prays for a temporary restraining order and preliminary and permanent injunctions against, ASAP GRAPHICS, INC., and AMES FRIEDMAN as follows:

1.    For temporary, preliminary and permanent injunctive relief immediately restraining and enjoining ASAP GRAPHICS, INC. and AMES FRIEDMAN and their respective agents, attorneys, servants, employees, and others acting in their stead or in concert with them from further using, distributing, selling, concealing, dealing in, dissipating, depleting, depreciating, impairing, diminishing in value, destroying, harming, encumbering, transferring, moving, disposing of or otherwise reducing the value of any and all of the Subject Equipment and the ASAP Assets or any proceeds thereof.

2.    For temporary and permanent injunctive relief immediately restraining and enjoining ASAP GRAPHICS, INC. and AMES FRIEDMAN, and their respective agents, attorneys, servants, employees, and others acting in their stead or in concert with them, from prohibiting or interfering with MAC FUNDING CORPORATION's entry upon ASAP GRAPHICS, INC.'s premises and MAC FUNDING CORPORATION repossessing the Subject Equipment and the ASAP Assets.

3.    For an order directing ASAP GRAPHICS, INC. to immediately assemble the Subject Equipment and ASAP Assets and make the same available for repossession by MAC FUNDING CORPORATION.

4.    For an order of immediate possession, with full title and control of all Subject Equipment and ASAP Assets to be assigned to MAC FUNDING CORPORATION, and authorizing and directing any U.S. Marshall or other law enforcement official to enter the premises of ASAP GRAPHICS, INC. by any means necessary to take possession of the Subject Equipment and ASAP Assets on behalf of MAC FUNDING CORPORATION, remove the Subject Equipment and ASAP Assets, and put MAC FUNDING CORPORAITON in physical possession and control thereof.

5.    For any other relief this Court deems just and proper.

Dated:  July 23, 2008

Respectfully submitted,

**MAC FUNDING CORPORATION**

By:___/s/ Rein F. Krammer_____
          One of Its Attorneys

Rein F. Krammer, Esq.
Masuda, Funai, Eifert & Mitchell, Ltd.
Attorneys for Plaintiff, MAC Funding Corporation
203 N. LaSalle Street, Suite 2500
Chicago, Illinois 60601-1262
(312) 245-7500
(312) 245-7467

N:\SYS08\6309\Lit\01090001.doc

JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE KEYS
TG

# GROUP EXHIBIT "1"

Lease No. SUL0209

# EQUIPMENT LEASE AGREEMENT

### TITLE PAGE

| Lessor: | | Lessee: | |
|---|---|---|---|
| Name | MAC FUNDING CORPORATION | Name | ASAP GRAPHICS, INC. |
| Address | 1500 Michael Drive | Address | 500 Southwest 21st Terrace, Suite B102 |
| City | Wood Dale | City | Fort Lauderdale |
| State | IL  Zip  60191 | State | FL  Zip  33312 |
| Contact | Mr. B. Krawulski  Phone  630-238-5605 | Contact | Mr. Ames Freidman  Phone  954-792-8155 |
| Position | Credit Manager | Entity Type | C-Corporation  FEIN No.  65-0590496 |
| | | State of Organization | |
| | | State of Organization ID No. | |

---

### EQUIPMENT SCHEDULE

| Quantity | Description – New/Used, Make, Model and Serial Number |
|---|---|

One (1) New Mitsubishi Diamond 3000S–6 (Six) Color Sheetfed Printing Press together will all auxiliary equipment.

---

Equipment Location, if Other than Lessee's Address Noted Above:

| Address | City | County | State | Zip |
|---|---|---|---|---|

| | Terms of Rental | | | Advance Rentals | |
|---|---|---|---|---|---|
| Term No. of Payments: | First Payment Due Date | Monthly Rental Payment (Plus Applicable Tax) | Interest Rate | Payment of $38,900 | ☐ First Payment's |
| 1-84 | 120 days after delivery | $28,800 | Treasuries plus 250 basis points fixed 30 prior to first payment | (Plus Applicable Tax) | ☐ Last |

Security Deposit $_____
Advance payments are due upon the execution of this Equipment Lease Agreement.
(All amounts listed on this document reflect U.S. Dollars.)

---

Purchase Option: _____ Yes _____ No
Purchase Option Price: $ 1.00

Shipment Terms: F.O.B. _____
Taxable: _____ Yes _____ No
Exemption No. _____ (if applicable)

**THIS LEASE IS SUBJECT TO THE ATTACHED TERMS AND CONDITIONS OF LEASE. THIS IS A NON-CANCELLABLE LEASE.**
Not withstanding anything to the contrary, the TITLE PAGE of the Equipment Lease Agreement shall control in the event of any conflict between the terms of this TITLE PAGE and those contained in the TERMS AND CONDITIONS OF LEASE.

| Lessor: | MAC FUNDING CORPORATION | Lessee: | ASAP GRAPHICS, INC. |
|---|---|---|---|
| By: | | By: | |
| | Mr. K Haruta | | Mr. Ames Freidman |
| Title: | President | Title: | President |
| Date: | December 4, 2003 | Date: | 12/09/03 |

# EQUIPMENT LEASE AGREEMENT
## TERMS AND CONDITIONS OF LEASE

1. **Lease:** Lessor hereby leases to Lessee and Lessee hereby leases from Lessor the equipment described in the Equipment Schedule set forth on the Title Page hereof and on any attached supplemental schedules, and any and all auxiliary equipment and accessories therefor (which together with all spare parts, attachments, accessories, accessions, additions, replacements, substitutions thereto or thereof, incorporated therein, made part thereof or otherwise attached or affixed thereto, are hereinafter collectively called the "Equipment"), subject to the terms and conditions of this Equipment Lease Agreement ("Lease"). If more than one Lessee is named in this Lease, the liability of each Lessee will be joint and several. This Lease shall become effective, binding and enforceable upon execution by Lessor and Lessee and is not cancelable without the express written consent of Lessor.

2. **Delivery and Installation:** Lessee shall be solely responsible to arrange for and effect the shipment, delivery and installation of the Equipment at the Equipment Location indicated on the Title Page of this Lease. In no event will Lessor be liable to Lessee for any loss or damage whatsoever arising from or in connection with the shipment, delivery or installation of the Equipment or any delay or failure in connection therewith.

3. **Term:** The term of this Lease is for the number of months shown on the Title Page. Upon delivery, Lessee shall execute a Delivery Certificate for the Equipment as provided by Lessor. The term of the Lease shall commence on the date of delivery of the Equipment as evidenced by the Delivery Certificate and related Bill of Lading, provided that, in the event that installation is delayed by reason of any fault of Lessee, Lessee shall in any event commence the payment of monthly rental payments on the First Payment Due Date.

4. **Delivery Certificate:** Lessee's execution and delivery of the aforesaid Delivery Certificate to Lessor with respect to the Equipment shall conclusively establish that, as between Lessor and Lessee, but without limiting or otherwise affecting Lessee's or Lessor's rights, if any, against any manufacturer, the Equipment is acceptable to and accepted by Lessee under this Lease notwithstanding any defect with respect to design, manufacture, condition or in any other respect, and that the Equipment is in good order and condition and conforms to the specifications applicable thereto and to all applicable governmental requirements and specifications.

5. **Lease Payments; Adjustments:** (a) Lessee will pay to Lessor the monthly rental for the Equipment in the amount shown on the Title Page, plus any and all applicable tax amounts due. All rent shall be paid without notice or demand and without abatement, deduction or set off of any amount whatsoever at the office of Lessor at the address set forth on the Title Page, or to such other person or address as Lessor may hereafter designate. LESSEE'S PAYMENT OBLIGATIONS HEREUNDER SHALL BE IRREVOCABLE, ABSOLUTE AND UNCONDITIONAL, AND WILL NOT BE SUBJECT TO ANY ABATEMENT, DEFENSE, SETOFF, COUNTERCLAIM OR RECOUPMENT WHATSOEVER FOR ANY REASON (INCLUDING, BUT NOT LIMITED TO, ANY INABILITY TO USE OR OPERATE, OR ANY LIMITATION ON THE USE OR OPERATION OF, THE EQUIPMENT). The Security Deposit set forth herein shall be due upon execution of this Lease. The first monthly rental payment will be due on the First Payment Due Date set forth on the Title Page and subsequent monthly rental payments shall be made on the same day thereafter for each subsequent month until all amounts due hereunder are paid in full. (b) The monthly rental set forth herein is based upon the estimated cost of the Equipment (including accessory, auxiliary or peripheral equipment, taxes, freight, delivery charges, and/or any other charges which Lessor agrees to pay/advance at the request of Lessee) and accordingly, the monthly rent will be adjusted accordingly if such costs differ from such estimates. Lessee hereby authorizes Lessor to so adjust such rental payments upon determination of the actual cost of the Equipment.

6. **Late Charges:** Lessee agrees to pay upon demand by Lessor, to the extent not prohibited by law, a collection service charge of Ten ($10.00) Dollars or Five (5.00%) percent of the delinquent payment, whichever is greater.

7. **Purchase Option:** If there is a Purchase Option and Purchase Option Price specified on the Title Page, upon the expiration of the term of this Lease, Lessee shall have the right and option to purchase not less than all of the Equipment for the Purchase Option Price shown herein, plus any applicable tax, by so notifying Lessor in writing not less than ninety (90) days prior to the expiration of the Lease term. Such purchase option may be exercised by Lessee only if Lessee is not then in default hereunder. If Lessee exercises such purchase option, such purchase option will be deemed exercised by Lessee as of the day immediately following the date of expiration of the term of this Lease by Lessee's delivery to Lessor of cash or certified check in the total amount shown herein. LESSOR'S SALE OF THE EQUIPMENT TO LESSEE WILL BE WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, AND WILL BE ON AN "AS IS, WHERE IS AND WITH ALL FAULTS" BASIS.

8. **Early Termination:** So long as Lessee is not in default hereunder, Lessee may elect at any time to terminate this Lease with respect to the Equipment covered hereby by paying to Lessor the aggregate amounts due and to become due and owing to Lessor hereunder, including but not limited to any and all monthly rental payments, unpaid late charges and property taxes, less any unearned finance charges, plus an Early Termination Premium computed as set forth herein. The Early Termination Premium shall be an amount equal to the original amount funded/financed by Lessor for the Equipment multiplied by the applicable percentage set forth in the table below.

Early Termination Exercised During the Following Period of Monthly Rent Payment.

| | Applicable Percentage |
|---|---|
| 1st month - 12th month | 5% |
| 13th month - 24th month | 4% |
| 25th month - 36th month | 3% |
| 37th month - 48th month | 2% |
| 49th month - 60th month | 1% |
| 61st month or later | 0% |

For the purpose of this Lease, the Applicable Percentage and all late charges shall be determined by Lessor and the same shall be final and binding upon Lessee.

9. **DISCLAIMER OF WARRANTIES; LIMITATION OF LIABILITY:** LESSOR MAKES NO WARRANTIES WHATSOEVER AND HEREBY DISCLAIMS ANY AND ALL WARRANTIES OF ANY NATURE WHATSOEVER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR USE, VALUE, TITLE, COMPLIANCE WITH SPECIFICATIONS, DESIGN, CONDITION, CAPACITY, DURABILITY, QUALITY OF MATERIAL OR WORKMANSHIP, CONFORMITY OF ANY DESCRIPTION OR PATENT INFRINGEMENT. LESSOR IS NOT RESPONSIBLE FOR ANY REPAIRS OR SERVICE TO THE EQUIPMENT, DEFECTS THEREIN OR FAILURES IN THE OPERATION THEREOF. LESSOR SHALL NOT BE LIABLE FOR ANY DAMAGES WHATSOEVER, INCLUDING, BUT NOT LIMITED TO ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, ALL OF WHICH ARE EXPRESSLY WAIVED. LESSEE EXPRESSLY ACKNOWLEDGES THAT (A) LESSOR DID NOT SELECT, MANUFACTURE OR SUPPLY THE EQUIPMENT, (B) LESSOR ACQUIRED THE EQUIPMENT AT THE REQUEST OF LESSEE SOLELY IN CONNECTION WITH ENTERING INTO THIS LEASE AGREEMENT AND (C) LESSEE HAS MADE THE SELECTION OF THE SUPPLIER OF THE EQUIPMENT AND EACH ITEM OF THE EQUIPMENT BASED ON ITS OWN JUDGEMENT AND EXPRESSLY DISCLAIMS ANY RELIANCE UPON ANY STATEMENTS OR REPRESENTATIONS MADE BY LESSOR. LESSEE LEASES THE EQUIPMENT "AS IS, WHERE IS AND WITH ALL FAULTS". LESSEE WAIVES ANY AND ALL CLAIMS AGAINST LESSOR AND THE MANUFACTURERS, SELLERS AND SUPPLIERS OF THE EQUIPMENT FOR PUNITIVE DAMAGES RELATING TO THE EQUIPMENT, THIS LEASE, THE RELATIONSHIP OF THE PARTIES AND ANY OTHER MATTERS RELATED THERETO.

10. **Possession, Equipment Location, Inspection and Return:** So long as Lessee is not in default under this Lease, Lessee shall be entitled to the possession and use of the Equipment in accordance with the terms of this Lease. Lessee shall not remove the Equipment from the Equipment Location set forth on the Title Page or part with possession or control of the Equipment without prior written consent of Lessor. Lessee agrees that the Equipment is, and shall at all times be and remain, personal property, notwithstanding that the Equipment or any part thereof may now be or hereafter become in any manner affixed or attached to or embedded in, or permanently resting upon any real property. Lessor may enter the premises where the Equipment is kept and inspect it during normal business hours. At the expiration or earlier termination (upon Lessee's breach or default) of the term of this Lease, except in the case of retention by Lessee upon purchase of the Equipment, Lessee, at its expense, will return the Equipment, properly packed and crated with freight prepaid, to Lessor at such place as Lessor may designate, in the same repair, condition, and working order as at the commencement of the Lease, reasonable wear and tear resulting from proper use excepted.

11. **Equipment Use and Maintenance:** Lessee, at its sole expense, will at all times keep the Equipment in good repair, condition, and working order and in compliance with all applicable requirements of law and meeting standards sufficient to satisfy any relevant manufacturer's requirement for warranty. Lessee will make no alterations, additions or improvements to the Equipment, which are permanent without the prior written consent, and in compliance with any instructions or directives, of Lessor which substantially impair the value of the equipment provided, however, Lessee may make alterations, additions or improvements to the Equipment which it may so elect, if it first gives Lessor fifteen (15) days advance notice thereof, and Lessor does not object thereto in writing within such fifteen (15) days. All such additions or improvements will immediately become the property of Lessor and will be returned to Lessor with the Equipment upon the expiration or earlier termination of this Lease, unless Lessor otherwise requires Lessee to restore the Equipment to its original state. In no event shall Lessor be required to maintain, service, repair, restore, renew, replace add to or improve in any manner whatsoever any of the Equipment.

12. **Risk of Loss or Damage:** Lessee assumes all ( ) loss or damage to the Equipment from any cause ...oever. In the event of any such loss or damage, Lessee will, at Lessor's sole option, (a) make all repairs necessary to place the same in good repair, condition and working order, or at the option of Lessor (b) pay to Lessor the purchase option amount stated herein, if any, plus any and all other amounts payable to Lessor hereunder. The total or partial destruction of the Equipment, or total or partial loss of use or possession thereof to Lessee, shall not relieve Lessee from the duty to pay rent as herein provided. Any transfer of title to the Equipment to Lessee will be upon the same terms as provided under the purchase option described above.

13. **Insurance:** Lessee, at its sole expense, will keep the Equipment insured at all times against all risks of loss or damage from any cause whatsoever in an amount equal to the full undepreciated replacement value (new) of the Equipment, at Lessor's option. All insurance will be of a type, form, in amounts, with a company and under terms and conditions satisfactory to Lessor. Lessee shall designate Lessor as a loss payee or additional party insured on each insurance policy. Such insurance policy shall provide that no cancellation or renewal thereof will be effective without 30 days prior written notice to Lessor of such cancellation or nonrenewal. The proceeds of insurance payable as a result of loss or damage to the Equipment will be applied to Lessee's obligations hereunder. Any excess or remaining proceeds shall be the property of Lessor. In the event of any default hereunder by Lessee, Lessee irrevocably appoints Lessor as Lessee's attorney in fact to make claim for, receive payment of, and execute and endorse all documents, checks, or drafts received in payment for loss or damage under any insurance policy. In the event that Lessee shall fail to insure the Equipment as required herein or in the event that such insurance shall expire, Lessor shall have the right (but not the obligation) to procure such insurance coverage and any and all amounts expended by Lessor in connection therewith shall become additional rent hereunder and shall be immediately paid by Lessee to Lessor.

14. **Title, Liens and Taxes:** Title to the Equipment shall at all times remain in Lessor, and Lessee will, at its sole expense, at all times protect and defend Lessor's title in and to the Equipment and in furtherance thereof, Lessee will keep the Equipment free and clear of all levies, liens, and encumbrances of any nature whatsoever and will be responsible for the payment of and will promptly pay and indemnify Lessor from and against all license and registration fees, assessments, imports, charges, filing or recording fees, documentary stamp taxes, sales/use taxes, personal property taxes, gross receipts taxes, excise taxes, including value added taxes, and all other taxes (local, state, and federal) which may now or hereafter be imposed upon the ownership, leasing, rental, sale, purchase, possession or use of the Equipment whether assessed to Lessor or Lessee, excluding, however, all taxes on or measured by Lessor's net income. Lessee will file all personal property tax returns covering the Equipment and will pay all personal property taxes assessed thereon. Lessee will provide Lessor with copies of all such personal property tax returns, together with evidence of payment thereof, not later than fifteen (15) days following the date such payment is due. Where applicable, Lessee shall provide Lessor with a tax exemption certificate acceptable to the taxing authorities. In the event that Lessee shall fail to make any such filings or pay such fees, taxes or charges, Lessor shall have the right (but not the obligation) to pay such amounts and such amounts shall become additional rent hereunder and shall be immediately paid by Lessee to Lessor. Lessee shall, at Lessor's request and Lessee's sole expense, affix and keep affixed in a prominent place on the Equipment labels, plates or other markings acceptable to Lessor stating that the Equipment is owned by Lessor.

15. **Assignments:** LESSEE WILL NOT, IN ANY MANNER, SUBLEASE, ASSIGN, TRANSFER, PLEDGE, MORTGAGE, ENCUMBER OR HYPOTHECATE THIS LEASE OR THE EQUIPMENT OR PERMIT ANY OF ITS RIGHTS UNDER THIS LEASE OR IN THE EQUIPMENT TO BE SUBJECT TO ANY LIEN, CHARGE OR ENCUMBRANCE OF ANY NATURE WHATSOEVER. Lessor may assign, pledge, mortgage, transfer, grant participation in, or otherwise dispose of any of its rights in this Lease and/or the Equipment without notice to Lessee. No breach or default by Lessor hereunder or pursuant to any other agreement between Lessor and Lessee will excuse performance by Lessee of any provision hereof. LESSEE ACKNOWLEDGES AND AGREES THAT THE RIGHTS OF ANY ASSIGNEE IN AND TO SUMS PAYABLE BY LESSEE WILL NOT BE SUBJECT TO ANY ABATEMENT, DEFENSE, SET-OFF, COUNTERCLAIM OR RECOUPMENT WHATSOEVER FOR ANY REASON. NO SUCH ASSIGNEE OF LESSOR WILL BE OBLIGATED TO PERFORM ANY DUTY, COVENANT, OR CONDITION REQUIRED TO BE PERFORMED BY LESSOR UNDER THE TERMS OF THIS LEASE SO LONG AS LESSOR REMAINS OBLIGATED TO PERFORM SUCH DUTIES, COVENANTS, OR CONDITIONS.

16. **Default:** Any of the following events or conditions will constitute an event of default hereunder: (a) Lessee's failure to pay when due any rent or other amount due hereunder within five (5) days after its due date; (b) seizure of the Equipment or any portion thereof under legal process or Lessee's removal, sale, transfer, encumbrance or parting with possession or control of the Equipment or any portion thereof; (c) Lessee's failure to perform any other term, covenant or condition hereof if such failure is not cured within ten (10) days after written notice thereof; (d) Lessee's failure to perform any obligation under any other agreement between Lessor and Lessee, whether or not related to this Lease; (e) the voluntary or involuntary making of an assignment by Lessee for the benefit of creditors, appointing of a receiver or trustee for Lessee or for any of Lessee's assets, institution by or against Lessee of any formal or informal proceeding of bankruptcy, reorganization, dissolution, liquidation, settlement of claim against or winding up of affairs of Lessee under any other insolvency law providing for the relief of debtors, or the making by Lessee of a transfer of all or a material portion of Lessee's assets or inventory not in the ordinary course of business; (f) Lessee's breach of any warranties set forth herein. In addition, any default and/or failure by Lessee to perform any other obligations set forth in or under any other agreement, note, or undertaking by and between Lessor and Lessee (including, but not limited to, any other Equipment Lease Agreement) shall constitute a default under this Lease, and upon the occurrence of such event of default, Lessor shall have the rights and privileges set forth in this Lease.

17. **Remedies:** Upon Lessee's default, Lessor will have the right to exercise any one or more of the following remedies, without affecting Lessor's title or right to possession of the Equipment: (a) terminate this Lease; (b) accelerate all rent payments and declare due, sue for, and recover all rents and other amounts then accrued or thereafter accruing for the entire Lease term; (c) render the Equipment unusable by electronic or other means and/or require Lessee to promptly redeliver the Equipment to Lessor in the manner specified herein; and/or (d) repossess the Equipment without notice, legal process, prejudicial hearing, or liability for trespass or other damage (which rights Lessee hereby voluntarily and knowingly waives). Lessor, at its sole option, may keep idle or sell or lease the Equipment upon such terms as it determines in its sole discretion and apply the proceeds to Lessee's obligations hereunder, after deducting from such proceeds: (x) all costs and expenses of repossession, disposition, and collection including all attorneys' fees reasonably incurred by Lessor; (y) in connection with any effort by Lessor to enforce the provisions hereof, Ten (10.00%) percent of the balance of the capitalized cost of the Equipment outstanding upon default for Lessor's administrative costs and time, as liquidated damages and not as a penalty, incurred as a result of Lessee's default; and (z) an amount equal to a Purchase Option Price to reimburse Lessor for Lessor's residual interest in the Equipment. Any excess or remaining proceeds shall be the property of Lessor. Lessee will promptly pay to Lessor any resulting deficiency, together with interest from the date due (whether by acceleration or otherwise) at the rate of eighteen percent (18%) per annum (or the maximum amount permitted by law, whichever is less). All such remedies are cumulative and may be enforced separately or concurrently and are in addition to any other rights or remedies available to Lessor at law or in equity.

18. **Security Interest:**

   (a) In the event this Lease is deemed to be a security agreement or lease in the nature of a security agreement, Lessee hereby grants to Lessor and Lessor hereby retains a continuing purchase money security interest in the Equipment, together with any and all proceeds (as presently or hereafter defined by the Uniform Commercial Code ("UCC")) of the Equipment including, but not limited to, cash, money, promissory notes, accounts, accounts receivable, documents, instruments, chattel paper, intangibles (including general and payment intangibles), contract rights, leases, lease proceeds, rental payments, license fees, trade-ins, equipment, fixtures, accessories and attachments, and the proceeds and products of the foregoing, all as presently or hereafter defined by the Uniform Commercial Code. Lessee shall join with Lessor in executing/authenticating one or more financing statements and other documents, to the extent required by the UCC in a form satisfactory to Lessor to evidence Lessor's interest in the Equipment. Lessee shall keep the Equipment free from any adverse lien, security interest, or encumbrance, and will not store or use the Equipment or any part thereof in violation of any statute or ordinance. In the event Lessee shall be in default under this Lease, Lessor, in addition to any remedies hereunder, shall have the remedies of a secured party under the UCC.

   (b) In addition to the provisions of subparagraph (a) hereof, Lessee hereby assigns, transfers and pledges to Lessor, all of Lessee's right, title and interest in and to the Equipment and hereby grants to Lessor a security interest in and to the Equipment in order to further secure the payment of any and all indebtedness of any nature whatsoever owing from Lessee to Lessor from time to time, whether presently existing or hereafter arising, and the prompt, full and faithful performance by Lessee of any and all provisions to be kept, observed, or performed by Lessee under this Lease or any other agreements now existing or hereafter entered into by and between Lessee and Lessor.

19. **Additional Documents:** During the term of this Lease, Lessee shall furnish Lessor the following, which shall be prepared in accordance with generally accepted accounting principles: (a) quarterly financial statements of Lessee within sixty (60) days after the end of each such fiscal quarter, and (b) within ninety (90) days after the close of each fiscal year, an audited, consolidated balance sheet, profit and loss statement, and source and application of funds, as of the end of each such year. Lessee shall also execute/authenticate and deliver to Lessor, upon Lessor's request, such instruments and assurances as Lessor deems advisable for confirmation or perfection of this Lease and Lessor's rights hereunder, including the filing or recording of this Lease or financing statements relating hereto.

20. **Governing Law, Jurisdiction, Venue and Waiver of Trial by Jury/Bond:** This Lease will be binding and effective only when signed by a duly authorized representative of Lessor. EXCEPT FOR THE PERFECTION OF ANY SECURITY INTEREST OR LIEN IN ANY OTHER STATE, THIS LEASE WILL BE GOVERNED AND CONSTRUED IN ALL RESPECTS BY THE INTERNAL LAWS AND DECISIONS, OTHER THAN ANY CONFLICT OF LAWS PROVISIONS, OF THE STATE OF ILLINOIS, INCLUDING, WITHOUT LIMITATION, ALL MATTERS OF CONSTRUCTION, VALIDITY, ENFORCEABILITY, AND PERFORMANCE. LESSEE (I) CONSENTS AT LESSOR'S ELECTION AND WITHOUT LIMITING LESSOR'S RIGHT TO COMMENCE AN ACTION IN ANY OTHER JURISDICTION, TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY COURT (FEDERAL OR STATE OR LOCAL) SITUATED IN THE COUNTY OF COOK, STATE OF ILLINOIS; (II) WAIVES ANY OBJECTION TO IMPROPER VENUE AND FORUM NON CONVENIENS; AND (III) CONSENTS TO SERVICE OF PROCESS BY CERTIFIED MAIL, POSTAGE PREPAID, ADDRESSED TO LESSEE AT ITS ADDRESS AS SET FORTH ON THE TITLE PAGE. LESSEE HEREBY WAIVES TRIAL BY JURY. LESSEE SHALL BRING ANY ACTION ARISING OUT OF THIS LEASE ONLY IN THE FEDERAL OR STATE COURTS LOCATED IN THE COUNTY OF COOK, STATE OF ILLINOIS. IN THE EVENT LESSEE INSTITUTES ANY ACTION IN ANY COURT OTHER THAN A COURT LOCATED IN THE COUNTY OF COOK, STATE OF ILLINOIS, LESSEE SHALL ASSUME ALL OF LESSOR'S COSTS IN TRANSFERRING SAID PROCEEDING TO A COURT LOCATED IN THE COUNTY OF COOK, STATE OF ILLINOIS, INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES. In the event that Lessee shall contest Lessor's right to possession in any action relating to the Equipment,

Lessee shall post a bond in the amount of two ⟨ ⟩mes the sales price or value (whichever is greater) ⟨ ⟩e Equipment to protect Lessor's interest therein. Lessor shall not be required to post any bond or other forms of security in connection with any action for the repossession or replevin of, or otherwise relating to, the Equipment.

21.  <u>Lessee's Representations/Warranties/Grants</u>

(a)  Lessee warrants, represents and covenants that (i) Lessee is an individual, organization, or registered organization as indicated on the line marked "Entity Type" on the Title Page; (ii) if Lessee is a registered organization, Lessee's state of organization is the state set forth on the line marked "State of Organization" on the Title Page; (iii) Lessee's place of business (or chief executive office, if Lessee has more than one place of business) is set forth on the Title Page (iv) if Lessee is an individual, Lessee's principal residential address set forth on the Title Page; and (iv) Lessee shall not change its form of business or organization, change or in any way amend or alter its legal name or change its residential address, place of business or chief executive office without providing Lessor at least thirty (30) days prior written notice thereof.

(b)  Lessee hereby appoints Lessor as its attorney in fact, and authorizes Lessor, its agents, attorneys and representatives to, (i) sign/authenticate on behalf of Lessor such additional documents/records as may be required from time to time to create, amend, extend, continue, maintain or perfect the interests described herein or otherwise granted to Lessor, and (ii) to make/undertake any filings or registrations with governmental officials or offices and take such other actions as Lessor deems appropriate to perfect, amend, continue and maintain the perfection of the interests created hereby or otherwise granted to or retained by Lessor. In addition, Lessee hereby ratifies any filings made against Lessee by Lessor prior to the date hereof.

22.  <u>Indemnification:</u>  Lessee hereby assumes liability for and agrees to indemnify, protect, save and keep harmless Lessor from and against any and all liabilities, losses, damages, penalties, claims, actions, suits, costs, expenses, and disbursements, including attorneys' fees, court costs, and legal expenses, of whatever kind or nature imposed on, incurred by, or asserted against Lessor in any way relating to or arising out of this Lease or the manufacture, purchase, ownership, delivery, lease, possession, use, operation, condition, return, or other disposition of the Equipment by Lessor or Lessee, any claim for patent, trademark, or copyright infringement, any claim arising out of strict liability in tort or other products liability theory, and any taxes for which Lessee is responsible hereunder or otherwise. Lessee's indemnities will survive the expiration or termination of this Lease.

23.  <u>Miscellaneous:</u>  (a)  This Lease constitutes the entire agreement between Lessor and Lessee and supersedes any and all prior agreements, correspondence, quotations, or understandings heretofore in force between the parties relating to the subject matter hereof.  There are no agreements (except for Amendment #1) between Lessor and Lessee with respect to the Equipment and no promises, representations or statements relative thereto have been made by Lessor, except those specifically set forth and made part of this Lease.  Acceptance of this Lease is limited to the terms and conditions, set forth herein.  Any additional or other terms or conditions are rejected by Lessor.  This Lease shall be binding upon the parties hereto and their respective successors and permitted assigns. (b) The terms and conditions of this Lease shall be interpreted in such a manner as to be effective and valid under applicable law.  If any term or condition or part of this Lease is held invalid, the remaining terms and conditions of this Lease shall not be affected thereby.  (c)  THIS LEASE MAY BE MODIFIED, CANCELLED OR RESCINDED ONLY BY THE WRITTEN AGREEMENT OF BOTH PARTIES, EXECUTED BY THEIR DULY AUTHORIZED AGENTS.  (d) No claim arising out of any breach of this Lease may be discharged in whole or in part by waiver or renunciation of such claim unless such waiver or renunciation is in writing and signed by the parties hereto.  Any failure by Lessor to enforce at any time any term or condition of this Lease shall not be construed as a waiver of Lessor's right thereafter to enforce each and every term and condition of this Lease. (e)  All rights available to Lessor under the UCC (as now or hereafter in effect), except as specifically limited or excluded herein (even though not specifically enumerated herein) are expressly reserved to Lessor as remedies available in the event of default. (f)  Any notices required to be given hereunder will be given in writing and directed to the address of each party as set forth herein, or to such other address as either party may substitute by written notice to the other.  (g)  Lessee hereby authorizes Lessor to insert or revise the First Payment Due Date, payment amount and the Equipment serial number or other description on the Title Page of this Lease and to correct any patent errors or omissions in this Lease.  (h)  Any true and correct photocopy or facsimile copy of this Lease (or any other documents executed in connection herewith) transmitted by Lessee to Lessor, are and shall be deemed to be, originals of this Lease and may be utilized by Lessor for any purpose whatsoever, including any proceedings relating to this Lease and/or the Equipment.

a subsidiary of ▲ Mitsubishi Corporation
# MAC FUNDING CORPORATION

1500 Michael Drive
Wood Dale, Illinois 60191
Tel: (630) 238-5600
Fax: (630) 238-5603

June 16, 2004

Mitsubishi Lithographic Press
Attn: Dennis Dessilla
600 Barclay Blvd.
Lincolnshire, IL. 60069

RE: SUL-0209 ASAP Graphics, Inc.

<u>Revised due to delivery date change</u>

*Reschedule 1*
*due to delivery date change*

Dear Dennis,

This letter is to provide confirmation of the interest rate lock on SUL-0209.

1) The 1st payment date is 6/14/04. MAC will make an adjustment since this was funded on 5/20/04.

2) The customer decided to go with MAC instead of other financial institution, and the customer rate is fixed 30 days prior to the first payment date of 6/14/04.

3) The rate lock date is 5/15/04 (Sat) so that 5/17/04 (M) is used.

4) MAC interest rate is locked at 6.39% (5/17/04 TN7 year 4.29% + 210 BP).

5) The customer rate is at 6.79% (5/17/04 TN7 year 4.29% + 250 BP).

6) The financed amount is $1,948,333.00.

7) The funding amount is $1,973,222.77 (the premium of $24,889.77).

8) The monthly payment is $29,041.63 (vs. $28,800 on Equipment Lease Agreement).

9) MAC received $38,900.00. This may be 2% deposit to be applied to the first lease payments.

10) Adjustment:  5/20/04 funded amount (old)    $1,974,460.43
                 6/14/04 funding amount (new)   $1,973,222.77
                 Overpaid to MLP                $    1,237.66

Henry Kotegawa
Senior Operating Manager
MAC Funding Corp.

CC: T. Nakazawa,
    B. Krawulski

SUL-0209 ASAP   CUST

Compound Period ......... :  Monthly

Nominal Annual Rate .... :  6.790 %

*Revised Customer Schedule*

CASH FLOW DATA

| Event | Date | Amount | Number | Period | End Date |
|-------|------|--------|--------|--------|----------|
| 1  Loan | 06/14/2004 | 1,948,333.00 | 1 | | |
| 2  Payment | 06/14/2004 | 29,041.63 | 84 | Monthly | 05/14/2011 |

AMORTIZATION SCHEDULE - Normal Amortization

| | Date | Payment | Interest | Principal | Balance |
|---|------|---------|----------|-----------|---------|
| Loan | 06/14/2004 | | | | 1,948,333.00 |
| 1 | 06/14/2004 | 29,041.63 | 0.00 | 29,041.63 | 1,919,291.37 |
| 2 | 07/14/2004 | 29,041.63 | 10,859.99 | 18,181.64 | 1,901,109.73 |
| 3 | 08/14/2004 | 29,041.63 | 10,757.11 | 18,284.52 | 1,882,825.21 ✓ |
| 4 | 09/14/2004 | 29,041.63 | 10,653.65 | 18,387.98 | 1,864,437.23 |
| 5 | 10/14/2004 | 29,041.63 | 10,549.61 | 18,492.02 | 1,845,945.21 |
| 6 | 11/14/2004 | 29,041.63 | 10,444.97 | 18,596.66 | 1,827,348.55 |
| 7 | 12/14/2004 | 29,041.63 | 10,339.75 | 18,701.88 | 1,808,646.67 |
| 2004 Totals | | 203,291.41 | 63,605.08 | 139,686.33 | |
| 8 | 01/14/2005 | 29,041.63 | 10,233.93 | 18,807.70 | 1,789,838.97 |
| 9 | 02/14/2005 | 29,041.63 | 10,127.51 | 18,914.12 | 1,770,924.85 |
| 10 | 03/14/2005 | 29,041.63 | 10,020.48 | 19,021.15 | 1,751,903.70 |
| 11 | 04/14/2005 | 29,041.63 | 9,912.86 | 19,128.77 | 1,732,774.93 |
| 12 | 05/14/2005 | 29,041.63 | 9,804.62 | 19,237.01 | 1,713,537.92 |
| 13 | 06/14/2005 | 29,041.63 | 9,695.77 | 19,345.86 | 1,694,192.06 |
| 14 | 07/14/2005 | 29,041.63 | 9,586.30 | 19,455.33 | 1,674,736.73 |
| 15 | 08/14/2005 | 29,041.63 | 9,476.22 | 19,565.41 | 1,655,171.32 |
| 16 | 09/14/2005 | 29,041.63 | 9,365.51 | 19,676.12 | 1,635,495.20 |
| 17 | 10/14/2005 | 29,041.63 | 9,254.18 | 19,787.45 | 1,615,707.75 |
| 18 | 11/14/2005 | 29,041.63 | 9,142.21 | 19,899.42 | 1,595,808.33 |
| 19 | 12/14/2005 | 29,041.63 | 9,029.62 | 20,012.01 | 1,575,796.32 |
| 2005 Totals | | 348,499.56 | 115,649.21 | 232,850.35 | |
| 20 | 01/14/2006 | 29,041.63 | 8,916.38 | 20,125.25 | 1,555,671.07 |
| 21 | 02/14/2006 | 29,041.63 | 8,802.51 | 20,239.12 | 1,535,431.95 |
| 22 | 03/14/2006 | 29,041.63 | 8,687.99 | 20,353.64 | 1,515,078.31 |
| 23 | 04/14/2006 | 29,041.63 | 8,572.82 | 20,468.81 | 1,494,609.50 |
| 24 | 05/14/2006 | 29,041.63 | 8,457.00 | 20,584.63 | 1,474,024.87 |
| 25 | 06/14/2006 | 29,041.63 | 8,340.52 | 20,701.11 | 1,453,323.76 |
| 26 | 07/14/2006 | 29,041.63 | 8,223.39 | 20,818.24 | 1,432,505.52 |
| 27 | 08/14/2006 | 29,041.63 | 8,105.59 | 20,936.04 | 1,411,569.48 |
| 28 | 09/14/2006 | 29,041.63 | 7,987.13 | 21,054.50 | 1,390,514.98 |
| 29 | 10/14/2006 | 29,041.63 | 7,868.00 | 21,173.63 | 1,369,341.35 |
| 30 | 11/14/2006 | 29,041.63 | 7,748.19 | 21,293.44 | 1,348,047.91 |
| 31 | 12/14/2006 | 29,041.63 | 7,627.70 | 21,413.93 | 1,326,633.98 |

a subsidiary of ▲ Mitsubishi C( ,oration

# MAC FUNDING CORPORATION

1500 Michael Drive
Wood Dale, Illinois 60191
Tel: (630) 238-5600
Fax: (630) 238-5603

Monday, September 19, 2005

Ames Freidman
ASAP Graphics, Inc.
500 Southwest 21st Terrace
Fort Lauderdale, Florida 33312

*Reschedule 2*

Re: Note and Personal Guaranty

Dear Mr. Freidman:

*June 05 , Oct 05*

We received your request dated August 25, 2005 for a 5 month lease payment deferral for the current four delinquent payments (June 2006 Sep 2006) on your lease with MAC Funding. Per our discussion, those five (5) payments have been rolled into the Note attached to this letter (together with applicable late charges).

You have paid up to the 5/14/05 payment under the lease according to our records. We would agree to accommodate your request subject to the following conditions:

(1) MAC requires a Note from ASAP Graphics with a Personal Guaranty from you for the amount equal to the deferred amount payable over 36 months with the interest rate of 6.79%. You must sign and return the Note and the personal guaranty attached thereto.

(2) You must continue to make the scheduled payments under the Lease together with the payments under the Note.

(3) You will send to MAC the following:

    a. Copies of documents evidencing your work on the refinancing of two homes and the sale of real estate (broker engagement letter, etc). You will update MAC on the progress of your refinancing periodically, but at least once per month;

    b. Updated personal financial statements within ten days hereof, including the list of specific assets, which could be used as additional collateral;

    c. ASAP Graphics' monthly financial statements submitted promptly every month. The last financial MAC received is as of 7/31/05. Please see the attached our memo regarding your financial statements; and

    d. A copy of ASAP Graphics' most recent corporate tax return, as well as your personal tax return.

This letter agreement will be effective only upon MAC Funding receipt of (a) a countersigned copy of this letter signed by you and your spouse, if any, who is also co-owner of personal assets listed on your personal statement, and (b) the Note and personal guaranty attached thereto by you. In all other respects, the existing lease, guaranties and/or any other agreements among MAC, ASAP Graphics, and you will remain in full force and effect, without change, except as specifically provided in this letter.

I trust that your compliance with the terms of the lease and the Note will be forthcoming and that no additional re-schedulings will be required. If you request another rescheduling, you agree that you will pledge additional collateral and assets (including a mortgage on your residence(s)), and provide the personal guaranties of you and your spouse, if any.

Please signify your agreement by signing where indicated. If you have any questions, please do not hesitate to call me.

Sincerely,

*Sarah Stapp*

Sarah Stapp
MAC Funding Corporation
Telephone: (630) 238-5617
Fax: (630) 238-5603
Email: sstapp@mac-funding.com

**ACCEPTED AND AGREED**

ASAP GRAPHICS, INC.
By: _____

Its: _____*president*_____

_____
Ames Friedman (individually)

_____*N/A*_____
Mrs. _____ Friedman (individually)

# ASAP Graphics, Inc. (SUL-0209R2)

### Promissory Note Calculation

New Payment        $34,051.08
Old Payment        $29,041.63
Difference            $5,009.45 x 36 mo. =   $180,340.20

Since ASAP's last payment was made on *5/14/05*, the
promissory note will start from *5/14/05*.

ASAP will make monthly payments of $34,051.08,
which includes the  promissory note's monthly payment.

## NOTE

U.S.$180,340.20

Wood Dale, Illinois
Made: September 16, 2005
Due: October 14, 2008

FOR VALUE RECEIVED, the undersigned, ASAP Graphics, Inc, a corporation organized and existing under the laws of the state of Florida whose present address is 500 Southwest 21st Terrace, Fort Lauderdale, Florida 33312, promises to pay to the order of MAC Funding Corporation ("Lender"), the principal sum of One Hundred Eighty Thousand Three Hundred Forty and 20/100 U.S. DOLLARS (U.S.$180,340.20), together with interest thereon (computed as set forth in paragraph 1 below) at the rate of six point seven nine percent (6.79%) per annum, such principal sum and interest to be payable in thirty-six (36) consecutive monthly installments as follows: (i) an initial payment of U.S.$5,009.45 on November 14, 2005 and (ii) the sum of U.S.$5,009.45 on the fourteenth day of each month thereafter through and including October 14, 2008.

All principal and interest due and owing hereunder shall be paid in full to Lender no later than October 14, 2008.

All payments of principal and interest shall be payable in U.S. dollars to Lender and delivered to MAC Funding Corporation, 1500 Michael Drive, Wood Dale, Illinois 60191, Attention: Accounts Receivable. This Note shall be subject to the following provisions, to wit:

1.      Interest shall accrue on the principal balance remaining due and unpaid from time to time under this Note from and after the date of this Note until paid in full.

2.      The undersigned may, at any time and if not in default, prepay the unpaid balance of the principal sum of this Note and all other amounts then due and owing to Lender hereunder, without penalty. No partial payment shall postpone the due date of this Note. All payments on account of the indebtedness herein set forth shall be first applied to costs and expenses incurred by Lender with respect to this Note, accrued interest, and then to the balance of the principal sum and the remainder to all other indebtedness, if any, owed by the undersigned to Lender.

3.      If any payment of principal or interest due under this Note is not properly paid when due or any default shall occur under the terms of this Note or under the terms of any other agreements between Lender and the undersigned, the entire balance of the principal sum of this Note, plus, accrued interest hereon and all other indebtedness owed by the undersigned pursuant to this Note to Lender shall be accelerated and become immediately due and payable. Immediately upon any event of default, including specifically, but not limited to, non-payment of principal and interest when due hereunder, interest shall begin to accrue on the entire amount, including principal and interest, owed hereunder, at the rate of eighteen percent (18%) per annum or the highest rate then permitted by law, whichever is lower, until fully paid. The undersigned shall pay to Lender all costs and expenses of collection hereunder including, but not limited to, reasonable attorneys' fees. In addition to the foregoing, the undersigned agrees to pay upon demand by Lender, to the extent not prohibited by law, a collection service charge of Ten ($10.00) Dollars or Five (5.00%) percent of the delinquent payment, whichever is greater.

4.      Presentment, notice of dishonor and protest are hereby waived by the undersigned and all makers, sureties, guarantors and endorsers hereof. The undersigned and all makers, sureties, guarantors and endorsers of this Note also waive the benefit of any exemption, valuation or appraisement laws as to this indebtedness.

5.      The undersigned warrants and represents that it is a corporation or other registered organization (as set forth above) duly organized and existing under the laws of its state of organization set forth in the first paragraph of this Note and that it has the right, power and authority to execute this Note and that the same is and shall be and remain binding upon the undersigned pursuant to its terms.

6.      At any time and from time to time, without notice to or consent of the undersigned, and without affecting the undersigned's liability hereunder, Lender may accept additional makers, endorsers, guarantors and sureties and may release any party liable upon or in respect to this Note, accept additional security for this Note, release, exchange, surrender or otherwise deal with any property, personal or real, securing this Note.

7.      No waiver by Lender of any default hereunder shall operate as a waiver of any other default or of the same default on future occasions. All rights of Lender shall inure to the benefit of its successors and assigns and all obligations of the undersigned shall bind its successors and assigns. Lender's remedies under this Note shall be considered cumulative and not exclusive. Any failure by Lender to enforce at any time any term or condition under this Note shall not be construed as a waiver by Lender of this Note or the right thereafter to enforce each and every provision of this Note.

8.      The provisions of this Note shall be deemed to be several and the invalidity of any provision hereof shall not affect the validity of the remaining provisions hereof. A judicial or administrative declaration in any jurisdiction of the invalidity of any one or more of the provisions hereof shall not invalidate the remaining provisions of this Note in such jurisdiction, nor shall such declaration have any effect on the validity or interpretation of this Note outside of that jurisdiction.

9.      Governing Law, Jurisdiction, Venue and Waiver of Trial by Jury:  This Note shall be governed and construed in all respects by the internal laws and decisions of the State of Illinois (without reference to conflicts of laws principles), including, without limitation, all matters of construction, validity, enforceability, and performance. **THE UNDERSIGNED (I) CONSENTS AT LENDER'S ELECTION AND WITHOUT LIMITING LENDER'S RIGHT TO COMMENCE AN ACTION IN ANY OTHER JURISDICTION, TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY COURT (FEDERAL, STATE OR LOCAL) SITUATED IN THE COUNTY OF COOK, STATE OF ILLINOIS; (II) WAIVES ANY OBJECTION TO IMPROPER VENUE AND FORUM NON CONVENIENS; AND (III) CONSENTS TO SERVICE OF PROCESS BY CERTIFIED MAIL, POSTAGE PREPAID, ADDRESSED TO THE UNDERSIGNED AT ITS ADDRESS AS SET FORTH HEREIN. THE UNDERSIGNED HEREBY WAIVES TRIAL BY JURY.** The undersigned shall bring any action arising out of this Note only in the federal or state courts in the County of Cook, State of Illinois. In the event the undersigned institutes any action in any court other than a court located in the County of Cook, State of Illinois, the undersigned shall assume all of Lender's costs in transferring said proceeding to a court located in the County of Cook, State of Illinois, including, without limitation, reasonable attorneys' fees.

10.     The undersigned and Lender intend in this Note to expressly and legally agree upon the interest rate and manner of payment stated herein; provided, however, that if the interest rate or manner of payment exceeds the maximum allowable under applicable law, then the undersigned shall be liable only for the payment of such maximum as is allowed by law, and payments previously received from the undersigned in excess of such legal maximum shall be considered as prepayments of the undersigned's obligations hereunder and applied in accordance with paragraph 2 hereof.  This Note is subject to the express condition that at no time shall the undersigned be obligated or required to pay interest at a rate which could subject Lender or the holder of this Note to either civil or criminal liability as a result of the interest rate being in excess of the maximum interest rate which the undersigned is permitted by law to contract or agree to pay.  If by the terms of this Note, the undersigned is at any time required or obligated to pay interest at a rate in excess of such maximum rate, the interest rate of this Note shall be deemed to be immediately reduced to such maximum rate.

11.     **THE UNDERSIGNED'S PAYMENT OBLIGATIONS TO LENDER UNDER THIS NOTE SHALL BE IRREVOCABLE, ABSOLUTE AND UNCONDITIONAL, AND WILL NOT BE SUBJECT TO ANY ABATEMENT, DEFENSE, SETOFF, COUNTERCLAIM OR RECOUPMENT WHATSOEVER FOR ANY REASON.**  In addition, the undersigned shall be responsible for and will promptly pay, when due, and indemnify Lender against (without any deduction against or reduction of any payments due under this Note) all federal, state, provincial, county, city, municipal and/or other gov-

ernmental taxes, levies, assessments, charges, liens, claims or encumbrances of any nature whatsoever relating to this Note, including, but not limited to, all license and registration fees, assessments, imposts, charges, filing or recording fees, documentary stamp taxes, sales/use taxes, personal property taxes, gross receipts taxes, excise taxes, value added taxes, withholding taxes, and all other taxes which may now or hereafter be imposed or any payments to be made hereunder, whether assessed the undersigned or Lender.

**ASAP GRAPHICS, INC.**                    **ATTEST:**

By: _____            By: _____

Position: ___*President*___              Position: Secretary

### PERSONAL GUARANTY OF AMES FRIEDMAN

As additional consideration to Lender, this Personal Guaranty is given by Ames Friedman ("Guarantor"), an individual with a residence at 2022 S.W. 25 Terr, Ft Lau, FL , Florida to induce Lender to enter into the Note. Guarantor hereby unconditionally guarantees to Lender the full and prompt payment and performance by ASAP Graphics, Inc. ("Debtor") of all obligations of Debtor under the foregoing Note. This Personal Guaranty is a guaranty of payment and not a guaranty of collection. Guarantor hereby expressly waives all defenses which might constitute a legal or equitable discharge of a surety or guarantor, and agrees that this Personal Guaranty shall be valid and unconditionally binding upon Guarantor in any event and under all circumstances. This Personal Guaranty shall continue to be effective or reinstated, as the case may be, if at any time any payment of any indebtedness by Debtor to Lender is rescinded or must otherwise be returned by Lender upon the insolvency, bankruptcy or reorganization of Debtor or otherwise, all as though such payment had not been made. In evidence of his Personal Guaranty, Guarantor hereby adopts (and acknowledges that he is bound by) the Note all to the same extent and with the same force and effect as if Guarantor executed the Note and all references to Debtor were references to Guarantor.

**AMES FRIEDMAN**

_____
In his individual capacity

N:\AGMT\6309002A.doc

09/16/2005  10:02:20 AM  Page 1

ASAP Graphics, Inc.  SUL-0209R2 Customer

Compound Period ......... :  Monthly

Nominal Annual Rate .... :  6.790 %

*Revised Pymt Schedule*

CASH FLOW DATA

| Event | Date | Amount | Number | Period | End Date |
|-------|------|--------|--------|--------|----------|
| 1  Loan | 05/14/2005 | 1,713,537.92 | 1 | | |
| 2  Loan | 11/14/2005 | 15,972.88 | 1 | | |
| 3  Payment | 11/14/2005 | 34,051.08 | 36 | Monthly | 10/14/2008 |
| 4  Payment | 11/14/2008 | 29,041.63 | 31 | Monthly | 05/14/2011 |

AMORTIZATION SCHEDULE - Normal Amortization, 360 Day Year

| | Date | Loan | Payment | Interest | Principal | Balance |
|---|------|------|---------|----------|-----------|---------|
| Loan | 05/14/2005 | 1,713,537.92 | | | | 1,713,537.92 |
| Loan | 11/14/2005 | 15,972.88 | | 59,003.78 | 59,003.78- | 1,788,514.58 |
| 1 | 11/14/2005 | | 34,051.08 | 0.00 | 34,051.08 | 1,754,463.50 |
| 2 | 12/14/2005 | | 34,051.08 | 9,927.34 | 24,123.74 | 1,730,339.76 |
| 2005 Totals | | 1,729,510.80 | 68,102.16 | 68,931.12 | 828.96- | |
| | | | | | | |
| 3 | 01/14/2006 | | 34,051.08 | 9,790.84 | 24,260.24 | 1,706,079.52 |
| 4 | 02/14/2006 | | 34,051.08 | 9,653.57 | 24,397.51 | 1,681,682.01 |
| 5 | 03/14/2006 | | 34,051.08 | 9,515.52 | 24,535.56 | 1,657,146.45 |
| 6 | 04/14/2006 | | 34,051.08 | 9,376.69 | 24,674.39 | 1,632,472.06 |
| 7 | 05/14/2006 | | 34,051.08 | 9,237.07 | 24,814.01 | 1,607,658.05 |
| 8 | 06/14/2006 | | 34,051.08 | 9,096.67 | 24,954.41 | 1,582,703.64 |
| 9 | 07/14/2006 | | 34,051.08 | 8,955.46 | 25,095.62 | 1,557,608.02 |
| 10 | 08/14/2006 | | 34,051.08 | 8,813.47 | 25,237.61 | 1,532,370.41 |
| 11 | 09/14/2006 | | 34,051.08 | 8,670.66 | 25,380.42 | 1,506,989.99 |
| 12 | 10/14/2006 | | 34,051.08 | 8,527.05 | 25,524.03 | 1,481,465.96 |
| 13 | 11/14/2006 | | 34,051.08 | 8,382.63 | 25,668.45 | 1,455,797.51 |
| 14 | 12/14/2006 | | 34,051.08 | 8,237.39 | 25,813.69 | 1,429,983.82 |
| 2006 Totals | | 0.00 | 408,612.96 | 108,257.02 | 300,355.94 | |
| | | | | | | |
| 15 | 01/14/2007 | | 34,051.08 | 8,091.33 | 25,959.75 | 1,404,024.07 |
| 16 | 02/14/2007 | | 34,051.08 | 7,944.44 | 26,106.64 | 1,377,917.43 |
| 17 | 03/14/2007 | | 34,051.08 | 7,796.72 | 26,254.36 | 1,351,663.07 |
| 18 | 04/14/2007 | | 34,051.08 | 7,648.16 | 26,402.92 | 1,325,260.15 |
| 19 | 05/14/2007 | | 34,051.08 | 7,498.76 | 26,552.32 | 1,298,707.83 |
| 20 | 06/14/2007 | | 34,051.08 | 7,348.52 | 26,702.56 | 1,272,005.27 |
| 21 | 07/14/2007 | | 34,051.08 | 7,197.43 | 26,853.65 | 1,245,151.62 |
| 22 | 08/14/2007 | | 34,051.08 | 7,045.48 | 27,005.60 | 1,218,146.02 |
| 23 | 09/14/2007 | | 34,051.08 | 6,892.68 | 27,158.40 | 1,190,987.62 |
| 24 | 10/14/2007 | | 34,051.08 | 6,739.00 | 27,312.08 | 1,163,675.54 |
| 25 | 11/14/2007 | | 34,051.08 | 6,584.46 | 27,466.62 | 1,136,208.92 |
| 26 | 12/14/2007 | | 34,051.08 | 6,429.05 | 27,622.03 | 1,108,586.89 |
| 2007 Totals | | 0.00 | 408,612.96 | 87,216.03 | 321,396.93 | |

ASAP Graphics, Inc.   SUL-0209R2 Customer

| | Date | Loan | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|---|
| 27 | 01/14/2008 | | 34,051.08 | 6,272.75 | 27,778.33 | 1,080,808.56 |
| 28 | 02/14/2008 | | 34,051.08 | 6,115.58 | 27,935.50 | 1,052,873.06 |
| 29 | 03/14/2008 | | 34,051.08 | 5,957.51 | 28,093.57 | 1,024,779.49 |
| 30 | 04/14/2008 | | 34,051.08 | 5,798.54 | 28,252.54 | 996,526.95 |
| 31 | 05/14/2008 | | 34,051.08 | 5,638.68 | 28,412.40 | 968,114.55 |
| 32 | 06/14/2008 | | 34,051.08 | 5,477.91 | 28,573.17 | 939,541.38 |
| 33 | 07/14/2008 | | 34,051.08 | 5,316.24 | 28,734.84 | 910,806.54 |
| 34 | 08/14/2008 | | 34,051.08 | 5,153.65 | 28,897.43 | 881,909.11 |
| 35 | 09/14/2008 | | 34,051.08 | 4,990.14 | 29,060.94 | 852,848.17 |
| 36 | 10/14/2008 | | 34,051.08 | 4,825.70 | 29,225.38 | 823,622.79 |
| 37 | 11/14/2008 | | 29,041.63 | 4,660.33 | 24,381.30 | 799,241.49 |
| 38 | 12/14/2008 | | 29,041.63 | 4,522.37 | 24,519.26 | 774,722.23 |
| 2008 Totals | | 0.00 | 398,594.06 | 64,729.40 | 333,864.66 | |
| 39 | 01/14/2009 | | 29,041.63 | 4,383.64 | 24,657.99 | 750,064.24 |
| 40 | 02/14/2009 | | 29,041.63 | 4,244.11 | 24,797.52 | 725,266.72 |
| 41 | 03/14/2009 | | 29,041.63 | 4,103.80 | 24,937.83 | 700,328.89 |
| 42 | 04/14/2009 | | 29,041.63 | 3,962.69 | 25,078.94 | 675,249.95 |
| 43 | 05/14/2009 | | 29,041.63 | 3,820.79 | 25,220.84 | 650,029.11 |
| 44 | 06/14/2009 | | 29,041.63 | 3,678.08 | 25,363.55 | 624,665.56 |
| 45 | 07/14/2009 | | 29,041.63 | 3,534.57 | 25,507.06 | 599,158.50 |
| 46 | 08/14/2009 | | 29,041.63 | 3,390.24 | 25,651.39 | 573,507.11 |
| 47 | 09/14/2009 | | 29,041.63 | 3,245.09 | 25,796.54 | 547,710.57 |
| 48 | 10/14/2009 | | 29,041.63 | 3,099.13 | 25,942.50 | 521,768.07 |
| 49 | 11/14/2009 | | 29,041.63 | 2,952.34 | 26,089.29 | 495,678.78 |
| 50 | 12/14/2009 | | 29,041.63 | 2,804.72 | 26,236.91 | 469,441.87 |
| 2009 Totals | | 0.00 | 348,499.56 | 43,219.20 | 305,280.36 | |
| 51 | 01/14/2010 | | 29,041.63 | 2,656.26 | 26,385.37 | 443,056.50 |
| 52 | 02/14/2010 | | 29,041.63 | 2,506.96 | 26,534.67 | 416,521.83 |
| 53 | 03/14/2010 | | 29,041.63 | 2,356.82 | 26,684.81 | 389,837.02 |
| 54 | 04/14/2010 | | 29,041.63 | 2,205.83 | 26,835.80 | 363,001.22 |
| 55 | 05/14/2010 | | 29,041.63 | 2,053.98 | 26,987.65 | 336,013.57 |
| 56 | 06/14/2010 | | 29,041.63 | 1,901.28 | 27,140.35 | 308,873.22 |
| 57 | 07/14/2010 | | 29,041.63 | 1,747.71 | 27,293.92 | 281,579.30 |
| 58 | 08/14/2010 | | 29,041.63 | 1,593.27 | 27,448.36 | 254,130.94 |
| 59 | 09/14/2010 | | 29,041.63 | 1,437.96 | 27,603.67 | 226,527.27 |
| 60 | 10/14/2010 | | 29,041.63 | 1,281.77 | 27,759.86 | 198,767.41 |
| 61 | 11/14/2010 | | 29,041.63 | 1,124.69 | 27,916.94 | 170,850.47 |
| 62 | 12/14/2010 | | 29,041.63 | 966.73 | 28,074.90 | 142,775.57 |
| 2010 Totals | | 0.00 | 348,499.56 | 21,833.26 | 326,666.30 | |
| 63 | 01/14/2011 | | 29,041.63 | 807.87 | 28,233.76 | 114,541.81 |
| 64 | 02/14/2011 | | 29,041.63 | 648.12 | 28,393.51 | 86,148.30 |
| 65 | 03/14/2011 | | 29,041.63 | 487.46 | 28,554.17 | 57,594.13 |
| 66 | 04/14/2011 | | 29,041.63 | 325.89 | 28,715.74 | 28,878.39 |
| 67 | 05/14/2011 | | 29,041.63 | 163.24 | 28,878.39 | 0.00 |
| 2011 Totals | | 0.00 | 145,208.15 | 2,432.58 | 142,775.57 | |

ASAP Graphics, Inc.  SUL-0209R2 Customer

| Date | Loan | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| Grand Totals | 1,729,510.80 | 2,126,129.41 | 396,618.61 | 1,729,510.80 | |

ASAP Graphics, Inc.    SUL-0209R2 Customer

Last interest amount decreased by 0.16 due to rounding.

a subsidiary of ▲▲ Mitsubishi Corporation

**MAC FUNDING CORPORATION**

1500 Michael Drive
Wood Dale, Illinois 60191
Tel: (630) 238-5600
Fax: (630) 238-5603

June 18, 2007

ASAP Graphics, Inc.
500 Southwest 21st Terrace
Fort Lauderdale, Florida 33312

08CV4179

JUDGE DER-YEGHIAYAN

MAGISTRATE JUDGE KEYS

TG

Attention: Mr. Ames Friedman, President

Re:     Equipment Lease Agreement – SUL-0209

Dear Mr. Friedman:

As you know, ASAP Graphics, Inc. ("ASAP") and MAC Funding Corporation ("MAC Funding") entered into Equipment Lease Agreement No. SUL-0209 dated on or about December 4, 2003 (the "Lease"). ASAP acknowledges and agrees that the Lease is presently in default and that MAC Funding has all of the rights set forth in the Lease including the right to foreclose upon and retake possession of the Mitsubishi Press and other items of equipment that are the subject of the Lease (collectively, the "Collateral"). ASAP has requested MAC Funding to forebear from taking any actions and/or instituting any proceedings to foreclose upon MAC Funding's interests in the Collateral. Furthermore, ASAP has requested MAC Funding to agree to reschedule the monthly payments to be made by ASAP pursuant to the Lease. MAC Funding has agreed to grant the financial accommodations requested by ASAP as hereinafter set forth, subject to and conditioned upon ASAP's (a) execution of this letter agreement, (b) execution and delivery of the agreements and documents required and/or otherwise set forth herein; and (c) performance of each and all of the obligations set forth herein and the agreements and documents attached to or referenced in this letter agreement.

Based upon the foregoing, and the promises, accommodations and undertakings of each of the parties as set forth hereinafter, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.     **Confirmation**.  ASAP hereby acknowledges and agrees that the Lease and all documents executed in connection therewith are valid and binding agreements, and are and remain in full force and effect pursuant to their terms, as amended to date. No default by MAC Funding exists under the Lease and MAC Funding has and shall continue to have and retain all the rights and remedies provided therein and under applicable law, without any defense or right of setoff of any nature whatsoever in favor of ASAP. In furtherance hereof, ASAP acknowledges that it has accepted the Collateral for all purposes under the Lease and hereby waives and releases any and all claims and causes of action against MAC Funding and the seller(s) of the Collateral relative to the Collateral and the performance and/or non-performance thereof. ASAP has defaulted and is presently in default under the Lease by, among other things, failing to make the monthly rental payments as specifically set forth therein.

2.     **Obligations of ASAP**.   In order to induce MAC Funding to grant the financial accommodations set forth in Paragraph 6 hereof, ASAP hereby agrees as follows:

Mr. Ames Friedman, President
ASAP Graphics, Inc.
Page 2

(a)    To further secure the payment of ASAP's obligations to MAC Funding under the Lease, and any and all other obligations due and owing, or that may become due and owing, from ASAP to MAC Funding (now or hereafter existing or arising, in the aggregate being referred to as the "Obligations"), ASAP shall cause (i) the mortgage attached hereto as Schedule "A" relative to the real property located at 2022 SW 25th, Fort Lauderdale, Florida (the "Mortgage") to be executed by the mortgagors noted therein and delivered to MAC Funding, and have such mortgagor(s) execute personal guarantees relative to the indebtedness outstanding under the Lease (such guarantee(s) to be in form and substance acceptable to MAC Funding); and (ii) the security agreement attached hereto as Schedule "B" (the "Security Agreement") to be executed and delivered to MAC Funding. The Mortgage, Guarantee(s) and Security Agreement shall be and remain in full force and effect and shall not be discharged or satisfied until such time as the Obligations have been paid in full to MAC Funding and MAC Funding shall have released the Mortgage, Guarantee(s) and Security Agreement. In furtherance hereof, ASAP, at its sole cost and expense, shall procure and deliver to MAC Funding a title insurance policy relative to the mortgaged premises and independent appraisals of the mortgaged premises (conducted by an MAI appraiser) current within three (3) months of the date hereof. In addition, upon the demand of MAC Funding, ASAP shall cause Ames Friedman (and any other owner) to execute and record a mortgage upon the real property located at Lot 5 Staniel Cay, Bahamas.

(b)    MAC Funding's security interest and lien upon the Collateral shall be and remain in full force and effect and shall not be discharged or satisfied as to any individual item of Collateral until such time as the Obligations have been paid in full to MAC Funding and MAC Funding shall have filed a release or termination statement as to any item of Collateral.

(c)    ASAP acknowledges and agrees that ASAP has only made scheduled leased payments through June 14, 2006 and that ASAP has been delinquent in payments for a period in excess of one year. As of June 18, 2007, (1) $1,699,509.48 in principal plus (2) $22,680.60 in late charges remained outstanding and absolutely and unconditionally due and owing to MAC Funding under the Lease. The parties hereby agree to amend the payment schedule set forth in the Lease as set forth herein. Accordingly, ASAP hereby agrees to pay the outstanding principal balance of $1,699,509.48 remaining payable under the Lease plus interest at the rate of 6.790% per annum to MAC Funding in weekly installments of principal and interest as follows:

(i)    the amount of $34,000.00 (being the sum of $27,000.00 in delinquent payments, plus $7,000.00 as a weekly payment due on June 18, 2007) concurrently with the execution of this letter agreement;

Mr. Ames Friedman, President
ASAP Graphics, Inc.
Page 3

      (ii)      the amount of $7,000.00 per week (weekly payments) commencing on Monday, June 25, 2007 and continuing thereafter on each Monday of each succeeding week thereafter through and including November 26, 2007;

      (iii)     the amount of $9,000.00 per week (weekly payments) commencing on Monday, December 3, 2007 and continuing thereafter on each Monday of each succeeding week thereafter through and including May 12, 2008;

      (iv)     the amount of $9,800.00 per week (weekly payments) commencing on Monday, May 19, 2008 and continuing thereafter on each Monday of each succeeding week thereafter through and including May 2, 2011; and

      (v)     the amount of $13,184.34 on Monday, May 9, 2011.

Each such weekly payment shall be due and payable on each Monday of each calendar week. An amortization schedule setting forth each of the payments required to be made by ASAP pursuant to subparagraphs (ii) through (v) above is attached hereto. ASAP shall make each and every payment required thereunder as and when due as set forth above and pursuant to the amortization schedule.

In addition to the foregoing payments, ASAP shall pay the sum of $22,680.60 in accrued late charges on or prior to June 18, 2008.

3.     **Ownership/Additional Documents.** ASAP hereby acknowledges and agrees that (a) MAC Funding is, and shall continue to be and remain, the owner of the Collateral until such time as provided in the Lease; (b) the Lease and Collateral covered thereby are, and shall be and remain, subject to the existing interests of MAC Funding (including ownership and security interests) in and to the same and that any and all UCC-1 filings made in connection therewith are and shall remain in full force and effect. Furthermore, in the event the Lease and MAC Funding's interest therein and in the Collateral shall be deemed to be an interest in the nature of a security interest, then in such event, the Collateral is, and shall be and remain subject to the security interest of MAC Funding in and to the Collateral. ASAP shall execute and deliver to MAC Funding such other and further documents as MAC Funding may request to further perfect MAC Funding's rights, title and interest in and to the Collateral and hereby authorizes MAC Funding to file of record such documents and records as may be necessary and/or expedient to further evidence and/or perfect MAC Funding's interests of record from time to time.

Concurrently with the execution of this letter agreement, the Mortgage and the Security Agreement, ASAP hereby agrees to execute and deliver to MAC Funding such additional documents as MAC Funding may reasonably request to further confirm, perfect and/or protect MAC Funding's rights and interests in and to the Collateral in form and substance satisfactory to MAC Funding, including but not limited to, the following documents:

      (a)     Declaration and Waiver Agreement relating to the ASAP Premises (as hereinafter defined);

      (b)     Request for insurance/insurance certificates;

Mr. Ames Friedman, President
ASAP Graphics, Inc.
Page 4

     (c)     Certified copies of Resolutions (i) authorizing the execution of this letter agreement and all documents and agreements referenced herein by ASAP, and (ii) confirming the authority of ASAP to execute the Security Agreement; and

     (d)     Incumbency Certificates.

4.     **ASAP Representations and Warranties**

ASAP hereby represents and warrants that:

     (a)     ASAP is a corporation organized and existing under the laws of the State of Florida, and is in good standing;

     (b)     The transactions contemplated by this letter agreement have been duly authorized by ASAP and its directors as required by applicable law and/or its organizational documents;

     (c)     The execution and delivery of this letter agreement and any other documents in connection herewith do not and shall not constitute a breach of, or default under, any of ASAP's organizational documents or other agreement to which ASAP is a party, or is otherwise bound;

     (d)     The Collateral covered by the Lease is and shall remain at the premises located at 500 Southwest 21st Terrace, Fort Lauderdale, Florida (the "ASAP Premises") and shall not be removed or otherwise transferred therefrom without the express prior consent of MAC Funding; and

     (e)     ASAP shall not change, amend or otherwise alter its company name, change the form of its business or the form of its organization or the state of its organization or merge with or into any third party without the express written consent of MAC Funding, which consent shall not be unreasonably withheld.

5.     **Default.** In the event that ASAP shall fail to make any payment to MAC Funding as and when due hereunder or otherwise, ASAP shall be in default under the Lease, this letter agreement and any other documents or instruments executed in connection herewith (including, but not limited to, the Mortgage and Security Agreement), and MAC Funding shall have the right to accelerate each and every payment due or to become due under this letter agreement, the Lease, the Mortgage and Security Agreement, and thereupon such amounts shall be immediately due and payable in full to MAC Funding. Upon default, MAC Funding shall have all of the rights set forth in the foregoing agreements, and as otherwise provided by applicable law.

6.     **Effect.** Except as specifically set forth herein, (a) the execution of this letter agreement and any documents related hereto shall in no manner limit, restrict or otherwise modify the obligations of the parties under the Lease, and any and all related documents, or other agreements entered into by and between MAC Funding and ASAP, and (b) the Lease and all such related agreements and documents shall remain in full force and effect except to the extent specifically set forth herein.

Mr. Ames Friedman, President
ASAP Graphics, Inc.
Page 5

7.      **UCC Filings.** ASAP hereby authorizes MAC Funding, its attorneys, representatives and agents to sign and/or otherwise authenticate on behalf of ASAP and file such UCC financing statements, amendments and/or other filings or records as MAC Funding may deem expedient in order to further perfect its rights and interests in, under and to the Lease, the Collateral, and the Security Agreement.

8.      **Governing Law.**  This letter agreement shall be governed by the laws of the State of Illinois without reference to conflicts of laws principles, except with respect to the Mortgage and foreclosure thereof, which shall be governed by the law of the jurisdiction in which the real property is located.

9.      **Further Documents.**

We would appreciate your immediately signing and returning the original of this letter agreement, together with all of the documents referenced herein and a check for the sum of $34,000.00 made payable to the order of MAC Funding Corporation. This letter agreement will become effective upon execution by all parties hereto and delivery of the fully executed original letter agreement, Mortgage, Security Agreement, and other all documents referenced herein to MAC Funding.

Very truly yours,

**MAC FUNDING CORPORATION**

By: _____

Title: _____ E v P

**ACKNOWLEDGED AND AGREED:**

**ASAP GRAPHICS, INC.**

By: _____

Title: _____ President

Date:  June 20, 2007

:JSP:cp:N:\_AGMT\ASAP Graphics LtrAgmtRev3.doc

Mr. Ames Friedman, President
ASAP Graphics, Inc.
Page 6

**SCHEDULE "A"**

**MORTGAGE**

**(FLORIDA PROPERTY)**

## MORTGAGE DEED

THIS MORTGAGE DEED is made as of this 18th day of June, 2007 between Ames Friedman, unmarried, with an address of 2022 SW 25th Terrace, Fort Lauderdale, Florida 33312 (hereinafter the "Borrower"), and MAC Funding Corporation, a Delaware corporation, with an address of 1500 Michael Drive, Wood Dale, Illinois 60191, Attn: Credit Department (hereinafter the "Lender").

## WITNESSETH

**WHEREAS,** ASAP Graphics, Inc. ("ASAP") is as of the date hereof justly indebted to Lender pursuant to a certain Equipment Lease Agreement, Number SUL-0209, dated on or about December 4, 2003, between ASAP and Lender (the "Lease"), and ASAP is now in default under the Lease; and

**WHEREAS,** Borrower has a substantial ownership interest in ASAP and has a financial interest in assuring the continued viability of ASAP, and accordingly (a) Borrower guaranteed ASAP's obligations under the Lease by executing a Continuing Guaranty dated on or about December 9, 2003 in favor of Lender, and (b) in order to induce Lender to grant a re-scheduling of the indebtedness due and owing to Lender, Borrower has executed a further Personal Guaranty for the Benefit of Lender dated of even date herewith, (collectively, the "Guaranty"); and

**WHEREAS,** Lender has agreed to re-schedule the indebtedness owed by ASAP to Lender; under that certain re-scheduling letter agreement dated June 18, 2007; and

**WHEREAS**, ASAP is delinquent in making required payments under the Lease and the Guaranty, and therefore, there is past due and owing upon and with respect to the Lease and Guaranty, at a minimum, the sum of approximately $431,293.56 as of June 14, 2007; and

**WHEREAS,** Borrower has agreed to execute this Mortgage in consideration of Lender agreeing to grant Borrower the aforesaid re-scheduling and certain other financial accommodations including, but not limited to, forebearance on Lender's right to foreclose on the Mitsubishi Press and related equipment that were supplied and sold to ASAP by MLP U.S.A., Inc. ("MLP") pursuant to a certain sales agreement(s) relating thereto (the "Sales Contract(s)"), such Mitsubishi Press and equipment being the subject of the Lease (collectively, the "Equipment") at this time notwithstanding; and

**WHEREAS,** Borrower has agreed to grant this Mortgage to Lender and permit the Lender to file this Mortgage against the "Property" (as defined herein) to further secure the obligations of

Borrower hereunder and under the Guaranty in the aggregate amount of $1,699,509.48 plus any additional amounts that may accrue after the date of this Mortgage under the Lease and Guaranty, including, but not limited to, principal, interest, late charges, fees, and attorneys' fees and costs, as set forth hereunder, and in the Lease and the Guaranty (in the aggregate, the "Mortgage Debt") (for avoidance of doubt, Borrower acknowledges that the term Mortgage Debt as defined herein does not necessarily constitute or include all of the amounts and obligations that may be due and owing to Lender and/or MLP, and that additional amounts and obligations may be owed, although the same may not be secured hereby); and

WHEREAS, Borrower is not aware of any judgment or judgment liens that have or will attach against the Property;

NOW THEREFORE, to secure and collateralize the performance due under and created and evidenced by the Lease and the Guaranty, and the payment of the Mortgage Debt and the performance by Borrower of all of the covenants and liabilities contained herein and in further consideration of Ten and NO/100 Dollars ($10.00) in hand paid, the receipt of which is acknowledged, Borrower does hereby by these presents, GRANT, MORTGAGE AND CONVEY to Lender, its successors and assigns the real estate and all estate, right, title and interest of Borrower therein, situated, lying and being in the City of Fort Lauderdale and State of Florida, legally described on Schedule "A" attached hereto and by this reference incorporated herein, together with all improvements, tenements, easements, hereditaments and appurtenances thereunto belonging, and all rents, issues and profits thereof for so long and during all such times as Borrower may be entitled thereto (which are pledged primarily and on a parity with said real estate and not secondarily), and all structures, buildings, additions and improvements, and replacements thereof, erected upon said real estate, including any on-site system providing electricity, heating, air conditioning, lighting, ventilation, water, and all plants and fixtures of every kind and nature whatsoever forming part of said structures or buildings or of any structures or buildings heretofore or hereafter standing on said real estate or on any part thereof or now or hereafter used in connection with the use and enjoyment of said real estate, regardless of whether physically attached thereto, and all rights of Borrower to further encumber said real estate for debt except by such encumbrance, which, by actual terms and specifically expressed intent, shall be, and at all times remain, subject and subordinate to the lien of this Mortgage. All of the above-mentioned and described real estate, property and rights are hereinafter referred to as the "Property".

BORROWER COVENANTS with Lender that Borrower is lawfully seized in fee simple of the Property; that the Property is free from all encumbrances except for prior encumbrances of record not subordinated to the lien of this Mortgage; that Borrower has good right, full power and lawful authority to convey this Mortgage to Lender and that Borrower, and the heirs, executors, representatives, and administrators of Borrower shall warrant and defend the Property to Lender and the successors and assigns of Lender forever against the claims and demands of all persons except as arise under or are created by prior encumbrances of record not subordinated to the lien of this Mortgage and that the grant and recording of this Mortgage does not violate the terms of any preceding agreement.

2

TO HAVE AND TO HOLD the Property unto Lender, and all successors and assigns of Lender, forever for the purposes and uses herein set forth.

IT IS FURTHER UNDERSTOOD AND AGREED THAT:

1.    <u>Incorporation of Recitals</u>.  The foregoing recitals are hereby incorporated and restated.

2.    <u>Obligations Relating to the Property</u>.  Borrower shall: (a) keep the Property in similar condition and repair, as of the date hereof; (b) comply with all requirements of law, and covenants and restrictions of record with respect to the Property and the use thereof; (c) not use or suffer or permit use of the Property for any purpose other than permitted by law and such covenants and restrictions; (d) pay each item of indebtedness secured by this Mortgage when due according to the terms hereof and of the Guaranty; and (e) pay all filing, recording fees and costs, transfer and financing fees/taxes and intangible taxes, incident to this Mortgage.

3.    <u>Taxes</u>.  Borrower shall pay before any penalty attaches all general real estate taxes, special taxes, special assessments, water charges, sewer service charges and all other charges against the Property when due.

4.    <u>Insurance</u>.  Borrower shall for so long as this Mortgage is in effect provide liability insurance for the Property insuring both Borrower and Lender with such limits for personal injury and death and property damage as Lender may request. Borrower shall also provide property/casualty/fire insurance for the Property with a coverage limit of not less then the full amount or value of all prior liens and encumbrances against the Property plus the amount of indebtedness secured hereby, which insurance shall indicate Lender as a loss payee and additional insured to the extent of the interest of Lender in the Property. All insurance required hereunder shall be in forms and amounts, issued by insurers satisfactory to Lender, and copies of same with current certificates shall upon request be provided to Lender.

5.    <u>Prepayment</u>.  Borrower shall have the privilege of making prepayments of the indebtedness secured hereby (in addition to the required payments) in accordance with the terms and conditions, if any, set forth in the Lease and the Guaranty, with or without penalty or premium, as therein provided.

6.    <u>Variation</u>.  If payment under the Lease or the Guaranty be extended or varied or if any part of any security therefor be released, all persons now or at any time hereafter liable therefor, or interested in the Property, shall be held to assent to such extension, variation or release, and the liability of same and the lien and all provisions hereof shall continue in full force, the right of recourse against all such persons being expressly reserved by Lender, notwithstanding such extension, variation or release.

7.    <u>Rights of Lender</u>.  In case of default herein, Lender may, but need not, make any payment or perform any act herein required of Borrower in any form and manner deemed expedient by Lender in the sole discretion of Lender and may, but need not, make full or partial payments of

3

principal or interest on prior encumbrances against the Property, if any, and purchase, discharge, compromise or settle any tax lien or other prior lien or title or claim thereof, or redeem from any tax sale or forfeiture affecting the Property or contest any tax or assessment. All monies paid for any of the purposes herein authorized and all expenses paid or incurred in connection therewith, including attorneys' fees, and all other monies advanced by Lender to protect the Property and the lien hereof, shall be so much additional indebtedness secured hereby and shall become immediately due and payable without notice and with interest thereon from the date of the disbursement. Lender in making any payment hereby authorized: (a) relating to taxes and assessments or insurance premiums, may do so according to any bill, statement or estimate procured from the appropriate office without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof; or (b) for the purchase, discharge, compromise or settlement of any other prior lien, may do so without inquiry as to the validity or amount of any claim for lien which may be asserted.

8. <u>Default</u>. If: (a) Borrower fails to pay in full the total amount of the Mortgage Debt as and when due and payable, or (b) a petition shall be filed by or against Borrower or any beneficiary of Borrower in voluntary or involuntary bankruptcy or under Chapters VII, XI, XII or XIII of the Federal Bankruptcy Act or any similar law, state or federal, whether now or hereafter existing; or (c) Borrower shall be adjudicated a bankrupt, or a trustee or a receiver shall be appointed for Borrower or for any property of Borrower, or any court shall have taken jurisdiction over any property of Borrower; or (d) Borrower shall make an assignment for the benefit of creditors, or shall admit in writing inability to pay debts generally as the same become due; or (e) default shall be made in the due observance or performance of any covenant, agreement or condition hereinbefore or hereinafter contained or required to be kept, performed or observed by Borrower and the same shall continue for thirty (30) days after written notice thereof, then and in every such case the whole of the indebtedness secured hereby shall, at once, at the option of Lender become immediately due and payable, together with all appurtenant costs and expenses and accrued interest thereon, without notice to Borrower.

9. <u>Foreclosure</u>. When the indebtedness hereby secured, or any part thereof, shall become due, whether by acceleration or otherwise, Lender shall have the right to foreclose the lien hereof for such indebtedness or part thereof. In any suit to foreclose the lien hereof, there shall be allowed and included as additional indebtedness in the decree for sale all expenditures and expenses which may be paid or incurred by or on behalf of Lender for attorneys' fees, appraisers' fees, outlays for documentary and expert evidence, stenographers' charges, publication costs, and costs (which may be estimated as to items to be expended after entry of the decree) for procuring all such abstracts of title, title searches and examinations, title insurance policies and similar data and assurances with respect to title as Lender may deem reasonably necessary either to prosecute such suit or to evidence to bidders at any sale which may be had pursuant to such decree the true condition of the title to or the value of the Property. All expenditures and expenses of the nature in this paragraph mentioned, and such expenses and fees as may be incurred in the protection of the Property and the maintenance of the lien of this Mortgage, including the fees of attorneys employed by Lender in any litigation or proceeding affecting this Mortgage, the Lease, the Guaranty or the Property, including probate and bankruptcy proceedings, or in preparations for the commencement or defense of any proceeding or

4

threatened suit or proceeding, shall be immediately due and payable by Borrower, with interest from the date of disbursement at the rates stated in the Lease and shall be secured by this Mortgage. The proceeds of any foreclosure sale of the Property shall be distributed and applied in the following order of priority: first, on account of all costs and expenses incident to the foreclosure proceedings, including all such items as are mentioned in this Mortgage; second, all other items which under the terms hereof constitute secured indebtedness additional to that created and evidenced by the Lease and Guaranty, with interest thereon as herein provided; third, all principal and interest remaining unpaid on the Lease and the Guaranty, fourth, any surplus to Borrower, or the heirs, legal representatives or assigns of Borrower, as such rights may appear.

10.    Inspection. Lender shall have the right to inspect the Property at all reasonable times and access thereto shall be permitted for that purpose.

11.    Condemnation. Borrower hereby assigns, transfers and sets over unto Lender the entire proceeds of any award or any claim for damages for any of the Property taken or damaged under the power of eminent domain or by condemnation. Lender may elect to apply said proceeds upon or in reduction of the indebtedness secured hereby, regardless of whether due, or to require Borrower to restore or rebuild. Any surplus which may remain out of said proceeds after payment of such cost of rebuilding or restoration shall, at the option of Lender, be applied on account of the indebtedness secured hereby or be paid to any other party entitled thereto. If the Property is abandoned by Borrower or if after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within thirty (30) days of the date of such notice, Lender is authorized to collect and apply the proceeds at the option of Lender either to restoration or repair of the Property or to the sums secured by this Mortgage.

12.    Release. Lender shall release this Mortgage and the lien hereof by proper instrument upon payment in full of all amounts past due and owing under and evidenced by the Lease, the Guaranty and this Mortgage.

13.    Notices. All notices required or permitted to be given hereunder shall be in writing unless otherwise herein expressly provided. Such notices shall be given by certified or registered, return receipt requested, postage pre-paid, mail, personal delivery, or recognized, commercial courier which maintains evidence of delivery, or by receipt confirmed facsimile and shall be deemed sufficiently given if addressed to the respective party at the respective addresses and telecopier numbers set forth below with a copy simultaneously given to the person listed below, if any. Regardless of the actual time of receipt, all notices between addresses in the continental United States sufficiently given are deemed given three (3) days after the postmarked date if given through the mail, on the day received if given by personal delivery or commercial courier and upon receipt of written transmission confirmation if given or made by facsimile.

If to Borrower:          Ames Friedman
                         2022 SW 25th Terrace
                         Fort Lauderdale, Florida 33312
                         Tel:    800-457-0677

Fax:    954-792-5440

If to Lender:          MAC Funding Corporation
                       1500 Michael Drive
                       Wood Dale, Illinois 60191
                       Attention: Henry Kotegawa
                       Tel:    630-238-5609
                       Fax:    630-238-5603

with a copy to:        Masuda, Funai, Eifert & Mitchell, Ltd.
                       1475 East Woodfield Road, Suite 800
                       Schaumburg, Illinois 60173
                       Attention: Joseph S. Parisi, Esq.
                       Tel:    847-734-8811
                       Fax:    847-734-1089

Both Borrower and Lender shall have the right, from time to time, by written notice to specify any other or additional addressees and/or addresses.

14.    Forbearance. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy hereunder. The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not be a waiver of the right of Lender to accelerate the maturity of the indebtedness secured by this Mortgage.

15.    Waiver. Borrower waives the benefit of and agrees not to invoke any appraisement, valuation, stay, extension or exemption laws, or any so-called "moratorium laws," now existing or hereafter enacted, in order to prevent or hinder the enforcement or foreclosure of this Mortgage. No action for the enforcement of the lien or of any provision hereof shall be subject to any defense which would not be good and available to the party interposing same in an action at law upon the Lease or Guaranty.

16.    Binding. This Mortgage and all provisions hereof shall extend to and be binding upon Borrower and all persons claiming under or through Borrower, and their heirs, executors, representatives, and administrators and the word "Borrower" when used herein shall include the singular or plural as the context may require. The word "Lender" when used herein shall include the successors and assigns of Lender named herein, and the owners/holders, from time to time, of the Lease and Guaranty.

6

17.    <u>Captions</u>.  The captions and headings of various paragraphs of this Mortgage are for convenience only and are not to be construed as defining or limiting in any way the scope or intent of the provisions hereof. Wherever used, the singular number shall include the plural and the plural the singular, and the use of any gender shall be applicable to all genders.

18.    <u>Unauthorized Transfer</u>.  Any sale, conveyance, assignment, pledge, mortgage, lease, hypothecation, encumbrance or other transfer of title to, or any interest in, or the placing of any lien upon the Property or any portion of any entity owning any interest therein (whether voluntary or by operation of law) without the prior written consent of Lender shall be an event of default hereunder.

19.    **<u>WAIVER OF TRIAL BY JURY</u>.   BORROWER AND LENDER BY ACCEPTANCE HEREOF, ACKNOWLEDGE AND AGREE THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS MORTGAGE OR WITH THE TRANSACTIONS CONTEMPLATED HEREIN WOULD BE BASED UPON DIFFICULT AND COMPLEX ISSUES. ACCORDINGLY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND LENDER HEREBY KNOWINGLY, INTENTIONALLY VOLUNTARILY AND MUTUALLY:  (A) WAIVE THE RIGHT TO TRIAL BY JURY IN ANY CIVIL ACTION, CLAIM, COUNTERCLAIM, CROSS-CLAIM, THIRD-PARTY CLAIM, DISPUTE, DEMAND, SUIT OR PROCEEDING ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS MORTGAGE, ANY MODIFICATION THERETO OR ANY CONDUCT OF ANY PARTY RELATING HERETO; AND, (B) AGREE THAT ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING SHALL BE TRIED BEFORE A JUDGE AND NOT BEFORE A JURY.**

20.    <u>Incorporation</u>.  This Mortgage incorporates into its terms, conditions and covenants, the preamble, recitals, granting clauses and the Schedules contained herein.

21.    <u>Fixture Filing</u>.  Borrower hereby authorizes Lender, at the sole discretion of Lender and at the expense of Lender, to file any Uniform Commercial Code financing statement that Lender may require or deem appropriate, including any original filing pertaining to the Property and any and all continuations, amendments, assignments, releases and terminations thereof without further signature or authorization of Lender. This Mortgage and any such Uniform Commercial Code statements, continuations, amendments, assignments, releases and terminations provided for hereunder shall be recorded and filed under the Uniform Commercial Code as adopted by the State in which the Property is situated, as amended, and cover property and equipment which are or which may become fixtures on the Property or constitute personalty.

22.    <u>Right to Deal with Transferee</u>.  In the event of the voluntary sale or transfer by operation of law, or otherwise, of all or any part of the Property, Lender is hereby authorized and empowered to deal with such vendee or transferee with reference to the Property or with reference to any of the terms or conditions hereof, as fully and to the same extent as Lender might deal with Borrower without in any way releasing or discharging Borrower from the covenants and/or undertaking hereunder and without Lender waiving any right hereunder.

23.   Covenants Run with Land.  All of the covenants hereof shall run with the land.

24.   Effect of Change in Laws Regarding Taxation.  If Lender becomes obligated to pay any tax as a result of the enactment, after the date hereof, of any law of the state in which the Property is situated, the United States or any other state having jurisdiction over this Mortgage or Borrower, deducting from the value of property for the purpose of taxation any lien thereon, or imposing upon Lender the payment of the whole or any part of any imposition herein required to be paid by Borrower, or changing in any way laws relating to the taxation of mortgages, debts secured by mortgages, the interest of Lender in the Property , or the manner of collection of taxes, so as to affect this Mortgage or the indebtedness secured hereby, Borrower upon demand by Lender, shall pay such tax or reimburse Lender therefore; provided, however that if in the opinion of legal counsel to Lender: (a) it may be unlawful to require Borrower to make such payments or reimbursement; or (b) the making of such payments or reimbursement might result in the imposition of interest beyond the maximum amount permitted by law, then Lender may elect, by notice given to Borrower, to declare all of the indebtedness secured hereby to be due and payable after sixty (60) days after the date of such notice, at which time if the indebtedness secured hereby is not fully satisfied, paid and performed, Lender shall have all of the rights, powers, remedies and recourses granted or reserved to Lender hereunder or under applicable law upon the occurrence of a default hereunder. If any law requires any documentary stamp or other tax hereon or on the Lease or the Guaranty, or requires payment of any tax upon the indebtedness secured hereby then the indebtedness secured hereby and the accrued interest thereon shall, at the election of Lender, become due and payable sixty (60) days after notice to Borrower; provided, however, said election shall be unavailing and this Mortgage and the Lease shall be and remain in effect if Borrower lawfully pays for such stamp or tax including interest and penalties thereon to or on behalf of Lender.

25.   Integration.  This Mortgage, the Lease, the Guaranty and all documents executed in conjunction therewith, fully and completely represent the final, entire and integrated expression of agreement between Lender and Borrower and supersede all prior negotiations, representations or agreements either written or oral between Lender and Borrower but only with respect to the provision by Borrower of the Property for security and collateral for the indebtedness secured hereby. This Mortgage may be amended only by an instrument of equal dignity. Borrower hereby declares and acknowledges that Borrower has received, without charge, a true copy of this Mortgage, the Lease and the Guaranty. If the recorded executed original of this Mortgage, an executed original of the Lease or an executed original of the Guaranty is lost, unavailable or damaged, for purposes of the enforcement hereof or thereof, the exercise of any right, power, remedy or recourse hereunder or thereunder or the release hereof or cancellation hereof, a copy certified as being true and correct by Lender shall be sufficient for all such purposes.

26.   Time of Essence.  Time is of the essence of this Mortgage, the Lease, and the Guaranty.

27.   Further Assurances.  Borrower, upon request of Lender from time to time, shall do or cause to be done such further acts and execute and deliver or cause to be executed and delivered such additional agreements, documents and instruments, (including a collateral assignment of specific leases or contracts) as Lender may reasonably require or deem advisable to keep valid and effective

8

the lien created hereby, to better secure the indebtedness secured hereby, to carry into effect the purposes of this Mortgage or to better assure and confirm unto Lender, the rights, powers, remedies and recourses of Lender hereunder. Upon any failure of Borrower to do so, Lender may execute, record, file, re-record or refile any and all such agreements, documents or instruments for and in the name of Borrower, and Borrower hereby irrevocably appoints Lender as agent and attorney-in-fact of Borrower for the foregoing purposes. Borrower shall be responsible for payment of all such filing and recording costs and fees.

28.    <u>Invalidity of Certain Provisions</u>.  If any term, condition or provision hereof is declared to be illegal, invalid or unenforceable for any reason whatsoever by a court of competent jurisdiction, such illegal, invalid or unenforceable term or provision shall be ineffective only to the extent of such illegality, invalidity, or unenforceability without invalidating the remainder of such term or provision, if any, and such illegality, invalidity or unenforceability shall not affect the other terms, conditions and provisions hereof, which terms, conditions and provisions shall remain binding and enforceable. If the lien created by this Mortgage is invalid or unenforceable as to any part of the indebtedness secured hereby or if such lien is invalid or unenforceable as to any part of the Property, then the unsecured or partially unsecured portion of the indebtedness secured hereby shall be completely satisfied prior to the remaining secured or partially secured portion of the indebtedness secured hereby.

29.    <u>Security Agreement</u>.  This Mortgage shall be deemed a Security Agreement as defined in the Florida Uniform Commercial Code. This Mortgage creates and Borrower hereby grants a security interest in favor of Lender in all property including all tangible and intangible personal property, fixtures and goods affecting property either referred to or described herein or in anyway connected with the use or enjoyment of the Property and all proceeds resulting therefrom.

30.    <u>Indemnification</u>.  To the fullest extent permitted by law, Borrower shall save, defend, indemnify and forever hold Lender, and its shareholders, affiliated persons, directors, officers, employees, agents and attorneys of Lender, free and forever harmless from and against all suits, actions, claims, demands, damages, losses and expenses, including the amount of all judgments, penalties, interest, court costs and attorneys' and other fees, costs and other expenses, arising out of or resulting from the operation, use or occupancy of the Property, or the entry upon the Property by any owner or holder of any mineral rights or interests the direct effect of which shall be to cause the value of the Property to be less than the amount of all prior liens and encumbrances against the Property plus the amount of the indebtedness secured hereby, or the release, threatened release, discharge, disposal, generation, presence, placement, existence, emission, escape, leakage, spillage, seepage and/or storage on the Property of any hazardous material, or the existence of any unsafe or hazardous condition on or in the Property, or any default or breach hereunder or under the Lease or the Guaranty or the exercise by Lender of any right, power, recourse and remedy hereunder or under law, or the performance of any duty hereunder by Lender or under the Lease or the Guaranty, or the construction, reconstruction or alteration of improvements to the Property, or any negligence or willful misconduct of Borrower, any lessee of the Property, or any of the agents, contractors, subcontractors, servants, employees, licensees or invitees of either, or any accident, injury, death or damage to any person or property occurring in, on or about the Property or any street, drive,

9

sidewalk, curb or passageway adjacent thereto, or any other transaction arising out of or in any way connected with the Property and this Mortgage. Any amount payable to Lender hereunder shall be payable within fifteen (15) days after the demand therefor by Lender and shall constitute additional indebtedness secured hereby and shall become immediately due and payable without notice and with interest thereon at the Default Rate from the date on which such amount is incurred until the date of repayment thereof by Borrower. The foregoing to the contrary notwithstanding, the indemnity by Borrower set forth herein shall not extend to any willful and wanton acts of Lender or the gross negligence of Lender.

31.    <u>Remedies Not Exclusive</u>.  No right, power, remedy or recourse herein conferred upon, granted or reserved to Lender is intended to be exclusive of any other right, power, remedy or recourse herein conferred upon, granted or reserved to Lender or of any other right, power, remedy or recourse conferred upon, granted or reserved to Lender under any other agreement, document or instrument or at law or in equity, but each shall be cumulative and shall be in addition to every other right, power, remedy or recourse conferred upon, granted or reserved to Lender hereunder or under the Lease or the Guaranty or now or hereafter existing at law or in equity.  Every right, power, remedy or recourse given by this Mortgage, the Lease or the Guaranty, to Lender or to which Lender may be otherwise entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Lender.

32.    <u>Waiver of Homestead Right</u>.  Borrower hereby releases and waives any and all rights he may have in the Property under and by virtue of any applicable homestead law in the State of Florida.

[Signature Page to Follow]

This Mortgage is made upon the STATUTORY CONDITION, signed effective as of the 18th day of June, 2007.

**BORROWER:**

**Ames Friedman**


By: _____


**WITNESS**                          **WITNESS**


By: _____     By: _____

Name: _____     Name: _____

Address: _____    Address: _____

Address: _____    Address: _____




N:\_AGMT\ASAP.MortgageDeed2.doc

STATE OF FLORIDA          )
                          ) SS.
COUNTY OF _Broward_       )

On the _31ˢ_ day of July, in the year 2007, before me, the undersigned, personally appeared <u>Ames Friedman</u> personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

_Lawrence C. Edmonds_
Notary Public

My Commission Expires:

_09/03/2010_

NOTARY PUBLIC-STATE OF FLORIDA
Lawrence C. Edmonds, Jr.
Commission # DD577559
Expires:   SEP. 03, 2010
BONDED THRU ATLANTIC BONDING CO., INC.

<u>Prepared By and Mail After Recording To</u>:

Joseph S. Parisi, Esq.
Masuda, Funai, Eifert & Mitchell, Ltd.
203 North LaSalle Street, Suite 2500
Chicago, Illinois 60601-1262

**Schedule A**

A portion of the South 420 feet of the North one-half of Lot 9, Block 10, according to the amended map of subdivision of Section 17, Township 50 South, Range 42 East, as recorded in Plat Book 1, Page 72 of the Public Records of Dade County, Florida, described as follows:

Commencing at the Northeast corner of the said North 100 feet of the South 420 feet of the North ½ of Lot 9, Block 10, thence South 1 22' 30" East along the East line of the said North ½ of Lot 9, Block 10, a distance of 67.24 feet to the Point of Beginning, thence continue South 01 22' 30" East, a distance of 98.76 feet, thence North 85 40' 52" West a distance of 132.75 feet, thence North 01 25' 30" West a distance of 56 feet, thence due East a distance of 4 feet, thence North 75 34' 56" East a distance of 131.54 feet to the Point of Beginning a/k/a Lot 3; said lands situate, lying and being in Broward County, Florida.

A portion of Lot 8 Block 10, Subdivision of Section 17, Township 50 South, Range 42 East, according to the Plat thereof, as

Recorded in Plat Book 1, at Page 72, of the Public Records of Dade County, Florida.  Being more particularly described as follows;

Commence at the Southwest corner of the North ½ of Lot 10, Block 10, of the Subdivision of Section 17, Township 50 South, Range 42 East, according to the Plat thereof, as recorded in Plat Book 1, at Page 72, of the Public Records of Dade County, Florida, thence run South 90 degrees 00' 00" East on an assumed bearing, along the South line of the North ½ of the aforementioned Lot 10, Block 10, for a distance of 447.76 feet to a Point, said Point being located on the West line of Lot 8, of the aforementioned Block 10; thence run North 01 degrees 22' 50" West, along the West line of the aforementioned Lot 8, for a distance of 279.02 feet to the Point of Beginning; thence continue North 01 degree 22' 50" West, a distance of 37.89 feet to a point on a non-tangent curve concave to the West Southwest, a radial through said point bearing North 55 degrees 45' 49" East, thence Southeasterly along said curve having for its elements, a radius of 32.49 feet, a delta of 20 degrees 23' 22", for a distance of 11.56 feet to a point on a non-tangent curve concave to the West.  A radial through said point bearing North 72 degrees 55' 23" East, thence Southeasterly and Southerly along said curve having for its elements, a radius of 50.70 feet, a delta of 22 degrees 03' 15" for a distance of 19.52 feet to a point on a non-tangent curve concave to the Northwest, a radial through said point bearing North 89 degrees 50' 08" East, thence Southwesterly along said curve having for its elements a radius of 8.49 feet, a delta of 71 degrees 48' 23", for a distance of 10.64 feet to the Point of Beginning.

Mr. Ames Friedman, President
ASAP Graphics, Inc.
Page 7

## SCHEDULE "B"

## SECURITY AGREEMENT

## SECURITY AGREEMENT

This Security Agreement ("Agreement") is made effective as of the 18th day of June, 2007, by and between MAC Funding Corporation, a Delaware corporation with its principal place of business at 1500 Michael Drive, Illinois 60091 ("Secured Party"), and ASAP Graphics, Inc., a Florida corporation with its principal place of business located at 500 Southwest 21st Terrace, Fort Lauderdale, Florida 33312 ("Debtor").

## WITNESSETH

WHEREAS, Secured Party and Debtor have entered into a certain Equipment Lease Agreement dated on or about December 4, 2003, designated as Equipment Lease Agreement No. SUL-0209 (the "Lease") whereby Debtor has leased from Secured Party a certain Mitsubishi Diamond 3000S 13-5 28" x 40" six (6) color sheetfed printing press together with all auxiliary equipment (collectively, the "Mitsubishi Press"); and

WHEREAS, Debtor is in default under the Lease, and Debtor has requested further and additional financial accommodations from Secured Party relative to the Lease and the payments required thereunder; and

WHEREAS, Secured Party has agreed to extend additional financial accommodations to Debtor as set forth in a certain letter agreement dated June 18, 2007 (the "Letter Agreement"); and

WHEREAS, Debtor has agreed to execute this Security Agreement in consideration of Secured Party extending such additional financial accommodations.

NOW, THEREFORE, the parties hereto hereby agree as follows:

## ARTICLE I.  GRANT OF SECURITY INTEREST

1.1    To secure any and all Indebtedness (as hereinafter defined) whatsoever owing from Debtor to Secured Party from time to time and the prompt, full and faithful performance by Debtor of any and all provisions to be kept, observed or performed and/or payments to be made by Debtor under this Agreement, the Letter Agreement and the Lease, Debtor hereby grants to Secured Party a continuing security interest in and to all of the following described personal property of Debtor whether now existing and/or owned and/or hereafter arising and/or acquired: (a) all accounts, accounts receivable, contract rights, instruments, documents, chattel paper, intangibles (including, but not limited to causes of action, general intangibles and payment intangibles, tax refunds and insurance proceeds) and other obligations or indebtedness owed to Debtor from whatever source arising; all rights of Debtor to receive any payments in money or kind; all guaranties of the foregoing and security therefor; all of the right, title and interest of Debtor in and with respect to the goods, software, services, or other property that give rise to or that secure any of the foregoing and insurance policies and proceeds relating thereto, and all rights of Debtor as an unpaid seller, lessor, licensor or other provider of goods, software and services, including, but not limited to, the rights of stoppage in transit, replevin, reclamation, and resale; and all of the foregoing, whether now owned or existing or hereafter created or acquired (collectively the "Accounts"); (b) all goods, software, merchandise, and other personal property

now owned or hereafter acquired by Debtor that are held for sale, lease, rental or license, or are furnished or to be furnished under any contract of service or are raw materials, work-in-process, finished goods, supplies or materials used or consumed in Debtor's business, and all products thereof, and all substitutions, replacements, additions, or accessions thereto (collectively the "Inventory"); (c) all machinery, equipment, furniture, vehicles and fixtures, now owned or hereafter acquired by Debtor and used or acquired for use in Debtor's business, together with all accessions thereto and all substitutions and replacements thereof and parts therefor and additions thereto (collectively the "Equipment"); (d) all cash and non-cash proceeds (as defined in the Uniform Commercial Code in effect from time to time) of any of the foregoing, including insurance proceeds; (e) all ledger sheets, files, records, documents, and instruments (including, but not limited to, computer programs, tapes and related electronic data processing software) evidencing an interest in or relating to the above; and (f) all instruments, documents, securities, monies, reserves, cash and cash equivalents and other like property, and the proceeds of any of the foregoing, owned by Debtor or in which Debtor has an interest, which now or hereafter are at any time in the possession or control of Secured Party or in transit by mail or carrier to or in the possession of any third party acting on behalf of Secured Party, without regard to whether Secured Party received said in pledge, for safekeeping, as agent for collection or transmission or otherwise or accounts of Debtor with Secured Party against which Secured Party may exercise its right of set-off. All the foregoing personal property is hereinafter sometimes individually and collectively referred to as "Collateral." For the purposes of this Agreement, "Indebtedness" shall mean any and all indebtedness, financial obligations and payments due and owing under the Lease, the Letter Agreement and any and all other notes, loans, advances and other financial accommodations of any nature whatsoever made by Secured Party to Debtor and all other obligations and liabilities of Debtor to Secured Party, whether now existing or hereafter incurred or created, whether voluntary or involuntary, whether due or not due, whether absolute or contingent, and/or whether incurred directly or acquired by Secured Party by assignment or otherwise.

1.2    Debtor shall execute and deliver to Secured Party, at any time and from time to time hereafter at the request of Secured Party, all agreements, instruments, documents and other written matter (hereinafter individually and collectively, referred to as "Supplemental Documentation") that Secured Party reasonably may request, in form and substance acceptable to Secured Party, to perfect, further perfect and/or maintain perfected Secured Party's security interest in the Collateral and to consummate the transaction contemplated in or by this Agreement and any other agreements now existing or hereafter entered into by and between Secured Party and Debtor. Debtor hereby irrevocably makes, constitutes and appoints Secured Party (and all persons designated by Secured Party for this purpose) as Debtor's true and lawful attorney (and agent-in-fact) to sign the name of Debtor to the Supplemental Documentation and to deliver the Supplemental Documentation to such persons as Secured Party in its own absolute discretion may elect. Debtor hereby appoints Secured Party as its attorney in fact, and authorizes Secured Party to, (i) sign/authenticate on behalf of Debtor such additional documents/records as may be required from time to time to create, amend, extend, continue, maintain or perfect the security interest described herein or otherwise granted to or retained by Secured Party and (ii) to make/undertake any filings or registrations with governmental officials or offices and take such other actions as Secured Party deems appropriate to perfect, amend, continue and maintain the perfection of the security interest created hereby or otherwise granted to or retained by Secured Party. In addition, Debtor hereby ratifies any filings made against Debtor by Secured Party prior to the date hereof.

1.3    Secured Party (by any of its officers, employees and/or agents) shall have the right at any time or times during Debtor's usual business hours to inspect the Collateral and all related records (and the premises upon which the Collateral is located) and to verify the amount and condition thereof or any other matter relating to the Collateral.

1.4    Debtor warrants and represents to and covenants with Secured Party that the Debtor keeps the Collateral and Debtor's books and records concerning the Collateral, at the Debtor's principal place of business noted above, and Debtor shall not remove such books and records and/or the Collateral therefrom and shall not keep any such books and records and/or the Collateral in any other office or location unless the same is within the continental United States of America and Debtor gives Secured Party written notice thereof at least 10 days prior thereto. By written notice delivered to Secured Party at least 10 days prior thereto, Debtor shall advise Secured Party of Debtor's opening of any new office or place of business or its closing of any existing office or place of business and any new office or place of business shall be within the continental United States of America.

1.5    Subject to any security interests having priority over Secured Party's interests, Debtor shall receive, as the sole and exclusive property of Secured Party and as trustee for Secured Party, all monies, checks, notes, drafts and all other payments constituting proceeds of Collateral which come into the possession or control of Debtor (or any of its shareholders, directors, officers, members, managers, employees, agents or those persons acting for or in concert with Debtor) and immediately upon receipt thereof, Debtor shall remit the same (or cause the same to be remitted) in kind, to Secured Party at such place as may be designated by Secured Party, or to any agent or agents appointed by Secured Party.

1.6    Secured Party, at any time Debtor is in default of this Agreement, in its sole and absolute discretion, may take control of, in any manner, and may endorse Debtor's name to any items constituting proceeds described in paragraph 1.5 above. For the purposes of this paragraph, Debtor hereby irrevocably makes, constitutes and appoints Secured Party (and all persons designated by Secured Party for this purpose) as Debtor's true and lawful attorney and agent-in-fact with power, without notice to Debtor, to take such actions.

1.7    Secured Party in its sole and absolute discretion, without waiving or releasing any obligation, liability or duty of Debtor under this Agreement, or any other agreements or any event of default, may, but shall be under no obligation to, at any time or times hereafter, pay (and/or acquire or accept any assignment of any security interest, lien, encumbrance) any claim asserted by any person against the Collateral. All sums paid by Secured Party in respect thereof and all costs, fees and expenses, including reasonable attorney's fees, court costs, expenses and other charges relating thereto, incurred by Secured Party on account thereof shall be a part of the Indebtedness and shall be payable to Secured Party on demand.

1.8    No authorization given by Secured Party pursuant to this Agreement, or any other agreement between Secured Party and Debtor to sell any specified portion of Collateral or any items thereof and no waiver by Secured Party in connection therewith shall establish a custom or constitute a waiver of any prohibition contained in such agreements against such sales with respect to any portion of the Collateral or any item thereof not covered by said authorization.

Debtor shall not have any right to sell or otherwise transfer the Collateral, unless and until Secured Party has been paid in full all amounts due and owing to Secured Party.

## ARTICLE II.  WARRANTIES, REPRESENTATIONS AND COVENANTS

2.1     Debtor warrants, represents and covenants that (i) Debtor is a registered organization and Debtor's state of organization is the state set forth in the introductory paragraph above; and (ii) Debtor shall not change its form of business or organization, change or in any way amend or alter its legal name or change its place of business without providing Secured Party at least thirty (30) days prior written notice thereof.

2.2     Debtor shall at all times properly care for and maintain the Collateral in accordance with manufacturer's(s') recommendations. Debtor, at its sole cost and expense, shall keep and maintain the Collateral insured for its full insurable value against loss or damage by fire, theft, explosion, sprinklers and all other hazards and risks ordinarily insured against by other owners or users of such properties and similar businesses. All such policies of insurance shall be in form and with insurers and shall be in such amounts as may be reasonably satisfactory to Secured Party. Debtor shall deliver to Secured Party the original (or certified copy) of each policy of insurance, or certificate of insurance and evidence of payment of all premiums for each such policy. Such policies of insurance shall contain an endorsement, in form and substance acceptable to Secured Party, showing loss payable to Secured Party and provide that all such insurance companies will give Secured Party at least 30 days prior written notice before any such policies of insurance shall be altered or canceled and that no act or default of Debtor or any other person shall affect the right of Secured Party to recover under such policy or policies of insurance in case of any loss or damage. In the event Debtor at any time hereafter shall fail to obtain or maintain any of the policies of insurance required above or to pay any premium in whole or in part relating thereto, Secured Party, without waiving or releasing any obligation of, or event of default by Debtor hereunder, may (but shall be under no obligation to do so) at any time thereafter obtain and maintain such policies of insurance and pay such premiums and take such actions with respect thereto which Secured Party deems advisable. All sums disbursed by Secured Party, including reasonable attorneys' fees, court costs, expenses and other charges relating thereto, shall be part of the Indebtedness, and shall be payable to Secured Party by Debtor on demand.

2.3     Debtor shall promptly pay, when due, all federal, state, county, city, municipal and/or other governmental taxes, levies, assessments, charges, liens, claims or encumbrances of any nature whatsoever (the "Charges"). In the event Debtor, at any time or times hereafter, shall fail to pay any Charge or to obtain discharges thereof, Secured Party may without waiving or releasing any obligations or liability of Debtor hereunder or any Event of Default, in its sole and absolute discretion at any time or times thereafter make such payment, or any part thereof, or obtain discharges and take any other action with respect thereto which Secured Party deems advisable. All sums so paid by Secured Party and any expenses, reasonable attorneys' fees, court costs and other charges relating thereto shall be part of the Indebtedness and shall be payable by Debtor to Secured Party on demand.

2.4     Debtor shall keep books of account and prepare financial statements and shall cause to be furnished to Secured Party the following (all of the foregoing and following to be kept and prepared in accordance with generally accepted accounting principles consistently

applied: (a) as soon as available, but not more than ninety (90) days after the close of each fiscal year of Debtor, financial statements for such fiscal year, including a balance sheet of Debtor and related statements of operations for such fiscal year, and a reconciliation of capital for such fiscal year; (b) concurrently with the delivery of the financial statements described in subparagraph (a) above, a certificate of the Debtor's certified public accountants certifying to Secured Party that based upon their review of the affairs of Debtor, performed in connection with the preparation of said financial statements, they are not aware of the occurrence or existence of any condition or event which constitutes or would, upon notice or lapse of time or both, constitute an event of default or, if they are aware thereof, the nature thereof; and (c) such other data and information (financial or otherwise) as Secured Party may from time to time reasonably request bearing upon the Collateral, Debtor's financial condition and/or results of operations.

2.5    The Collateral shall at all times be and remain personal property and shall not be affixed or attached to any real property in such a manner so as to become, or be deemed to be, a fixture. Any fixture filings undertaken by Secured Party shall be precautionary and shall not be deemed to constitute an admission that the Collateral has become a fixture.

2.6    (a)    **DEBTOR ACKNOWLEDGES AND AGREES THAT SECURED PARTY MAKES NO WARRANTIES WHATSOEVER, RELATING TO THE COLLATERAL, AND HEREBY DISCLAIMS ANY AND ALL WARRANTIES OF ANY NATURE WHATSOEVER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, VALUE, TITLE, COMPLIANCE WITH SPECIFICATIONS, DESIGN, CONDITION, CAPACITY, DURABILITY, QUALITY OF MATERIAL OR WORKMANSHIP, CONFORMITY OF ANY DESCRIPTION OR PATENT INFRINGEMENT. SECURED PARTY IS NOT RESPONSIBLE FOR ANY REPAIRS OR SERVICE TO THE COLLATERAL, DEFECTS THEREIN OR FAILURES IN THE OPERATION THEREOF. SECURED PARTY SHALL NOT BE LIABLE FOR ANY DAMAGES WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER. DEBTOR EXPRESSLY ACKNOLWEDGES THAT (A) SECURED PARTY DID NOT SELECT, MANUFACTURE OR SUPPLY THE COLLATERAL; (B) SECURED PARTY IS ONLY FINANCING THE COLLATERAL AND (C) DEBTOR HAS MADE THE SELECTION OF THE SUPPLIER OF THE COLLATERAL AND EACH ITEM OF THE COLLATERAL BASED ON ITS OWN JUDGMENT AND EXPRESSLY DISCLAIMS ANY RELIANCE UPON ANY STATEMENTS OR REPRESENTATIONS MADE BY SECURED PARTY. DEBTOR SHALL BE SOLELY RESPONSIBLE TO ARRANGE FOR AND EFFECT THE SHIPMENT, DELIVERY AND INSTALLATION OF THE COLLATERAL AT THE LOCATION INDICATED ABOVE. IN NO EVENT WILL SECURED PARTY BE LIABLE TO DEBTOR FOR ANY LOSS OR DAMAGE WHATSOEVER ARISING FROM OR IN CONNECTION WITH THE SHIPMENT, DELIVERY OR INSTALLATION OF THE COLLATERAL OR ANY DELAY OR FAILURE IN CONNECTION THEREWITH.**

2.7    Debtor has not granted and will not grant any security interest in any of the Collateral to any person other than Secured Party, and has not executed and will not execute any security agreement or financing statement covering any of the Collateral except to Secured Party,

with the exception of the existing, security interests (which security interests have been previously been granted and perfected prior to the date hereof).

2.8     Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral.

2.9     Debtor will promptly notify Secured Party in writing of any event which affects the value of the Collateral, the ability of Debtor or Secured Party to dispose of the Collateral, or the rights and remedies of Secured Party in relation thereto, including, but not limited to, the levy of any legal process against the Collateral.

## ARTICLE III.  DEFAULT

3.1     The occurrence of any one of the following events shall constitute a default ("Event of Default") by Debtor under this Agreement:  (a) if Debtor fails or neglects to perform, keep or observe any term, provision, condition, covenant, warranty or representation (other than a payment or pecuniary obligation) contained in this Agreement, the Lease, the Letter Agreement or any other agreements with Secured Party which is required to be performed, kept or observed by Debtor; (b) if any statement (including any financial statements and/or part thereof), report or certificate made or delivered by Debtor, or any of its officers, employees or agents, to Secured Party is not true and correct; (c) if Debtor fails to pay any of the Indebtedness to Secured Party, when due and payable or declared due and payable or Debtor becomes insolvent or is otherwise unable to pay its debts as they mature; (d) if the Collateral is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes within the possession of any receiver, trustee, custodian, or assignee for the benefit of creditors; (e) if a petition under any section or chapter of the Bankruptcy Reform Act of 1978 or any similar law or regulation shall be filed by Debtor or if Debtor shall make an assignment for the benefit of its creditors, or if any case or proceeding is filed by Debtor for its dissolution or liquidation; (f) if Debtor is enjoined, restrained, or in any way prevented by court or administrative order from conducting all or any material part of its business affairs or if a petition under any section or chapter of the Bankruptcy Reform Act of 1978 or any similar law or regulation is filed against Debtor or if any cause or proceeding is filed against Debtor for its dissolution or liquidation and such injunction, restraint or petition is not dismissed or stayed with ten (10) days after the entry or filing thereof; (g) if an application is made by any person other than Debtor for the appointment of a receiver, trustee, or custodian for the Collateral and the same is not dismissed within ten (10) days after the application therefor; (i) if a notice of lien, levy or assessment is filed of record with respect to the Collateral by the United States or any department, agency or instrumentality thereof or by any state, county, municipal or other governmental agency, including with limitation, the Pension Benefit Guaranty Corporation, or if any taxes or debts, owing at any time or times hereafter to any one of them becomes a lien or encumbrance upon the Collateral and the same is not released with ten (10) days after the same becomes a lien or encumbrance; (j) the loss or suspension of any licenses or permits required to operate Debtor's business as presently conducted; or (k) the occurrence of a default or an event of default under any other agreement between Secured Party and Debtor.

3.2     All of Secured Party's rights and remedies under this Agreement and any other agreement are cumulative and non-exclusive.

3.3     Upon an Event of Default, Secured Party, in its sole and absolute discretion, may: (a) declare any and all Indebtedness secured hereby immediately due and payable, whereupon

the Indebtedness shall be and become immediately due and payable; (b) exercise any one or more of the rights and remedies accruing to a secured party, and enforce this Agreement and the security interest granted herein under the Uniform Commercial Code of the relevant state or states and any other applicable law upon default by a debtor; (c) require Debtor, immediately upon demand by Secured Party, to assemble the Collateral and make it available to Secured Party at Debtor's principal place of business; (d) enter, with or without process of law and without breach of the peace, any premises where the Collateral or the books and records of Debtor related thereto are or may be located, and without charge or liability to Secured Party therefor, seize and remove the Collateral (and copies of Debtor's books and records in any way related to the Collateral) from said premises, and Debtor hereby grants Secured Party a security interest in said books and records for the purpose above stated; and (e) sell or otherwise dispose of the Collateral at public or private sale for cash or credit, provided, however, that Debtor shall be credited with the net proceeds of such sale only when such proceeds are actually received by Secured Party.

3.4    Debtor recognizes that in the event Debtor fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, or any other agreement with Secured Party, no remedy at law will provide adequate relief to Secured Party, and agrees that Secured Party shall be entitled to temporary and permanent injunctive relief as may be provided by law in any such case without the necessity of proving actual damages.

3.5    Any notice required to be given by Secured Party of a sale, lease, other disposition of the Collateral or any other intended action by Secured Party, deposited in the United States mail, postage prepaid and duly addressed to Debtor at the address specified at the beginning of this Agreement not less than ten (10) days prior to such proposed action, shall constitute commercially reasonable and fair notice to Debtor thereof.

3.6    In the event Secured Party seeks possession of the Collateral through replevin or other court process, Debtor hereby irrevocably waives any bond, surety or security required as an incident to such possession.

3.7    Secured Party's right to possession shall not be affected or obviated in any manner by reason of any claims asserted by Debtor of any nature whatsoever, including specifically, but not limited to, any defense of setoff, abatement, recoupment or any claim or counterclaim, including, but not limited to, any claim of breach of warranty or contract.  In furtherance thereof, Secured Party may enter upon Debtor's premises and remove the Collateral and/or disable or render the Collateral unusable, whether electronically or by any other means available to Secured Party.  Further, Secured Party may require Debtor to assemble the Collateral and make it available for removal by Secured Party at a place designated by Secured Party.

## ARTICLE IV.  GENERAL

4.1    Debtor waives the right to direct the application of any and all payments at any time or times hereafter received by Secured Party on account of the Indebtedness and Debtor agrees that Secured Party shall have the continuing exclusive right to apply and re-apply any and all such payments in such manner as Secured Party may deem advisable, notwithstanding any entry by Secured Party upon any of its books and records, so long as such application is not contrary to the terms of this Agreement and the Lease.

4.2    This Agreement may not be modified, altered or amended except by an agreement in writing signed by Debtor and Secured Party. Debtor may not sell, assign or transfer this Agreement or any portion hereof, including without limitation Debtor's rights, interests, remedies, powers and/or duties hereunder without the prior written consent of Secured Party.

4.3    Secured Party's failure at any time hereafter to require strict performance by Debtor of any provision of this Agreement, the Lease or any other agreement between the parties shall not waive, affect or diminish any right of Secured Party thereafter to demand strict compliance and performance herewith or therewith. Any suspension or wavier by Secured Party of an Event of Default by Debtor under this Agreement or any other agreement shall not suspend, waive or affect any other Event of Default by Debtor under this Agreement, or any other agreement, whether the same is prior or subsequent thereto and whether of the same or of a different type. None of the undertakings, agreements, warranties, covenants and representations of Debtor contained in this Agreement and no Event of Default by Debtor under this Agreement, or any other agreement shall be deemed to have been suspended or waived by Secured Party unless such suspension or wavier is by an instrument in writing signed by an officer of Secured Party and directed to Debtor specifying such suspension or waiver.

4.4    If any provision of this Agreement, the Lease or any other agreement or the application thereof to any person or circumstance is held invalid or unenforceable, the remainder of this Agreement, the Lease and any other agreement and the application of such provision to other persons or circumstances will not be affected thereby and the provisions of this Agreement, the Lease and any other agreement shall be severable in any such instance.

4.5    This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Debtor and Secured Party. This provision, however, shall not be deemed to modify paragraph 4.4 hereof.

4.6    Except as otherwise provided in this Agreement and except as otherwise provided in any other agreement by specific reference to the applicable provision of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision of any other agreement, the terms, conditions and provisions of this Agreement shall control and govern and be enforced.

4.7    Except to the extent provided to the contrary in this Agreement, the Lease and in any other agreements, no termination or cancellation (regardless of cause or procedure) of this Agreement, the Lease or any other agreement shall in any way affect or impair the power, obligations, duties, rights and liabilities of Debtor or Secured Party in any way or respect relating to (i) any transaction or event occurring prior to such termination or cancellation, (ii) the Collateral and/or (iii) any of the undertakings, agreements, covenants, warranties and representations of Debtor contained in this Agreement, the Lease or in the other agreements.  All such undertakings, agreements, covenants, warranties and representations shall survive such termination or cancellation.

4.8    Except as otherwise specifically provided in this Agreement, Debtor waives any and all notice or demands which Debtor might be entitled to receive with respect to this Agreement by virtue of any applicable statute or law, and waives presentment, demand and

protest and notice of presentment, protest default, dishonor, non-payment, maturity, release, compromise, settlement, extension or renewal of any or all accounts and guaranties at any time held by Secured Party on which Debtor may in any way be liable.

4.9    Governing Law, Jurisdiction, Venue and Waiver of Trial by Jury.  This Security Agreement will be governed and construed in all respects by the internal laws and decisions, other than any conflict of laws provisions, of the State of Illinois, including, without limitation, all matters of construction, validity, enforceability, and performance. **DEBTOR (I) CONSENTS AT SECURED PARTY'S ELECTION AND WITHOUT LIMITING SECURED PARTY'S RIGHT TO COMMENCE AN ACTION IN ANY OTHER JURISDICTION, TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY COURT (FEDERAL, STATE OR LOCAL) SITUATED IN THE COUNTY OF COOK, STATE OF ILLINOIS; (II) WAIVES ANY OBJECTION TO IMPROPER VENUE AND FORUM NON CONVENIENS; AND (III) CONSENTS TO SERVICE OF PROCESS BY CERTIFIED MAIL, POSTAGE PREPAID, ADDRESSED TO DEBTOR AT ITS ADDRESS AS SET FORTH HEREIN. DEBTOR HEREBY WAIVES TRIAL BY JURY.**  Debtor shall bring any action arising out of this Security Agreement or the Lease only in the federal or state courts located in the County of Cook, State of Illinois.  In the event Debtor institutes any action in any court other than a court located in the County of Cook, State of Illinois, Debtor shall assume all of Secured Party's costs in transferring said proceeding to a court located in the County of Cook, State of Illinois, including, without limitation, reasonable attorneys' fees.  In any action arising out of or in connection with this Security Agreement, or the Lease, the prevailing party shall be entitled to recover its reasonable attorneys' fees and all costs and expenses incurred in connection with such action, in addition to any other relief to which it may be entitled.

4.10    If at any time or times hereafter Secured Party:  (a) employs counsel for advice or other representation (i) to represent Secured Party in any litigation, contest, dispute, suit or proceeding or to commence, defend or intervene or to take any other action in or with respect to any litigation, contest, dispute, suit or proceedings (whether instituted by Secured Party, Debtor or any other person) in any way or respect relating to the Collateral or this Agreement or (ii) in the event of default, to enforce any rights of Secured Party against Debtor or any other person which may be obligated to Secured Party by virtue of this Agreement or the Lease including, without limitation, any account debtor; (b) takes any action to protect, collect, sell, liquidate or otherwise dispose of the Collateral; and/or (c) attempts to or enforces any of Secured Party's rights or remedies under this Agreement, including, without limitation, Secured Party's right or remedies with respect to the Collateral, the reasonable costs and expenses incurred by Secured Party in any manner or way with respect to the foregoing, shall be part of Debtor's liabilities and indebtedness to Secured Party, payable by Debtor to Secured Party on demand.  Without limiting the generality of the foregoing, such expenses, costs, charges and fees include reasonable: (i) attorneys' fees, paralegal fees, costs and expenses; (ii) accountants' and other experts' fees, costs and expenses; (iii) court costs and expenses; (iv) court reporter fees, costs and expenses; (v) long distance telephone charges; and (vi) telegram charges.

4.11    Debtor releases Secured Party from any and all causes of action or claims which Debtor may now or hereafter have for any asserted loss or damage to Debtor claimed to be caused by or arising from any failure of Secured Party to protect, enforce or collect in whole or in part any of the Collateral so long as Secured Party complies with the Uniform Commercial Code.

4.12    To the extent that Secured Party receives any payment on account from Debtor's liabilities, or any proceeds of Collateral are applied on account of Debtor's liabilities, and any such payment(s) and/or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, subordinated and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common or equitable cause, then, to the extent of such payment(s) or proceeds received, Debtor's liabilities to Secured Party or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment(s) and/or proceeds had not been received by Secured Party and applied on account of Debtor's liabilities and indebtedness.

4.13    All costs, fees and expenses incurred by Secured Party, or for which Secured Party becomes obligated, in connection with the inspection of the Collateral or any related records (collectively, the "Inspection Costs") shall be paid by Secured Party unless an Event of Default has occurred, in which case all Inspection Costs shall be paid by Debtor.

4.14    In the event that Debtor shall contest Secured Party's right to possession in any action relating to the Collateral, Debtor shall post a bond in the amount of two times the sales price or value (whichever is greater) of the Collateral to protect Secured Party's interest therein. Secured Party shall not be required to post any bond or other forms of security in connection with any action for the repossession or replevin of, or otherwise relating to, the Collateral.

4.15    Debtor waives any and all claims for punitive damages relating to the Collateral, the Documents, this Agreement, the relationship of the parties and any other matters related thereto.

4.16    To the extent that any security interest granted hereby is valid as a purchase money security interest, the same shall take effect according to the terms of this Agreement as a purchase money security interest. To the extent that any obligation secured hereby cannot validly be secured by a purchase money security interest, it shall nevertheless be secured by the security interest provided herein as a non-purchase money security interest.

4.17    This Agreement shall take effect upon signature/authentication and shall remain in full force and effect for so long as Debtor remains in any way indebted or obligated to Secured Party. This Agreement may be terminated only by written agreement signed/authenticated by Secured Party. Any filing(s) undertaken by Secured Party relative hereto may only be terminated/released by the filing by Secured Party of a termination/release statement with the Secretary of State (or other appropriate filing office) of the state(s) where Secured Party has previously filed any such financing statements. No other party, including Debtor, shall have the right to file such termination statement, and any such filing by any third party is not authorized by Secured Party and shall be null, void, and of no force or effect whatsoever. Any termination statement filed relative hereto shall not have any effect upon any other agreement or filing between the parties hereto.

4.18    All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

4.19    All terms not specifically defined herein shall have the definitions and meanings set forth in the Uniform Commercial Code, as presently in effect, and as hereafter amended from time to time.  To the extent that any defined term used herein is more restrictive than the same term as used in the Uniform Commercial Code, the scope and definition of such defined term shall be expanded and enlarged to encompass the definition set forth in the Uniform Commercial Code, it being the intent of the parties that the rights and remedies granted to Secured Party shall be as broad and as comprehensive as allowed by applicable law.

**IN WITNESS WHEREOF,** this Agreement has been duly executed as of the day and year specified at the beginning hereof.

**DEBTOR:**                                              **SECURED PARTY:**
**ASAP GRAPHICS, INC.**                       **MAC FUNDING CORPORATION**


By: _____        By: _____
        Ames Friedman
Position: <u>President</u>_____        Position: _____


Accepted as of the 18th day of June, 2007.


N:\AGMT\ASAP Blanket.doc

- 11 -

ASAP

Compound Period ......... :  Weekly

Nominal Annual Rate .... :  6.790 %

*Weekly basis Customer*

CASH FLOW DATA

| | Event | Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|---|
| 1 | Loan | 12/15/2006 | 1,736,055.91 | 1 | | |
| 2 | Payment | 12/26/2006 | (1) 5,000.00 ✓ | 1 | | |
| 3 | Payment | 12/29/2006 | (2) 5,000.00 ✓ | 1 | | |
| 4 | Payment | 01/26/2007 | (3) 6,000.00 ✓ | 1 | | |
| 5 | Payment | 01/29/2007 | (4) 6,000.00 ✓ | 1 | | |
| 6 | Payment | 01/30/2007 | (5) 6,000.00 ✓ | 1 | | |
| 7 | Payment | 01/31/2007 | (6) 6,000.00 ✓ | 1 | | |
| 8 | Payment | 03/16/2007 | (7) 6,000.00 ✓ | 1 | | |
| 9 | Payment | 03/20/2007 | (8) 6,000.00 ✓ | 1 | | |
| 10 | Payment | 03/21/2007 | (9) 6,000.00 ✓ | 1 | | |
| 11 | Payment | 03/30/2007 | (10) 18,000.00 ✓ | 1 | | |
| 12 | Payment | 04/24/2007 | (11) 6,000.00 ✓ | 1 | | |
| 13 | Payment | 05/03/2007 | (12) 6,000.00 ✓ | 1 | | |
| 14 | Payment | 05/31/2007 | (13) 6,000.00 ✓ | 1 | | |
| 15 | Payment | 06/01/2007 | 27,000.00 | 1 | | |
| 16 | Payment | 06/04/2007 | 5,000.00 | 2 | Weekly | 06/11/2007 |
| 17 | Payment | 06/18/2007 | 7,000.00 | 24 | Weekly | 11/26/2007 |
| 18 | Payment | 12/03/2007 | 9,000.00 | 24 | Weekly | 05/12/2008 |
| 19 | Payment | 05/19/2008 | 9,800.00 | 155 | Weekly | 05/02/2011 |
| 20 | Payment | 05/09/2011 | 7,810.38 | 1 | | |

*Received (Actual receipt date) $88,000*

*(Requested $25K + $2k lat*

AMORTIZATION SCHEDULE - Normal Amortization, 360 Day Year

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| Loan | 12/15/2006 | | | | 1,736,055.91 |
| 1 | 12/26/2006 | 5,000.00 | 3,578.36 | 1,421.64 | 1,734,634.27 |
| 2 | 12/29/2006 | 5,000.00 | 981.51 | 4,018.49 | 1,730,615.78 |
| 2006 Totals | | 10,000.00 | 4,559.87 | 5,440.13 | |
| 3 | 01/26/2007 | 6,000.00 | 9,056.86 | 3,056.86- | 1,733,672.64 |
| 4 | 01/29/2007 | 6,000.00 | 980.97 | 5,019.03 | 1,728,653.61 |
| 5 | 01/30/2007 | 6,000.00 | 326.04 | 5,673.96 | 1,722,979.65 |
| 6 | 01/31/2007 | 6,000.00 | 324.97 | 5,675.03 | 1,717,304.62 |
| 7 | 03/16/2007 | 6,000.00 | 14,151.32 | 8,151.32- | 1,725,455.94 |
| 8 | 03/20/2007 | 6,000.00 | 1,301.76 | 4,698.24 | 1,720,757.70 |
| 9 | 03/21/2007 | 6,000.00 | 324.55 | 5,675.45 | 1,715,082.25 |
| 10 | 03/30/2007 | 18,000.00 | 2,887.31 | 15,112.69 | 1,699,969.56 |
| 11 | 04/24/2007 | 6,000.00 | 7,955.57 | 1,955.57- | 1,701,925.13 |
| 12 | 05/03/2007 | 6,000.00 | 2,865.16 | 3,134.84 | 1,698,790.29 |
| 13 | 05/31/2007 | 6,000.00 | 8,890.31 | 2,890.31- | 1,701,680.60 |
| 14 | 06/01/2007 | 27,000.00 | 320.96 | 26,679.04 | 1,675,001.56 |
| 15 | 06/04/2007 | 5,000.00 | 947.77 | 4,052.23 | 1,670,949.33 |

ASAP

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 16 | 06/11/2007 | 5,000.00 | 2,181.87 | 2,818.13 | 1,668,131.20 |
| 17 | 06/18/2007 | 7,000.00 | 2,178.19 | 4,821.81 | 1,663,309.39 |
| 18 | 06/25/2007 | 7,000.00 | 2,171.90 | 4,828.10 | 1,658,481.29 |
| 19 | 07/02/2007 | 7,000.00 | 2,165.59 | 4,834.41 | 1,653,646.88 |
| 20 | 07/09/2007 | 7,000.00 | 2,159.28 | 4,840.72 | 1,648,806.16 |
| 21 | 07/16/2007 | 7,000.00 | 2,152.96 | 4,847.04 | 1,643,959.12 |
| 22 | 07/23/2007 | 7,000.00 | 2,146.63 | 4,853.37 | 1,639,105.75 |
| 23 | 07/30/2007 | 7,000.00 | 2,140.29 | 4,859.71 | 1,634,246.04 |
| 24 | 08/06/2007 | 7,000.00 | 2,133.95 | 4,866.05 | 1,629,379.99 |
| 25 | 08/13/2007 | 7,000.00 | 2,127.59 | 4,872.41 | 1,624,507.58 |
| 26 | 08/20/2007 | 7,000.00 | 2,121.23 | 4,878.77 | 1,619,628.81 |
| 27 | 08/27/2007 | 7,000.00 | 2,114.86 | 4,885.14 | 1,614,743.67 |
| 28 | 09/03/2007 | 7,000.00 | 2,108.48 | 4,891.52 | 1,609,852.15 |
| 29 | 09/10/2007 | 7,000.00 | 2,102.10 | 4,897.90 | 1,604,954.25 |
| 30 | 09/17/2007 | 7,000.00 | 2,095.70 | 4,904.30 | 1,600,049.95 |
| 31 | 09/24/2007 | 7,000.00 | 2,089.30 | 4,910.70 | 1,595,139.25 |
| 32 | 10/01/2007 | 7,000.00 | 2,082.88 | 4,917.12 | 1,590,222.13 |
| 33 | 10/08/2007 | 7,000.00 | 2,076.46 | 4,923.54 | 1,585,298.59 |
| 34 | 10/15/2007 | 7,000.00 | 2,070.03 | 4,929.97 | 1,580,368.62 |
| 35 | 10/22/2007 | 7,000.00 | 2,063.60 | 4,936.40 | 1,575,432.22 |
| 36 | 10/29/2007 | 7,000.00 | 2,057.15 | 4,942.85 | 1,570,489.37 |
| 37 | 11/05/2007 | 7,000.00 | 2,050.70 | 4,949.30 | 1,565,540.07 |
| 38 | 11/12/2007 | 7,000.00 | 2,044.23 | 4,955.77 | 1,560,584.30 |
| 39 | 11/19/2007 | 7,000.00 | 2,037.76 | 4,962.24 | 1,555,622.06 |
| 40 | 11/26/2007 | 7,000.00 | 2,031.28 | 4,968.72 | 1,550,653.34 |
| 41 | 12/03/2007 | 9,000.00 | 2,024.80 | 6,975.20 | 1,543,678.14 |
| 42 | 12/10/2007 | 9,000.00 | 2,015.69 | 6,984.31 | 1,536,693.83 |
| 43 | 12/17/2007 | 9,000.00 | 2,006.57 | 6,993.43 | 1,529,700.40 |
| 44 | 12/24/2007 | 9,000.00 | 1,997.44 | 7,002.56 | 1,522,697.84 |
| 45 | 12/31/2007 | 9,000.00 | 1,988.29 | 7,011.71 | 1,515,686.13 |
| 2007 Totals | | 328,000.00 | 113,070.35 | 214,929.65 | |
| 46 | 01/07/2008 | 9,000.00 | 1,979.14 | 7,020.86 | 1,508,665.27 |
| 47 | 01/14/2008 | 9,000.00 | 1,969.97 | 7,030.03 | 1,501,635.24 |
| 48 | 01/21/2008 | 9,000.00 | 1,960.79 | 7,039.21 | 1,494,596.03 |
| 49 | 01/28/2008 | 9,000.00 | 1,951.60 | 7,048.40 | 1,487,547.63 |
| 50 | 02/04/2008 | 9,000.00 | 1,942.39 | 7,057.61 | 1,480,490.02 |
| 51 | 02/11/2008 | 9,000.00 | 1,933.18 | 7,066.82 | 1,473,423.20 |
| 52 | 02/18/2008 | 9,000.00 | 1,923.95 | 7,076.05 | 1,466,347.15 |
| 53 | 02/25/2008 | 9,000.00 | 1,914.71 | 7,085.29 | 1,459,261.86 |
| 54 | 03/03/2008 | 9,000.00 | 1,905.46 | 7,094.54 | 1,452,167.32 |
| 55 | 03/10/2008 | 9,000.00 | 1,896.20 | 7,103.80 | 1,445,063.52 |
| 56 | 03/17/2008 | 9,000.00 | 1,886.92 | 7,113.08 | 1,437,950.44 |
| 57 | 03/24/2008 | 9,000.00 | 1,877.63 | 7,122.37 | 1,430,828.07 |
| 58 | 03/31/2008 | 9,000.00 | 1,868.33 | 7,131.67 | 1,423,696.40 |
| 59 | 04/07/2008 | 9,000.00 | 1,859.02 | 7,140.98 | 1,416,555.42 |
| 60 | 04/14/2008 | 9,000.00 | 1,849.69 | 7,150.31 | 1,409,405.11 |
| 61 | 04/21/2008 | 9,000.00 | 1,840.36 | 7,159.64 | 1,402,245.47 |
| 62 | 04/28/2008 | 9,000.00 | 1,831.01 | 7,168.99 | 1,395,076.48 |

ASAP

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 63 | 05/05/2008 | 9,000.00 | 1,821.65 | 7,178.35 | 1,387,898.13 |
| 64 | 05/12/2008 | 9,000.00 | 1,812.27 | 7,187.73 | 1,380,710.40 |
| 65 | 05/19/2008 | 9,800.00 | 1,802.89 | 7,997.11 | 1,372,713.29 |
| 66 | 05/26/2008 | 9,800.00 | 1,792.45 | 8,007.55 | 1,364,705.74 |
| 67 | 06/02/2008 | 9,800.00 | 1,781.99 | 8,018.01 | 1,356,687.73 |
| 68 | 06/09/2008 | 9,800.00 | 1,771.52 | 8,028.48 | 1,348,659.25 |
| 69 | 06/16/2008 | 9,800.00 | 1,761.04 | 8,038.96 | 1,340,620.29 |
| 70 | 06/23/2008 | 9,800.00 | 1,750.54 | 8,049.46 | 1,332,570.83 |
| 71 | 06/30/2008 | 9,800.00 | 1,740.03 | 8,059.97 | 1,324,510.86 |
| 72 | 07/07/2008 | 9,800.00 | 1,729.51 | 8,070.49 | 1,316,440.37 |
| 73 | 07/14/2008 | 9,800.00 | 1,718.97 | 8,081.03 | 1,308,359.34 |
| 74 | 07/21/2008 | 9,800.00 | 1,708.42 | 8,091.58 | 1,300,267.76 |
| 75 | 07/28/2008 | 9,800.00 | 1,697.85 | 8,102.15 | 1,292,165.61 |
| 76 | 08/04/2008 | 9,800.00 | 1,687.27 | 8,112.73 | 1,284,052.88 |
| 77 | 08/11/2008 | 9,800.00 | 1,676.68 | 8,123.32 | 1,275,929.56 |
| 78 | 08/18/2008 | 9,800.00 | 1,666.07 | 8,133.93 | 1,267,795.63 |
| 79 | 08/25/2008 | 9,800.00 | 1,655.45 | 8,144.55 | 1,259,651.08 |
| 80 | 09/01/2008 | 9,800.00 | 1,644.81 | 8,155.19 | 1,251,495.89 |
| 81 | 09/08/2008 | 9,800.00 | 1,634.16 | 8,165.84 | 1,243,330.05 |
| 82 | 09/15/2008 | 9,800.00 | 1,623.50 | 8,176.50 | 1,235,153.55 |
| 83 | 09/22/2008 | 9,800.00 | 1,612.83 | 8,187.17 | 1,226,966.38 |
| 84 | 09/29/2008 | 9,800.00 | 1,602.13 | 8,197.87 | 1,218,768.51 |
| 85 | 10/06/2008 | 9,800.00 | 1,591.43 | 8,208.57 | 1,210,559.94 |
| 86 | 10/13/2008 | 9,800.00 | 1,580.71 | 8,219.29 | 1,202,340.65 |
| 87 | 10/20/2008 | 9,800.00 | 1,569.98 | 8,230.02 | 1,194,110.63 |
| 88 | 10/27/2008 | 9,800.00 | 1,559.23 | 8,240.77 | 1,185,869.86 |
| 89 | 11/03/2008 | 9,800.00 | 1,548.47 | 8,251.53 | 1,177,618.33 |
| 90 | 11/10/2008 | 9,800.00 | 1,537.70 | 8,262.30 | 1,169,356.03 |
| 91 | 11/17/2008 | 9,800.00 | 1,526.91 | 8,273.09 | 1,161,082.94 |
| 92 | 11/24/2008 | 9,800.00 | 1,516.11 | 8,283.89 | 1,152,799.05 |
| 93 | 12/01/2008 | 9,800.00 | 1,505.29 | 8,294.71 | 1,144,504.34 |
| 94 | 12/08/2008 | 9,800.00 | 1,494.46 | 8,305.54 | 1,136,198.80 |
| 95 | 12/15/2008 | 9,800.00 | 1,483.61 | 8,316.39 | 1,127,882.41 |
| 96 | 12/22/2008 | 9,800.00 | 1,472.75 | 8,327.25 | 1,119,555.16 |
| 97 | 12/29/2008 | 9,800.00 | 1,461.88 | 8,338.12 | 1,111,217.04 |
| 2008 Totals | | 494,400.00 | 89,930.91 | 404,469.09 | |
| 98 | 01/05/2009 | 9,800.00 | 1,450.99 | 8,349.01 | 1,102,868.03 |
| 99 | 01/12/2009 | 9,800.00 | 1,440.09 | 8,359.91 | 1,094,508.12 |
| 100 | 01/19/2009 | 9,800.00 | 1,429.18 | 8,370.82 | 1,086,137.30 |
| 101 | 01/26/2009 | 9,800.00 | 1,418.24 | 8,381.76 | 1,077,755.54 |
| 102 | 02/02/2009 | 9,800.00 | 1,407.30 | 8,392.70 | 1,069,362.84 |
| 103 | 02/09/2009 | 9,800.00 | 1,396.34 | 8,403.66 | 1,060,959.18 |
| 104 | 02/16/2009 | 9,800.00 | 1,385.37 | 8,414.63 | 1,052,544.55 |
| 105 | 02/23/2009 | 9,800.00 | 1,374.38 | 8,425.62 | 1,044,118.93 |
| 106 | 03/02/2009 | 9,800.00 | 1,363.38 | 8,436.62 | 1,035,682.31 |
| 107 | 03/09/2009 | 9,800.00 | 1,352.36 | 8,447.64 | 1,027,234.67 |
| 108 | 03/16/2009 | 9,800.00 | 1,341.33 | 8,458.67 | 1,018,776.00 |
| 109 | 03/23/2009 | 9,800.00 | 1,330.29 | 8,469.71 | 1,010,306.29 |

ASAP

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 110 | 03/30/2009 | 49,000 | 9,800.00 | 1,319.23 | 8,480.77 | 1,001,825.52 |
| 111 | 04/06/2009 | | 9,800.00 | 1,308.15 | 8,491.85 | 993,333.67 |
| 112 | 04/13/2009 | | 9,800.00 | 1,297.06 | 8,502.94 | 984,830.73 |
| 113 | 04/20/2009 | 39,200 | 9,800.00 | 1,285.96 | 8,514.04 | 976,316.69 |
| 114 | 04/27/2009 | | 9,800.00 | 1,274.84 | 8,525.16 | 967,791.53 |
| 115 | 05/04/2009 | | 9,800.00 | 1,263.71 | 8,536.29 | 959,255.24 |
| 116 | 05/11/2009 | | 9,800.00 | 1,252.57 | 8,547.43 | 950,707.81 |
| 117 | 05/18/2009 | 39,200 | 9,800.00 | 1,241.41 | 8,558.59 | 942,149.22 |
| 118 | 05/25/2009 | | 9,800.00 | 1,230.23 | 8,569.77 | 933,579.45 |
| 119 | 06/01/2009 | | 9,800.00 | 1,219.04 | 8,580.96 | 924,998.49 |
| 120 | 06/08/2009 | | 9,800.00 | 1,207.83 | 8,592.17 | 916,406.32 |
| 121 | 06/15/2009 | 49,000 | 9,800.00 | 1,196.62 | 8,603.38 | 907,802.94 |
| 122 | 06/22/2009 | | 9,800.00 | 1,185.38 | 8,614.62 | 899,188.32 |
| 123 | 06/29/2009 | | 9,800.00 | 1,174.13 | 8,625.87 | 890,562.45 |
| 124 | 07/06/2009 | | 9,800.00 | 1,162.87 | 8,637.13 | 881,925.32 |
| 125 | 07/13/2009 | 39,200 | 9,800.00 | 1,151.59 | 8,648.41 | 873,276.91 |
| 126 | 07/20/2009 | | 9,800.00 | 1,140.30 | 8,659.70 | 864,617.21 |
| 127 | 07/27/2009 | | 9,800.00 | 1,128.99 | 8,671.01 | 855,946.20 |
| 128 | 08/03/2009 | | 9,800.00 | 1,117.67 | 8,682.33 | 847,263.87 |
| 129 | 08/10/2009 | | 9,800.00 | 1,106.33 | 8,693.67 | 838,570.20 |
| 130 | 08/17/2009 | 49,000 | 9,800.00 | 1,094.98 | 8,705.02 | 829,865.18 |
| 131 | 08/24/2009 | | 9,800.00 | 1,083.61 | 8,716.39 | 821,148.79 |
| 132 | 08/31/2009 | | 9,800.00 | 1,072.23 | 8,727.77 | 812,421.02 |
| 133 | 09/07/2009 | | 9,800.00 | 1,060.83 | 8,739.17 | 803,681.85 |
| 134 | 09/14/2009 | 39,200 | 9,800.00 | 1,049.42 | 8,750.58 | 794,931.27 |
| 135 | 09/21/2009 | | 9,800.00 | 1,038.00 | 8,762.00 | 786,169.27 |
| 136 | 09/28/2009 | | 9,800.00 | 1,026.56 | 8,773.44 | 777,395.83 |
| 137 | 10/05/2009 | | 9,800.00 | 1,015.10 | 8,784.90 | 768,610.93 |
| 138 | 10/12/2009 | | 9,800.00 | 1,003.63 | 8,796.37 | 759,814.56 |
| 139 | 10/19/2009 | 39,200 | 9,800.00 | 992.14 | 8,807.86 | 751,006.70 |
| 140 | 10/26/2009 | | 9,800.00 | 980.64 | 8,819.36 | 742,187.34 |
| 141 | 11/02/2009 | | 9,800.00 | 969.13 | 8,830.87 | 733,356.47 |
| 142 | 11/09/2009 | | 9,800.00 | 957.59 | 8,842.41 | 724,514.06 |
| 143 | 11/16/2009 | 49,000 | 9,800.00 | 946.05 | 8,853.95 | 715,660.11 |
| 144 | 11/23/2009 | | 9,800.00 | 934.49 | 8,865.51 | 706,794.60 |
| 145 | 11/30/2009 | | 9,800.00 | 922.91 | 8,877.09 | 697,917.51 |
| 146 | 12/07/2009 | | 9,800.00 | 911.32 | 8,888.68 | 689,028.83 |
| 147 | 12/14/2009 | 39,200 | 9,800.00 | 899.71 | 8,900.29 | 680,128.54 |
| 148 | 12/21/2009 | | 9,800.00 | 888.09 | 8,911.91 | 671,216.63 |
| 149 | 12/28/2009 | | 9,800.00 | 876.45 | 8,923.55 | 662,293.08 |
| 2009 Totals | | | 509,600.00 | 60,676.04 | 448,923.96 | |
| 150 | 01/04/2010 | | 9,800.00 | 864.80 | 8,935.20 | 653,357.88 |
| 151 | 01/11/2010 | 39,250 | 9,800.00 | 853.13 | 8,946.87 | 644,411.01 |
| 152 | 01/18/2010 | | 9,800.00 | 841.45 | 8,958.55 | 635,452.46 |
| 153 | 01/25/2010 | | 9,800.00 | 829.75 | 8,970.25 | 626,482.21 |
| 154 | 02/01/2010 | | 9,800.00 | 818.04 | 8,981.96 | 617,500.25 |
| 155 | 02/08/2010 | | 9,800.00 | 806.31 | 8,993.69 | 608,506.56 |
| 156 | 02/15/2010 | | 9,800.00 | 794.57 | 9,005.43 | 599,501.13 |

ASAP

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 157 | 02/22/2010 | 9,800.00 | 782.81 | 9,017.19 | 590,483.94 |
| 158 | 03/01/2010 | 9,800.00 | 771.04 | 9,028.96 | 581,454.98 |
| 159 | 03/08/2010 | 9,800.00 | 759.25 | 9,040.75 | 572,414.23 |
| 160 | 03/15/2010 | 9,800.00 | 747.44 | 9,052.56 | 563,361.67 |
| 161 | 03/22/2010 | 9,800.00 | 735.62 | 9,064.38 | 554,297.29 |
| 162 | 03/29/2010 | 9,800.00 | 723.78 | 9,076.22 | 545,221.07 |
| 163 | 04/05/2010 | 9,800.00 | 711.93 | 9,088.07 | 536,133.00 |
| 164 | 04/12/2010 | 9,800.00 | 700.07 | 9,099.93 | 527,033.07 |
| 165 | 04/19/2010 | 9,800.00 | 688.18 | 9,111.82 | 517,921.25 |
| 166 | 04/26/2010 | 9,800.00 | 676.29 | 9,123.71 | 508,797.54 |
| 167 | 05/03/2010 | 9,800.00 | 664.37 | 9,135.63 | 499,661.91 |
| 168 | 05/10/2010 | 9,800.00 | 652.44 | 9,147.56 | 490,514.35 |
| 169 | 05/17/2010 | 9,800.00 | 640.50 | 9,159.50 | 481,354.85 |
| 170 | 05/24/2010 | 9,800.00 | 628.54 | 9,171.46 | 472,183.39 |
| 171 | 05/31/2010 | 9,800.00 | 616.56 | 9,183.44 | 462,999.95 |
| 172 | 06/07/2010 | 9,800.00 | 604.57 | 9,195.43 | 453,804.52 |
| 173 | 06/14/2010 | 9,800.00 | 592.56 | 9,207.44 | 444,597.08 |
| 174 | 06/21/2010 | 9,800.00 | 580.54 | 9,219.46 | 435,377.62 |
| 175 | 06/28/2010 | 9,800.00 | 568.50 | 9,231.50 | 426,146.12 |
| 176 | 07/05/2010 | 9,800.00 | 556.45 | 9,243.55 | 416,902.57 |
| 177 | 07/12/2010 | 9,800.00 | 544.38 | 9,255.62 | 407,646.95 |
| 178 | 07/19/2010 | 9,800.00 | 532.29 | 9,267.71 | 398,379.24 |
| 179 | 07/26/2010 | 9,800.00 | 520.19 | 9,279.81 | 389,099.43 |
| 180 | 08/02/2010 | 9,800.00 | 508.07 | 9,291.93 | 379,807.50 |
| 181 | 08/09/2010 | 9,800.00 | 495.94 | 9,304.06 | 370,503.44 |
| 182 | 08/16/2010 | 9,800.00 | 483.79 | 9,316.21 | 361,187.23 |
| 183 | 08/23/2010 | 9,800.00 | 471.63 | 9,328.37 | 351,858.86 |
| 184 | 08/30/2010 | 9,800.00 | 459.45 | 9,340.55 | 342,518.31 |
| 185 | 09/06/2010 | 9,800.00 | 447.25 | 9,352.75 | 333,165.56 |
| 186 | 09/13/2010 | 9,800.00 | 435.04 | 9,364.96 | 323,800.60 |
| 187 | 09/20/2010 | 9,800.00 | 422.81 | 9,377.19 | 314,423.41 |
| 188 | 09/27/2010 | 9,800.00 | 410.56 | 9,389.44 | 305,033.97 |
| 189 | 10/04/2010 | 9,800.00 | 398.30 | 9,401.70 | 295,632.27 |
| 190 | 10/11/2010 | 9,800.00 | 386.03 | 9,413.97 | 286,218.30 |
| 191 | 10/18/2010 | 9,800.00 | 373.74 | 9,426.26 | 276,792.04 |
| 192 | 10/25/2010 | 9,800.00 | 361.43 | 9,438.57 | 267,353.47 |
| 193 | 11/01/2010 | 9,800.00 | 349.10 | 9,450.90 | 257,902.57 |
| 194 | 11/08/2010 | 9,800.00 | 336.76 | 9,463.24 | 248,439.33 |
| 195 | 11/15/2010 | 9,800.00 | 324.40 | 9,475.60 | 238,963.73 |
| 196 | 11/22/2010 | 9,800.00 | 312.03 | 9,487.97 | 229,475.76 |
| 197 | 11/29/2010 | 9,800.00 | 299.64 | 9,500.36 | 219,975.40 |
| 198 | 12/06/2010 | 9,800.00 | 287.24 | 9,512.76 | 210,462.64 |
| 199 | 12/13/2010 | 9,800.00 | 274.82 | 9,525.18 | 200,937.46 |
| 200 | 12/20/2010 | 9,800.00 | 262.38 | 9,537.62 | 191,399.84 |
| 201 | 12/27/2010 | 9,800.00 | 249.92 | 9,550.08 | 181,849.76 |
| 2010 Totals | | 509,600.00 | 29,156.68 | 480,443.32 | |
| 202 | 01/03/2011 | 9,800.00 | 237.45 | 9,562.55 | 172,287.21 |
| 203 | 01/10/2011 | 9,800.00 | 224.97 | 9,575.03 | 162,712.18 |

ASAP

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 204 | 01/17/2011 | 9,800.00 | 212.46 | 9,587.54 | 153,124.64 |
| 205 | 01/24/2011 | 9,800.00 | 199.95 | 9,600.05 | 143,524.59 |
| 206 | 01/31/2011 | 9,800.00 | 187.41 | 9,612.59 | 133,912.00 |
| 207 | 02/07/2011 | 9,800.00 | 174.86 | 9,625.14 | 124,286.86 |
| 208 | 02/14/2011 | 9,800.00 | 162.29 | 9,637.71 | 114,649.15 |
| 209 | 02/21/2011 | 9,800.00 | 149.71 | 9,650.29 | 104,998.86 |
| 210 | 02/28/2011 | 9,800.00 | 137.10 | 9,662.90 | 95,335.96 |
| 211 | 03/07/2011 | 9,800.00 | 124.49 | 9,675.51 | 85,660.45 |
| 212 | 03/14/2011 | 9,800.00 | 111.85 | 9,688.15 | 75,972.30 |
| 213 | 03/21/2011 | 9,800.00 | 99.20 | 9,700.80 | 66,271.50 |
| 214 | 03/28/2011 | 9,800.00 | 86.54 | 9,713.46 | 56,558.04 |
| 215 | 04/04/2011 | 9,800.00 | 73.85 | 9,726.15 | 46,831.89 |
| 216 | 04/11/2011 | 9,800.00 | 61.15 | 9,738.85 | 37,093.04 |
| 217 | 04/18/2011 | 9,800.00 | 48.43 | 9,751.57 | 27,341.47 |
| 218 | 04/25/2011 | 9,800.00 | 35.70 | 9,764.30 | 17,577.17 |
| 219 | 05/02/2011 | 9,800.00 | 22.95 | 9,777.05 | 7,800.12 |
| 220 | 05/09/2011 | 7,810.38 | 10.26 | 7,800.12 | 0.00 |
| 2011 Totals | | 184,210.38 | 2,360.62 | 181,849.76 | |
| Grand Totals | | 2,035,810.38 | 299,754.47 | 1,736,055.91 | |

ASAP

Last interest amount increased by 0.07 due to rounding.

# GROUP EXHIBIT "2"

## SECURITY AGREEMENT

This Security Agreement ("Agreement") is made as of the X 9 day of December, 2003, by and between MAC Funding Corporation, a Delaware corporation with its principal place of business at 1500 Michael Drive, Wood Dale, Illinois 60191 ("Secured Party"), and ASAP Graphics, Inc., a Florida corporation with its principal place of business located at 500 Southwest 21st Terrace, Suite B102, Fort Lauderdale, Florida 33312 ("Debtor").

## ARTICLE I.  GRANT OF SECURITY INTEREST

1.1     To secure any and all Indebtedness (as hereinafter defined) whatsoever owing from Debtor to Secured Party from time to time and the prompt full and faithful performance by Debtor of any and all provisions to be kept, observed or performed and/or payments to be made by Debtor under this Agreement, and that certain Equipment Lease Agreement No. SUL0209, dated December 4, 2003, by and between Secured Party and Debtor (the "Lease"), Debtor hereby grants to Secured Party a continuing security interest in and to all of the following described personal property of Debtor whether now existing and/or owned and/or hereafter arising and/or acquired:  (a) all accounts, accounts receivable, contract rights, instruments, documents, chattel paper, intangibles (including, but not limited to causes of action, general intangibles and payment intangibles, tax refunds and insurance proceeds) and other obligations or indebtedness owed to Debtor from whatever source arising; all rights of Debtor to receive any payments in money or kind; all guaranties of the foregoing and security therefor; all of the right, title and interest of Debtor in and with respect to the goods, software, services, or other property that give rise to or that secure any of the foregoing and insurance policies and proceeds relating thereto, and all rights of Debtor as an unpaid seller, lessor, licensor or other provider of goods, software and services, including, but not limited to, the rights of stoppage in transit, replevin, reclamation, and resale; and all of the foregoing, whether now owned or existing or hereafter created or acquired (collectively the "Accounts"); (b) all goods, software, merchandise, and other personal property now owned or hereafter acquired by Debtor that are held for sale, lease, rental or license, or are furnished or to be furnished under any contract of service or are raw materials, work-in-process, finished goods, supplies or materials used or consumed in Debtor's business, and all products thereof, and all substitutions, replacements, additions, or accessions thereto (collectively the "Inventory"); (c) all machinery, equipment, furniture, vehicles and fixtures, now owned or hereafter acquired by Debtor and used or acquired for use in Debtor's business, together with all accessions thereto and all substitutions and replacements thereof and parts therefor and additions thereto (collectively the "Equipment"); (d) all cash and non-cash proceeds (as defined in the Uniform Commercial Code in effect from time to time) of any of the foregoing, including insurance proceeds; (e) all ledger sheets, files, records, documents, and instruments (including, but not limited to, computer programs, tapes and related electronic data processing software) evidencing an interest in or relating to the above; and (f) all instruments, documents, securities, monies, reserves, cash and cash equivalents and other like property, and the proceeds of any of the foregoing, owned by Debtor or in which Debtor has an interest, which now or hereafter are at any time in the possession or control of Secured Party or in transit by mail or carrier to or in the

possession of any third party acting on behalf of Secured Party, without regard to whether Secured Party received said in pledge, for safekeeping, as agent for collection or transmission or otherwise or accounts of Debtor with Secured Party against which Secured Party may exercise its right of set-off. All the foregoing personal property is hereinafter sometimes individually and collectively referred to as "Collateral." For the purposes of this Agreement, "Indebtedness" shall mean any and all indebtedness, financial obligations and payments due and owing under the Lease, and any and all other notes, loans, advances and other financial accommodations of any nature whatsoever made by Secured Party to Debtor and all other obligations and liabilities of Debtor to Secured Party, whether now existing or hereafter incurred or created, whether voluntary or involuntary, whether due or not due, whether absolute or contingent, and/or whether incurred directly or acquired by Secured Party by assignment or otherwise.

1.2     Debtor shall execute and deliver to Secured Party, at any time and from time to time hereafter at the request of Secured Party, all agreements, instruments, documents and other written matter (hereinafter individually and collectively, referred to as "Supplemental Documentation") that Secured Party reasonably may request, in form and substance acceptable to Secured Party, to perfect, further perfect and/or maintain perfected Secured Party's security interest in the Collateral and to consummate the transaction contemplated in or by this Agreement and any other agreements now existing or hereafter entered into by and between Secured Party and Debtor. Debtor hereby irrevocably makes, constitutes and appoints Secured Party (and all persons designated by Secured Party for this purpose) as Debtor's true and lawful attorney (and agent-in-fact) to sign the name of Debtor to the Supplemental Documentation and to deliver the Supplemental Documentation to such persons as Secured Party in its own absolute discretion may elect. Debtor hereby appoints Secured Party as its attorney in fact, and authorizes Secured Party to, (i) sign/authenticate on behalf of Debtor such additional documents/records as may be required from time to time to create, amend, extend, continue, maintain or perfect the security interest described herein or otherwise granted to or retained by Secured Party and (ii) to make/undertake any filings or registrations with governmental officials or offices and take such other actions as Secured Party deems appropriate to perfect, amend, continue and maintain the perfection of the security interest created hereby or otherwise granted to or retained by Secured Party. In addition, Debtor hereby ratifies any filings made against Debtor by Secured Party prior to the date hereof.

1.3     Secured Party (by any of its officers, employees and/or agents) shall have the right at any time or times during Debtor's usual business hours to inspect the Collateral and all related records (and the premises upon which the Collateral is located) and to verify the amount and condition thereof or any other matter relating to the Collateral.

1.4     Debtor warrants and represents to and covenants with Secured Party that (a) except as specifically stated at the end of this paragraph, Secured Party shall have a first priority position in the Collateral; and (b) the offices and/or locations where Debtor keeps the Collateral and Debtor's books and records concerning the Collateral, are at the location specified at the end of this paragraph and Debtor shall not remove such books and records and/or the Collateral therefrom and shall not keep any such books and records and/or the Collateral in any other office or location unless the same is within the continental United States of America and Debtor gives Secured Party written notice thereof at least 10 days prior thereto. By written notice delivered to

- 2 -

Secured Party at least 10 days prior thereto, Debtor shall advise Secured Party of Debtor's opening of any new office or place of business or its closing of any existing office or place of business and any new office or place of business shall be within the continental United States of America.

Location of Collateral, Debtor's books and records concerning Collateral, Debtor's principal place of business and all other offices and places of business: 500 Southwest 21st Terrace, Suite B102, Forth Lauderdale, Florida 33312.

1.5     Debtor shall receive, as the sole and exclusive property of Secured Party and as trustee for Secured Party, all monies, checks, notes, drafts and all other payments constituting proceeds of Collateral which come into the possession or control of Debtor (or any of its shareholders, directors, officers, members, managers, employees, agents or those persons acting for or in concert with Debtor) and immediately upon receipt thereof, Debtor shall remit the same (or cause the same to be remitted) in kind, to Secured Party at such place as may be designated by Secured Party, or to any agent or agents appointed by Secured Party.

1.6     Secured Party, at any time Debtor is in default of this Agreement, in its sole and absolute discretion, may take control of, in any manner, and may endorse Debtor's name to any items constituting proceeds described in paragraph 1.5 above.  For the purposes of this paragraph, Debtor hereby irrevocably makes, constitutes and appoints Secured Party (and all persons designated by Secured Party for this purpose) as Debtor's true and lawful attorney and agent-in-fact with power, without notice to Debtor, to take such actions.

1.7     Secured Party in its sole and absolute discretion, without waiving or releasing any obligation, liability or duty of Debtor under this Agreement, or any other agreements or any event of default, may, but shall be under no obligation to, at any time or times hereafter, pay (and/or acquire or accept any assignment of any security interest, lien, encumbrance) any claim asserted by any person against the Collateral.  All sums paid by Secured Party in respect thereof and all costs, fees and expenses, including reasonable attorney's fees, court costs, expenses and other charges relating thereto, incurred by Secured Party on account thereof shall be a part of the Indebtedness and shall be payable to Secured Party on demand.

1.8     No authorization given by Secured Party pursuant to this Agreement, or any other agreement between Secured Party and Debtor to sell any specified portion of Collateral or any items thereof and no waiver by Secured Party in connection therewith shall establish a custom or constitute a waiver of any prohibition contained in such agreements against such sales with respect to any portion of the Collateral or any item thereof not covered by said authorization. Debtor shall not have any rights to sell or otherwise transfer the Collateral, unless and until Secured Party has been paid in full all amounts due and owing to Secured Party.

## ARTICLE II. WARRANTIES, REPRESENTATIONS AND COVENANTS

2.1    Debtor warrants, represents and covenants that (i) Debtor is an individual, organization, or registered organization as indicated in the introductory paragraph above; (ii) if Debtor is a registered organization, Debtor's state of organization is the state set forth in the introductory paragraph above; (iii) Debtor's place of business (or chief executive office, if Debtor has more than one place of business) is set forth in the introductory paragraph above; (iv) if Debtor is an individual, Debtor's principal residential address is set froth in the introductory paragraph above; and (v) Debtor shall not change its form of business or organization, change or in any way amend or alter its legal name or change its residential address, place of business or chief executive office without providing Secured Party at least thirty (30) days prior written notice thereof.

2.2    Debtor shall at all times properly care for and maintain the Collateral in accordance with manufacturer's(s') recommendations. Debtor, at its sole cost and expense, shall keep and maintain the Collateral insured for its full insurable value against loss or damage by fire, theft, explosion, sprinklers and all other hazards and risks ordinarily insured against by other owners or users of such properties and similar businesses. All such policies of insurance shall be in form and with insurers and shall be in such amounts as may be reasonably satisfactory to Secured Party. Debtor shall deliver to Secured Party the original (or certified copy) of each policy of insurance, or certificate of insurance and evidence of payment of all premiums for each such policy. Such policies of insurance shall contain an endorsement, in form and substance acceptable to Secured Party, showing loss payable to Secured Party and provide that all such insurance companies will give Secured Party at least 30 days prior written notice before any such policies of insurance shall be altered or canceled and that no act or default of Debtor or any other person shall affect the right of Secured Party to recover under such policy or policies of insurance in case of any loss or damage. In the event Debtor at any time hereafter shall fail to obtain or maintain any of the policies of insurance required above or to pay any premium in whole or in part relating thereto, Secured Party, without waiving or releasing any obligation of, or event of default by Debtor hereunder, may (but shall be under no obligation to do so) at any time thereafter obtain and maintain such policies of insurance and pay such premiums and take such actions with respect thereto which Secured Party deems advisable. All sums disbursed by Secured Party, including reasonable attorneys' fees, court costs, expenses and other charges relating thereto, shall be part of the Indebtedness, and shall be payable to Secured Party by Debtor on demand.

2.3    Debtor shall promptly pay, when due, all federal, state, county, city, municipal and/or other governmental taxes, levies, assessments, charges, liens, claims or encumbrances of any nature whatsoever (the "Charges"). In the event Debtor, at any time or times hereafter, shall fail to pay any Charge or to obtain discharges thereof, Secured Party may without waiving or releasing any obligations or liability of Debtor hereunder or any Event of Default, in its sole and absolute discretion at any time or times thereafter make such payment, or any part thereof, or obtain discharges and take any other action with respect thereto which Secured Party deems advisable. All sums so paid by Secured Party and any expenses, reasonable attorneys' fees, court costs and other charges relating thereto shall be part of the Indebtedness and shall be payable by Debtor to Secured Party on demand.

2.4    Debtor shall keep books of account and prepare financial statements and shall cause to be furnished to Secured Party the following (all of the foregoing and following to be kept and prepared in accordance with generally accepted accounting principles consistently applied: (a) as soon as available, but not more than 90 days after the close of each fiscal year of Debtor, financial statements for such fiscal year, including a balance sheet of Debtor and related statements of operations for such fiscal year, and a reconciliation of capital for such fiscal year; (b) concurrently with the delivery of the financial statements described in subparagraph (a) above, a certificate of the Debtor's certified public accountants certifying to Secured Party that based upon their review of the affairs of Debtor, performed in connection with the preparation of said financial statements, they are not aware of the occurrence or existence of any condition or event which constitutes or would, upon notice or lapse of time or both, constitute an event of default or, if they are aware thereof, the nature thereof; and (c) such other data and information (financial or otherwise) as Secured Party may from time to time reasonably request bearing upon the Collateral, Debtor's financial condition and/or results of operations.

2.5    The Collateral shall at all times be and remain personal property and shall not be affixed or attached to any real property in such a manner so as to become, or be deemed to be, a fixture.  Any fixture filings undertaken by Secured Party shall be precautionary and shall not be deemed to constitute an admission that the Collateral has become a fixture.

2.6    (a)    **DEBTOR ACKNOWLEDGES AND AGREES THAT SECURED PARTY MAKES NO WARRANTIES WHATSOEVER, RELATING TO THE COLLATERAL, AND HEREBY DISCLAIMS ANY AND ALL WARRANTIES OF ANY NATURE WHATSOEVER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, VALUE, TITLE, COMPLIANCE WITH SPECIFICATIONS, DESIGN, CONDITION, CAPACITY, DURABILITY, QUALITY OF MATERIAL OR WORKMANSHIP, CONFORMITY OF ANY DESCRIPTION OR PATENT INFRINGEMENT.  SECURED PARTY IS NOT RESPONSIBLE FOR ANY REPAIRS OR SERVICE TO THE COLLATERAL, DEFECTS THEREIN OR FAILURES IN THE OPERATION THEREOF.  SECURED PARTY SHALL NOT BE LIABLE FOR ANY DAMAGES WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER.  DEBTOR EXPRESSLY ACKNOLWEDGES THAT (A) SECURED PARTY DID NOT SELECT, MANUFACTURE OR SUPPLY THE COLLATERAL; (B) SECURED PARTY IS ONLY FINANCING THE COLLATERAL AND (C) DEBTOR HAS MADE THE SELECTION OF THE SUPPLIER OF THE COLLATERAL AND EACH ITEM OF THE COLLATERAL BASED ON ITS OWN JUDGMENT AND EXPRESSLY DISCLAIMS ANY RELIANCE UPON ANY STATEMENTS OR REPRESENTATIONS MADE BY SECURED PARTY.  DEBTOR SHALL BE SOLELY RESPONSIBLE TO ARRANGE FOR AND EFFECT THE SHIPMENT, DELIVERY AND INSTALLATION OF THE COLLATERAL AT THE LOCATION INDICATED ABOVE.  IN NO EVENT WILL SECURED PARTY BE LIABLE TO DEBTOR FOR ANY LOSS OR DAMAGE WHATSOEVER ARISING FROM OR IN CONNECTION WITH THE SHIPMENT,**

**DELIVERY OR INSTALLATION OF THE COLLATERAL OR ANY DELAY OR FAILURE IN CONNECTION THEREWITH.**

2.7    Debtor has not granted and will not grant any security interest in any of the Collateral to any person other than MAC, and has not executed and will not execute any security agreement or financing statement covering any of the Collateral except to MAC, with the exception of the security interest of HSBC Bank USA perfected by the filing of UCC Financing Statement No. 200304872367 on September 5, 2003.

2.8    Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral.

2.9    Debtor will promptly notify MAC in writing of any event which affects the value of the Collateral, the ability of Debtor or MAC to dispose of the Collateral, or the rights and remedies of MAC in relation thereto, including, but not limited to, the levy of any legal process against the Collateral.

## ARTICLE III. DEFAULT

3.1    The occurrence of any one of the following events shall constitute a default ("Event of Default") by Debtor under this Agreement:  (a) if Debtor fails or neglects to perform, keep or observe any term, provision, condition, covenant, warranty or representation (other than a payment or pecuniary obligation) contained in this Agreement, the Lease or any other agreements with Secured Party which is required to be performed, kept or observed by Debtor; (b) if any statement (including any financial statements and/or part thereof), report or certificate made or delivered by Debtor, or any of its officers, employees or agents, to Secured Party is not true and correct; (c) if Debtor fails to pay any of the Indebtedness to Secured Party, when due and payable or declared due and payable or Debtor becomes insolvent or is otherwise unable to pay its debts as they mature; (d) if the Collateral is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes within the possession of any receiver, trustee, custodian, or assignee for the benefit of creditors; (e) if a petition under any section or chapter of the Bankruptcy Reform Act of 1978 or any similar law or regulation shall be filed by Debtor or if Debtor shall make an assignment for the benefit of its creditors, or if any case or proceeding is filed by Debtor for its dissolution or liquidation; (f) if Debtor is enjoined, restrained, or in any way prevented by court or administrative order from conducting all or any material part of its business affairs or if a petition under any section or chapter of the Bankruptcy Reform Act of 1978 or any similar law or regulation is filed against Debtor or if any cause or proceeding is filed against Debtor for its dissolution or liquidation and such injunction, restraint or petition is not dismissed or stayed with ten (10) days after the entry or filing thereof; (g) if an application is made by any person other than Debtor for the appointment of a receiver, trustee, or custodian for the Collateral and the same is not dismissed within ten (10) days after the application therefor; (i) if a notice of lien, levy or assessment is filed of record with respect to the Collateral by the United States or any department, agency or instrumentality thereof or by any state, county, municipal or other governmental agency, including with limitation, the Pension Benefit Guaranty Corporation, or if any taxes or debts, owing at any time or times hereafter to any one of them becomes a lien or encumbrance upon the Collateral and the same is not released with ten (10) days after the same becomes a lien or encumbrance; (j) the loss or suspension of any licenses or

- 6 -

permits required to operate Debtor's business as presently conducted; or (k) the occurrence of a default or an event of default under any other agreement between Secured Party and Debtor.

  3.2 All of Secured Party's rights and remedies under this Agreement and any other agreement are cumulative and non-exclusive.

  3.3 Upon an Event of Default, Secured Party, in its sole and absolute discretion, may: (a) declare any and all Indebtedness secured hereby immediately due and payable, whereupon the Indebtedness shall be and become immediately due and payable; (b) exercise any one or more of the rights and remedies accruing to a secured party, and enforce this Agreement and the security interest granted herein under the Uniform Commercial Code of the relevant state or states and any other applicable law upon default by a debtor; (c) require Debtor, immediately upon demand by Secured Party, to assemble the Collateral and make it available to Secured Party at Debtor's principal place of business; (d) enter, with or without process of law and without breach of the peace, any premises where the Collateral or the books and records of Debtor related thereto are or may be located, and without charge or liability to Secured Party therefor, seize and remove the Collateral (and copies of Debtor's books and records in any way related to the Collateral) from said premises, and Debtor hereby grants Secured Party a security interest in said books and records for the purpose above stated; and (e) sell or otherwise dispose of the Collateral at public or private sale for cash or credit, provided, however, that Debtor shall be credited with the net proceeds of such sale only when such proceeds are actually received by Secured Party.

  3.4 Debtor recognizes that in the event Debtor fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, or any other agreement with Secured Party, no remedy at law will provide adequate relief to Secured Party, and agrees that Secured Party shall be entitled to temporary and permanent injunctive relief as may be provided by law in any such case without the necessity of proving actual damages.

  3.5 Any notice required to be given by Secured Party of a sale, lease, other disposition of the Collateral or any other intended action by Secured Party, deposited in the United States mail, postage prepaid and duly addressed to Debtor at the address specified at the beginning of this Agreement not less than ten (10) days prior to such proposed action, shall constitute commercially reasonable and fair notice to Debtor thereof.

  3.6 In the event Secured Party seeks possession of the Collateral through replevin or other court process, Debtor hereby irrevocably waives any bond, surety or security required as an incident to such possession.

  3.7 Secured Party's right to possession shall not be affected or obviated in any manner by reason of any claims asserted by Debtor of any nature whatsoever, including specifically, but not limited to, any defense of setoff, abatement, recoupment or any claim or counterclaim, including, but not limited to, any claim of breach of warranty or contract. In furtherance thereof, Secured Party may enter upon Debtor's premises and remove the Collateral and/or disable or render the Collateral unusable, whether electronically or by any other means available to Secured Party. Further, Secured Party may require Debtor to assemble the Collateral and make it available for removal by Secured Party at a place designated by Secured Party.

# ARTICLE IV.  GENERAL

4.1    Debtor waives the right to direct the application of any and all payments at any time or times hereafter received by Secured Party on account of the Indebtedness and Debtor agrees that Secured Party shall have the continuing exclusive right to apply and re-apply any and all such payments in such manner as Secured Party may deem advisable, notwithstanding any entry by Secured Party upon any of its books and records, so long as such application is not contrary to the terms of this Agreement and the Lease.

4.2    This Agreement may not be modified, altered or amended except by an agreement in writing signed by Debtor and Secured Party.  Debtor may not sell, assign or transfer this Agreement or any portion hereof, including without limitation Debtor's rights, interests, remedies, powers and/or duties hereunder without the prior written consent of Secured Party.

4.3    Secured Party's failure at any time hereafter to require strict performance by Debtor of any provision of this Agreement, the Lease or any other agreement between the parties shall not waive, affect or diminish any right of Secured Party thereafter to demand strict compliance and performance herewith or therewith.  Any suspension or wavier by Secured Party of an Event of Default by Debtor under this Agreement or any other agreement shall not suspend, waive or affect any other Event of Default by Debtor under this Agreement, or any other agreement, whether the same is prior or subsequent thereto and whether of the same or of a different type.  None of the undertakings, agreements, warranties, covenants and representations of Debtor contained in this Agreement and no Event of Default by Debtor under this Agreement, or any other agreement shall be deemed to have been suspended or waived by Secured Party unless such suspension or wavier is by an instrument in writing signed by an officer of Secured Party and directed to Debtor specifying such suspension or waiver.

4.4    If any provision of this Agreement, the Lease or any other agreement or the application thereof to any person or circumstance is held invalid or unenforceable, the remainder of this Agreement, the Lease and any other agreement and the application of such provision to other persons or circumstances will not be affected thereby and the provisions of this Agreement, the Lease and any other agreement shall be severable in any such instance.

4.5    This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Debtor and Secured Party.  This provision, however, shall not be deemed to modify paragraph 4.4 hereof.

4.6    Except as otherwise provided in this Agreement and except as otherwise provided in any other agreement by specific reference to the applicable provision of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision of any other agreement, the terms, conditions and provisions of this Agreement shall control and govern and be enforced.

4.7    Except to the extent provided to the contrary in this Agreement, the Lease and in any other agreements, no termination or cancellation (regardless of cause or procedure) of this Agreement, the Lease or any other agreement shall in any way affect or impair the power, obligations, duties, rights and liabilities of Debtor or Secured Party in any way or respect relating

to (i) any transaction or event occurring prior to such termination or cancellation, (ii) the Collateral and/or (iii) any of the undertakings, agreements, covenants, warranties and representations of Debtor contained in this Agreement, the Lease or in the other agreements. All such undertakings, agreements, covenants, warranties and representations shall survive such termination or cancellation.

4.8    Except as otherwise specifically provided in this Agreement, Debtor waives any and all notice or demands which Debtor might be entitled to receive with respect to this Agreement by virtue of any applicable statute or law, and waives presentment, demand and protest and notice of presentment, protest default, dishonor, non-payment, maturity, release, compromise, settlement, extension or renewal of any or all accounts and guaranties at any time held by Secured Party on which Debtor may in any way be liable.

4.9    <u>Governing Law, Jurisdiction, Venue and Waiver of Trial by Jury</u>.  This Security Agreement will be governed and construed in all respects by the internal laws and decisions, other than any conflict of laws provisions, of the State of Illinois, including, without limitation, all matters of construction, validity, enforceability, and performance.  ~~DEBTOR (i) CONSENTS AT SECURED PARTY'S ELECTION AND WITHOUT LIMITING SECURED PARTY'S RIGHT TO COMMENCE AN ACTION IN ANY OTHER JURISDICTION, TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY COURT (FEDERAL, STATE OR LOCAL) SITUATED IN THE COUNTY OF COOK, STATE OF ILLINOIS; (II) WAIVES ANY OBJECTION TO IMPROPER VENUE AND FORUM NON CONVENIENS; AND (III) CONSENTS TO SERVICE OF PROCESS BY CERTIFIED MAIL, POSTAGE PREPAID, ADDRESSED TO DEBTOR AT ITS ADDRESS AS SET FORTH HEREIN. DEBTOR HEREBY WAIVES TRIAL BY JURY.~~  Debtor shall bring any action arising out of this Security Agreement or the Lease only in the federal or state courts located in the County of Cook, State of Illinois.  In the event Debtor institutes any action in any court other than a court located in the County of Cook, State of Illinois, Debtor shall assume all of Secured Party's costs in transferring said proceeding to a court located in the County of Cook, State of Illinois, including, without limitation, reasonable attorneys' fees.  In any action arising out of or in connection with this Security Agreement, or the Lease, the prevailing party shall be entitled to recover its reasonable attorneys' fees and all costs and expenses incurred in connection with such action, in addition to any other relief to which it may be entitled.

4.10    If at any time or times hereafter Secured Party: (a) employs counsel for advice or other representation (i) to represent Secured Party in any litigation, contest, dispute, suit or proceeding or to commence, defend or intervene or to take any other action in or with respect to any litigation, contest, dispute, suit or proceedings (whether instituted by Secured Party, Debtor or any other person) in any way or respect relating to the Collateral or this Agreement or (ii) in the event of default, to enforce any rights of Secured Party against Debtor or any other person which may be obligated to Secured Party by virtue of this Agreement or the Lease including, without limitation, any account debtor; (b) takes any action to protect, collect, sell, liquidate or otherwise dispose of the Collateral; and/or (c) attempts to or enforces any of Secured Party's rights or remedies under this Agreement, including, without limitation, Secured Party's right or remedies with respect to the Collateral, the reasonable costs and expenses incurred by Secured

*an amount equal to the principal balance remaining outstanding and owing to Secured Party (at the time of default) under and pursuant to Equipment Lease Agreement No. SUL0209 executed by Debtor and Secured Party.*

Party in any manner or way with respect to the foregoing, shall be part of Debtor's liabilities and indebtedness to Secured Party, payable by Debtor to Secured Party on demand. Without limiting the generality of the foregoing, such expenses, costs, charges and fees include reasonable: (i) attorneys' fees, paralegal fees, costs and expenses; (ii) accountants' and other experts' fees, costs and expenses; (iii) court costs and expenses; (iv) court reporter fees, costs and expenses; (v) long distance telephone charges; and (vi) telegram charges.

4.11   Debtor releases Secured Party from any and all causes of action or claims which Debtor may now or hereafter have for any asserted loss or damage to Debtor claimed to be caused by or arising from any failure of Secured Party to protect, enforce or collect in whole or in part any of the Collateral so long as Secured Party complies with the Uniform Commercial Code.

4.12   To the extent that Secured Party receives any payment on account from Debtor's liabilities, or any proceeds of Collateral are applied on account of Debtor's liabilities, and any such payment(s) and/or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, subordinated and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common or equitable cause, then, to the extent of such payment(s) or proceeds received, Debtor's liabilities to Secured Party or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment(s) and/or proceeds had not been received by Secured Party and applied on account of Debtor's liabilities and indebtedness.

4.13   All costs, fees and expenses incurred by Secured Party, or for which Secured Party becomes obligated, in connection with the inspection of the Collateral or any related records (collectively, the "Inspection Costs") shall be paid by Secured Party unless an Event of Default has occurred, in which case all Inspection Costs shall be paid by Debtor.

4.14   In the event that Debtor shall contest Secured Party's right to possession in any action relating to the Collateral, Debtor shall post a bond in ~~the amount of two times the sales price or value (whichever is greater) of the Collateral to protect Secured Party's interest therein.~~ Secured Party shall not be required to post any bond or other forms of security in connection with any action for the repossession or replevin of, or otherwise relating to, the Collateral.
*(or any portion thereof)*

4.15   Debtor waives any and all claims for punitive damages relating to the Collateral, the Documents, this Agreement, the relationship of the parties and any other matters related thereto.

4.16   To the extent that any security interest granted hereby is valid as a purchase money security interest, the same shall take effect according to the terms of this Agreement as a purchase money security interest. To the extent that any obligation secured hereby cannot validly be secured by a purchase money security interest, it shall nevertheless be secured by the security interest provided herein as a non-purchase money security interest.

4.17   This Agreement shall take effect upon signature/authentication and shall remain in full force and effect for so long as Debtor remains in any way indebted or obligated to Secured

- 10 -

Party. This Agreement may be terminated only by written agreement signed/authenticated by Secured Party. Any filing(s) undertaken by Secured Party relative hereto may only be terminated/released by the filing by Secured Party of a termination/release statement with the Secretary of State (or other appropriate filing office) of the state(s) where Secured Party has previously filed any such financing statements. No other party, including Debtor, shall have the right to file such termination statement, and any such filing by any third party is not authorized by Secured Party and shall be null, void, and of no force or effect whatsoever. Any termination statement filed relative hereto shall not have any effect upon any other agreement or filing between the parties hereto.

4.18    All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

4.19    All terms not specifically defined herein shall have the definitions and meanings set forth in the Uniform Commercial Code, as presently in effect, and as hereafter amended from time to time. To the extent that any defined term used herein is more restrictive than the same term as used in the Uniform Commercial Code, the scope and definition of such defined term shall be expanded and enlarged to encompass the definition set forth in the Uniform Commercial Code, it being the intent of the parties that the rights and remedies granted to Secured Party shall be as broad and as comprehensive as allowed by applicable law.

**IN WITNESS WHEREOF,** this Agreement has been duly executed as of the day and year specified at the beginning hereof.

**DEBTOR:**                              **SECURED PARTY:**
**ASAP GRAPHICS, INC.**                  **MAC FUNDING CORPORATION**

By: _____           By: _____

Position: _____ _CEO_____            Position: _Operating Manager___

Accepted as of the _12_ day of _December_, 2003.

N:\SYS1S\UCC-AGMT\5087-general.doc

- 11 -

## SECURITY AGREEMENT

This Security Agreement ("Agreement") is made effective as of the 18th day of June, 2007, by and between MAC Funding Corporation, a Delaware corporation with its principal place of business at 1500 Michael Drive, Illinois 60091 ("Secured Party"), and ASAP Graphics, Inc., a Florida corporation with its principal place of business located at 500 Southwest 21st Terrace, Fort Lauderdale, Florida 33312 ("Debtor").

### WITNESSETH

WHEREAS, Secured Party and Debtor have entered into a certain Equipment Lease Agreement dated on or about December 4, 2003, designated as Equipment Lease Agreement No. SUL-0209 (the "Lease") whereby Debtor has leased from Secured Party a certain Mitsubishi Diamond 3000S 13-5 28" x 40" six (6) color sheetfed printing press together with all auxiliary equipment (collectively, the "Mitsubishi Press"); and

WHEREAS, Debtor is in default under the Lease, and Debtor has requested further and additional financial accommodations from Secured Party relative to the Lease and the payments required thereunder; and

WHEREAS, Secured Party has agreed to extend additional financial accommodations to Debtor as set forth in a certain letter agreement dated June 18, 2007 (the "Letter Agreement"); and

WHEREAS, Debtor has agreed to execute this Security Agreement in consideration of Secured Party extending such additional financial accommodations.

NOW, THEREFORE, the parties hereto hereby agree as follows:

### ARTICLE I.  GRANT OF SECURITY INTEREST

1.1    To secure any and all Indebtedness (as hereinafter defined) whatsoever owing from Debtor to Secured Party from time to time and the prompt, full and faithful performance by Debtor of any and all provisions to be kept, observed or performed and/or payments to be made by Debtor under this Agreement, the Letter Agreement and the Lease, Debtor hereby grants to Secured Party a continuing security interest in and to all of the following described personal property of Debtor whether now existing and/or owned and/or hereafter arising and/or acquired: (a) all accounts, accounts receivable, contract rights, instruments, documents, chattel paper, intangibles (including, but not limited to causes of action, general intangibles and payment intangibles, tax refunds and insurance proceeds) and other obligations or indebtedness owed to Debtor from whatever source arising; all rights of Debtor to receive any payments in money or kind; all guaranties of the foregoing and security therefor; all of the right, title and interest of Debtor in and with respect to the goods, software, services, or other property that give rise to or that secure any of the foregoing and insurance policies and proceeds relating thereto, and all rights of Debtor as an unpaid seller, lessor, licensor or other provider of goods, software and services, including, but not limited to, the rights of stoppage in transit, replevin, reclamation, and resale; and all of the foregoing, whether now owned or existing or hereafter created or acquired (collectively the "Accounts"); (b) all goods, software, merchandise, and other personal property

now owned or hereafter acquired by Debtor that are held for sale, lease, rental or license, or are furnished or to be furnished under any contract of service or are raw materials, work-in-process, finished goods, supplies or materials used or consumed in Debtor's business, and all products thereof, and all substitutions, replacements, additions, or accessions thereto (collectively the "Inventory"); (c) all machinery, equipment, furniture, vehicles and fixtures, now owned or hereafter acquired by Debtor and used or acquired for use in Debtor's business, together with all accessions thereto and all substitutions and replacements thereof and parts therefor and additions thereto (collectively the "Equipment"); (d) all cash and non-cash proceeds (as defined in the Uniform Commercial Code in effect from time to time) of any of the foregoing, including insurance proceeds; (e) all ledger sheets, files, records, documents, and instruments (including, but not limited to, computer programs, tapes and related electronic data processing software) evidencing an interest in or relating to the above; and (f) all instruments, documents, securities, monies, reserves, cash and cash equivalents and other like property, and the proceeds of any of the foregoing, owned by Debtor or in which Debtor has an interest, which now or hereafter are at any time in the possession or control of Secured Party or in transit by mail or carrier to or in the possession of any third party acting on behalf of Secured Party, without regard to whether Secured Party received said in pledge, for safekeeping, as agent for collection or transmission or otherwise or accounts of Debtor with Secured Party against which Secured Party may exercise its right of set-off. All the foregoing personal property is hereinafter sometimes called individually and collectively referred to as "Collateral." For the purposes of this Agreement, "Indebtedness" shall mean any and all indebtedness, financial obligations and payments due and owing under the Lease, the Letter Agreement and any and all other notes, loans, advances and other financial accommodations of any nature whatsoever made by Secured Party to Debtor and all other obligations and liabilities of Debtor to Secured Party, whether now existing or hereafter incurred or created, whether voluntary or involuntary, whether due or not due, whether absolute or contingent, and/or whether incurred directly or acquired by Secured Party by assignment or otherwise.

1.2    Debtor shall execute and deliver to Secured Party, at any time and from time to time hereafter at the request of Secured Party, all agreements, instruments, documents and other written matter (hereinafter individually and collectively, referred to as "Supplemental Documentation") that Secured Party reasonably may request, in form and substance acceptable to Secured Party, to perfect, further perfect and/or maintain perfected Secured Party's security interest in the Collateral and to consummate the transaction contemplated in or by this Agreement and any other agreements now existing or hereafter entered into by and between Secured Party and Debtor. Debtor hereby irrevocably makes, constitutes and appoints Secured Party (and all persons designated by Secured Party for this purpose) as Debtor's true and lawful attorney (and agent-in-fact) to sign the name of Debtor to the Supplemental Documentation and to deliver the Supplemental Documentation to such persons as Secured Party in its own absolute discretion may elect. Debtor hereby appoints Secured Party as its attorney in fact, and authorizes Secured Party to, (i) sign/authenticate on behalf of Debtor such additional documents/records as may be required from time to time to create, amend, extend, continue, maintain or perfect the security interest described herein or otherwise granted to or retained by Secured Party and (ii) to make/undertake any filings or registrations with governmental officials or offices and take such other actions as Secured Party deems appropriate to perfect, amend, continue and maintain the perfection of the security interest created hereby or otherwise granted to or retained by Secured Party. In addition, Debtor hereby ratifies any filings made against Debtor by Secured Party prior to the date hereof.

- 2 -

1.3    Secured Party (by any of its officers, employees and/or agents) shall have the right at any time or times during Debtor's usual business hours to inspect the Collateral and all related records (and the premises upon which the Collateral is located) and to verify the amount and condition thereof or any other matter relating to the Collateral.

1.4    Debtor warrants and represents to and covenants with Secured Party that the Debtor keeps the Collateral and Debtor's books and records concerning the Collateral, at the Debtor's principal place of business noted above, and Debtor shall not remove such books and records and/or the Collateral therefrom and shall not keep any such books and records and/or the Collateral in any other office or location unless the same is within the continental United States of America and Debtor gives Secured Party written notice thereof at least 10 days prior thereto. By written notice delivered to Secured Party at least 10 days prior thereto, Debtor shall advise Secured Party of Debtor's opening of any new office or place of business or its closing of any existing office or place of business and any new office or place of business shall be within the continental United States of America.

1.5    Subject to any security interests having priority over Secured Party's interests, Debtor shall receive, as the sole and exclusive property of Secured Party and as trustee for Secured Party, all monies, checks, notes, drafts and all other payments constituting proceeds of Collateral which come into the possession or control of Debtor (or any of its shareholders, directors, officers, members, managers, employees, agents or those persons acting for or in concert with Debtor) and immediately upon receipt thereof, Debtor shall remit the same (or cause the same to be remitted) in kind, to Secured Party at such place as may be designated by Secured Party, or to any agent or agents appointed by Secured Party.

1.6    Secured Party, at any time Debtor is in default of this Agreement, in its sole and absolute discretion, may take control of, in any manner, and may endorse Debtor's name to any items constituting proceeds described in paragraph 1.5 above. For the purposes of this paragraph, Debtor hereby irrevocably makes, constitutes and appoints Secured Party (and all persons designated by Secured Party for this purpose) as Debtor's true and lawful attorney and agent-in-fact with power, without notice to Debtor, to take such actions.

1.7    Secured Party in its sole and absolute discretion, without waiving or releasing any obligation, liability or duty of Debtor under this Agreement, or any other agreements or any event of default, may, but shall be under no obligation to, at any time or times hereafter, pay (and/or acquire or accept any assignment of any security interest, lien, encumbrance) any claim asserted by any person against the Collateral. All sums paid by Secured Party in respect thereof and all costs, fees and expenses, including reasonable attorney's fees, court costs, expenses and other charges relating thereto, incurred by Secured Party on account thereof shall be a part of the Indebtedness and shall be payable to Secured Party on demand.

1.8    No authorization given by Secured Party pursuant to this Agreement, or any other agreement between Secured Party and Debtor to sell any specified portion of Collateral or any items thereof and no waiver by Secured Party in connection therewith shall establish a custom or constitute a waiver of any prohibition contained in such agreements against such sales with respect to any portion of the Collateral or any item thereof not covered by said authorization.

Debtor shall not have any right to sell or otherwise transfer the Collateral, unless and until Secured Party has been paid in full all amounts due and owing to Secured Party.

## ARTICLE II.  WARRANTIES, REPRESENTATIONS AND COVENANTS

2.1    Debtor warrants, represents and covenants that (i) Debtor is a registered organization and Debtor's state of organization is the state set forth in the introductory paragraph above; and (ii) Debtor shall not change its form of business or organization, change or in any way amend or alter its legal name or change its place of business without providing Secured Party at least thirty (30) days prior written notice thereof.

2.2    Debtor shall at all times properly care for and maintain the Collateral in accordance with manufacturer's(s') recommendations.  Debtor, at its sole cost and expense, shall keep and maintain the Collateral insured for its full insurable value against loss or damage by fire, theft, explosion, sprinklers and all other hazards and risks ordinarily insured against by other owners or users of such properties and similar businesses. All such policies of insurance shall be in form and with insurers and shall be in such amounts as may be reasonably satisfactory to Secured Party. Debtor shall deliver to Secured Party the original (or certified copy) of each policy of insurance, or certificate of insurance and evidence of payment of all premiums for each such policy. Such policies of insurance shall contain an endorsement, in form and substance acceptable to Secured Party, showing loss payable to Secured Party and provide that all such insurance companies will give Secured Party at least 30 days prior written notice before any such policies of insurance shall be altered or canceled and that no act or default of Debtor or any other person shall affect the right of Secured Party to recover under such policy or policies of insurance in case of any loss or damage. In the event Debtor at any time hereafter shall fail to obtain or maintain any of the policies of insurance required above or to pay any premium in whole or in part relating thereto, Secured Party, without waiving or releasing any obligation of, or event of default by Debtor hereunder, may (but shall be under no obligation to do so) at any time thereafter obtain and maintain such policies of insurance and pay such premiums and take such actions with respect thereto which Secured Party deems advisable. All sums disbursed by Secured Party, including reasonable attorneys' fees, court costs, expenses and other charges relating thereto, shall be part of the Indebtedness, and shall be payable to Secured Party by Debtor on demand.

2.3    Debtor shall promptly pay, when due, all federal, state, county, city, municipal and/or other governmental taxes, levies, assessments, charges, liens, claims or encumbrances of any nature whatsoever (the "Charges"). In the event Debtor, at any time or times hereafter, shall fail to pay any Charge or to obtain discharges thereof, Secured Party may without waiving or releasing any obligations or liability of Debtor hereunder or any Event of Default, in its sole and absolute discretion at any time or times thereafter make such payment, or any part thereof, or obtain discharges and take any other action with respect thereto which Secured Party deems advisable. All sums so paid by Secured Party and any expenses, reasonable attorneys' fees, court costs and other charges relating thereto shall be part of the Indebtedness and shall be payable by Debtor to Secured Party on demand.

2.4    Debtor shall keep books of account and prepare financial statements and shall cause to be furnished to Secured Party the following (all of the foregoing and following to be kept and prepared in accordance with generally accepted accounting principles consistently

- 4 -

applied: (a) as soon as available, but not more than ninety (90) days after the close of each fiscal year of Debtor, financial statements for such fiscal year, including a balance sheet of Debtor and related statements of operations for such fiscal year, and a reconciliation of capital for such fiscal year; (b) concurrently with the delivery of the financial statements described in subparagraph (a) above, a certificate of the Debtor's certified public accountants certifying to Secured Party that based upon their review of the affairs of Debtor, performed in connection with the preparation of said financial statements, they are not aware of the occurrence or existence of any condition or event which constitutes or would, upon notice or lapse of time or both, constitute an event of default or, if they are aware thereof, the nature thereof; and (c) such other data and information (financial or otherwise) as Secured Party may from time to time reasonably request bearing upon the Collateral, Debtor's financial condition and/or results of operations.

2.5    The Collateral shall at all times be and remain personal property and shall not be affixed or attached to any real property in such a manner so as to become, or be deemed to be, a fixture. Any fixture filings undertaken by Secured Party shall be precautionary and shall not be deemed to constitute an admission that the Collateral has become a fixture.

2.6    (a)    **DEBTOR ACKNOWLEDGES AND AGREES THAT SECURED PARTY MAKES NO WARRANTIES WHATSOEVER, RELATING TO THE COLLATERAL, AND HEREBY DISCLAIMS ANY AND ALL WARRANTIES OF ANY NATURE WHATSOEVER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, VALUE, TITLE, COMPLIANCE WITH SPECIFICATIONS, DESIGN, CONDITION, CAPACITY, DURABILITY, QUALITY OF MATERIAL OR WORKMANSHIP, CONFORMITY OF ANY DESCRIPTION OR PATENT INFRINGEMENT. SECURED PARTY IS NOT RESPONSIBLE FOR ANY REPAIRS OR SERVICE TO THE COLLATERAL, DEFECTS THEREIN OR FAILURES IN THE OPERATION THEREOF. SECURED PARTY SHALL NOT BE LIABLE FOR ANY DAMAGES WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER. DEBTOR EXPRESSLY ACKNOLWEDGES THAT (A) SECURED PARTY DID NOT SELECT, MANUFACTURE OR SUPPLY THE COLLATERAL; (B) SECURED PARTY IS ONLY FINANCING THE COLLATERAL AND (C) DEBTOR HAS MADE THE SELECTION OF THE SUPPLIER OF THE COLLATERAL AND EACH ITEM OF THE COLLATERAL BASED ON ITS OWN JUDGMENT AND EXPRESSLY DISCLAIMS ANY RELIANCE UPON ANY STATEMENTS OR REPRESENTATIONS MADE BY SECURED PARTY. DEBTOR SHALL BE SOLELY RESPONSIBLE TO ARRANGE FOR AND EFFECT THE SHIPMENT, DELIVERY AND INSTALLATION OF THE COLLATERAL AT THE LOCATION INDICATED ABOVE. IN NO EVENT WILL SECURED PARTY BE LIABLE TO DEBTOR FOR ANY LOSS OR DAMAGE WHATSOEVER ARISING FROM OR IN CONNECTION WITH THE SHIPMENT, DELIVERY OR INSTALLATION OF THE COLLATERAL OR ANY DELAY OR FAILURE IN CONNECTION THEREWITH.**

2.7    Debtor has not granted and will not grant any security interest in any of the Collateral to any person other than Secured Party, and has not executed and will not execute any security agreement or financing statement covering any of the Collateral except to Secured Party,

with the exception of the existing, security interests (which security interests have been previously been granted and perfected prior to the date hereof).

2.8     Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral.

2.9     Debtor will promptly notify Secured Party in writing of any event which affects the value of the Collateral, the ability of Debtor or Secured Party to dispose of the Collateral, or the rights and remedies of Secured Party in relation thereto, including, but not limited to, the levy of any legal process against the Collateral.

## ARTICLE III.  DEFAULT

3.1     The occurrence of any one of the following events shall constitute a default ("Event of Default") by Debtor under this Agreement:  (a) if Debtor fails or neglects to perform, keep or observe any term, provision, condition, covenant, warranty or representation (other than a payment or pecuniary obligation) contained in this Agreement, the Lease, the Letter Agreement or any other agreements with Secured Party which is required to be performed, kept or observed by Debtor; (b) if any statement (including any financial statements and/or part thereof), report or certificate made or delivered by Debtor, or any of its officers, employees or agents, to Secured Party is not true and correct; (c) if Debtor fails to pay any of the Indebtedness to Secured Party, when due and payable or declared due and payable or Debtor becomes insolvent or is otherwise unable to pay its debts as they mature; (d) if the Collateral is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes within the possession of any receiver, trustee, custodian, or assignee for the benefit of creditors; (e) if a petition under any section or chapter of the Bankruptcy Reform Act of 1978 or any similar law or regulation shall be filed by Debtor or if Debtor shall make an assignment for the benefit of its creditors, or if any case or proceeding is filed by Debtor for its dissolution or liquidation; (f) if Debtor is enjoined, restrained, or in any way prevented by court or administrative order from conducting all or any material part of its business affairs or if a petition under any section or chapter of the Bankruptcy Reform Act of 1978 or any similar law or regulation is filed against Debtor or if any cause or proceeding is filed against Debtor for its dissolution or liquidation and such injunction, restraint or petition is not dismissed or stayed with ten (10) days after the entry or filing thereof; (g) if an application is made by any person other than Debtor for the appointment of a receiver, trustee, or custodian for the Collateral and the same is not dismissed within ten (10) days after the application therefor; (i) if a notice of lien, levy or assessment is filed of record with respect to the Collateral by the United States or any department, agency or instrumentality thereof or by any state, county, municipal or other governmental agency, including with limitation, the Pension Benefit Guaranty Corporation, or if any taxes or debts, owing at any time or times hereafter to any one of them becomes a lien or encumbrance upon the Collateral and the same is not released with ten (10) days after the same becomes a lien or encumbrance; (j) the loss or suspension of any licenses or permits required to operate Debtor's business as presently conducted; or (k) the occurrence of a default or an event of default under any other agreement between Secured Party and Debtor.

3.2     All of Secured Party's rights and remedies under this Agreement and any other agreement are cumulative and non-exclusive.

3.3     Upon an Event of Default, Secured Party, in its sole and absolute discretion, may: (a) declare any and all Indebtedness secured hereby immediately due and payable, whereupon

- 6 -

the Indebtedness shall be and become immediately due and payable; (b) exercise any one or more of the rights and remedies accruing to a secured party, and enforce this Agreement and the security interest granted herein under the Uniform Commercial Code of the relevant state or states and any other applicable law upon default by a debtor; (c) require Debtor, immediately upon demand by Secured Party, to assemble the Collateral and make it available to Secured Party at Debtor's principal place of business; (d) enter, with or without process of law and without breach of the peace, any premises where the Collateral or the books and records of Debtor related thereto are or may be located, and without charge or liability to Secured Party therefor, seize and remove the Collateral (and copies of Debtor's books and records in any way related to the Collateral) from said premises, and Debtor hereby grants Secured Party a security interest in said books and records for the purpose above stated; and (e) sell or otherwise dispose of the Collateral at public or private sale for cash or credit, provided, however, that Debtor shall be credited with the net proceeds of such sale only when such proceeds are actually received by Secured Party.

3.4     Debtor recognizes that in the event Debtor fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, or any other agreement with Secured Party, no remedy at law will provide adequate relief to Secured Party, and agrees that Secured Party shall be entitled to temporary and permanent injunctive relief as may be provided by law in any such case without the necessity of proving actual damages.

3.5     Any notice required to be given by Secured Party of a sale, lease, other disposition of the Collateral or any other intended action by Secured Party, deposited in the United States mail, postage prepaid and duly addressed to Debtor at the address specified at the beginning of this Agreement not less than ten (10) days prior to such proposed action, shall constitute commercially reasonable and fair notice to Debtor thereof.

3.6     In the event Secured Party seeks possession of the Collateral through replevin or other court process, Debtor hereby irrevocably waives any bond, surety or security required as an incident to such possession.

3.7     Secured Party's right to possession shall not be affected or obviated in any manner by reason of any claims asserted by Debtor of any nature whatsoever, including specifically, but not limited to, any defense of setoff, abatement, recoupment or any claim or counterclaim, including, but not limited to, any claim of breach of warranty or contract. In furtherance thereof, Secured Party may enter upon Debtor's premises and remove the Collateral and/or disable or render the Collateral unusable, whether electronically or by any other means available to Secured Party. Further, Secured Party may require Debtor to assemble the Collateral and make it available for removal by Secured Party at a place designated by Secured Party.

## ARTICLE IV.  GENERAL

4.1     Debtor waives the right to direct the application of any and all payments at any time or times hereafter received by Secured Party on account of the Indebtedness and Debtor agrees that Secured Party shall have the continuing exclusive right to apply and re-apply any and all such payments in such manner as Secured Party may deem advisable, notwithstanding any entry by Secured Party upon any of its books and records, so long as such application is not contrary to the terms of this Agreement and the Lease.

4.2     This Agreement may not be modified, altered or amended except by an agreement in writing signed by Debtor and Secured Party. Debtor may not sell, assign or transfer this Agreement or any portion hereof, including without limitation Debtor's rights, interests, remedies, powers and/or duties hereunder without the prior written consent of Secured Party.

4.3     Secured Party's failure at any time hereafter to require strict performance by Debtor of any provision of this Agreement, the Lease or any other agreement between the parties shall not waive, affect or diminish any right of Secured Party thereafter to demand strict compliance and performance herewith or therewith. Any suspension or wavier by Secured Party of an Event of Default by Debtor under this Agreement or any other agreement shall not suspend, waive or affect any other Event of Default by Debtor under this Agreement, or any other agreement, whether the same is prior or subsequent thereto and whether of the same or of a different type. None of the undertakings, agreements, warranties, covenants and representations of Debtor contained in this Agreement and no Event of Default by Debtor under this Agreement, or any other agreement shall be deemed to have been suspended or waived by Secured Party unless such suspension or wavier is by an instrument in writing signed by an officer of Secured Party and directed to Debtor specifying such suspension or waiver.

4.4     If any provision of this Agreement, the Lease or any other agreement or the application thereof to any person or circumstance is held invalid or unenforceable, the remainder of this Agreement, the Lease and any other agreement and the application of such provision to other persons or circumstances will not be affected thereby and the provisions of this Agreement, the Lease and any other agreement shall be severable in any such instance.

4.5     This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Debtor and Secured Party. This provision, however, shall not be deemed to modify paragraph 4.4 hereof.

4.6     Except as otherwise provided in this Agreement and except as otherwise provided in any other agreement by specific reference to the applicable provision of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision of any other agreement, the terms, conditions and provisions of this Agreement shall control and govern and be enforced.

4.7     Except to the extent provided to the contrary in this Agreement, the Lease and in any other agreements, no termination or cancellation (regardless of cause or procedure) of this Agreement, the Lease or any other agreement shall in any way affect or impair the power, obligations, duties, rights and liabilities of Debtor or Secured Party in any way or respect relating to (i) any transaction or event occurring prior to such termination or cancellation, (ii) the Collateral and/or (iii) any of the undertakings, agreements, covenants, warranties and representations of Debtor contained in this Agreement, the Lease or in the other agreements.  All such undertakings, agreements, covenants, warranties and representations shall survive such termination or cancellation.

4.8     Except as otherwise specifically provided in this Agreement, Debtor waives any and all notice or demands which Debtor might be entitled to receive with respect to this Agreement by virtue of any applicable statute or law, and waives presentment, demand and

protest and notice of presentment, protest default, dishonor, non-payment, maturity, release, compromise, settlement, extension or renewal of any or all accounts and guaranties at any time held by Secured Party on which Debtor may in any way be liable.

    4.9    <u>Governing Law, Jurisdiction, Venue and Waiver of Trial by Jury</u>. This Security Agreement will be governed and construed in all respects by the internal laws and decisions, other than any conflict of laws provisions, of the State of Illinois, including, without limitation, all matters of construction, validity, enforceability, and performance. **DEBTOR (I) CONSENTS AT SECURED PARTY'S ELECTION AND WITHOUT LIMITING SECURED PARTY'S RIGHT TO COMMENCE AN ACTION IN ANY OTHER JURISDICTION, TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY COURT (FEDERAL, STATE OR LOCAL) SITUATED IN THE COUNTY OF COOK, STATE OF ILLINOIS; (II) WAIVES ANY OBJECTION TO IMPROPER VENUE AND FORUM NON CONVENIENS; AND (III) CONSENTS TO SERVICE OF PROCESS BY CERTIFIED MAIL, POSTAGE PREPAID, ADDRESSED TO DEBTOR AT ITS ADDRESS AS SET FORTH HEREIN. DEBTOR HEREBY WAIVES TRIAL BY JURY.** Debtor shall bring any action arising out of this Security Agreement or the Lease only in the federal or state courts located in the County of Cook, State of Illinois. In the event Debtor institutes any action in any court other than a court located in the County of Cook, State of Illinois, Debtor shall assume all of Secured Party's costs in transferring said proceeding to a court located in the County of Cook, State of Illinois, including, without limitation, reasonable attorneys' fees. In any action arising out of or in connection with this Security Agreement, or the Lease, the prevailing party shall be entitled to recover its reasonable attorneys' fees and all costs and expenses incurred in connection with such action, in addition to any other relief to which it may be entitled.

    4.10    If at any time or times hereafter Secured Party: (a) employs counsel for advice or other representation (i) to represent Secured Party in any litigation, contest, dispute, suit or proceeding or to commence, defend or intervene or to take any other action in or with respect to any litigation, contest, dispute, suit or proceedings (whether instituted by Secured Party, Debtor or any other person) in any way or respect relating to the Collateral or this Agreement or (ii) in the event of default, to enforce any rights of Secured Party against Debtor or any other person which may be obligated to Secured Party by virtue of this Agreement or the Lease including, without limitation, any account debtor; (b) takes any action to protect, collect, sell, liquidate or otherwise dispose of the Collateral; and/or (c) attempts to or enforces any of Secured Party's rights or remedies under this Agreement, including, without limitation, Secured Party's right or remedies with respect to the Collateral, the reasonable costs and expenses incurred by Secured Party in any manner or way with respect to the foregoing, shall be part of Debtor's liabilities and indebtedness to Secured Party, payable by Debtor to Secured Party on demand. Without limiting the generality of the foregoing, such expenses, costs, charges and fees include reasonable: (i) attorneys' fees, paralegal fees, costs and expenses; (ii) accountants' and other experts' fees, costs and expenses; (iii) court costs and expenses; (iv) court reporter fees, costs and expenses; (v) long distance telephone charges; and (vi) telegram charges.

    4.11    Debtor releases Secured Party from any and all causes of action or claims which Debtor may now or hereafter have for any asserted loss or damage to Debtor claimed to be caused by or arising from any failure of Secured Party to protect, enforce or collect in whole or in part any of the Collateral so long as Secured Party complies with the Uniform Commercial Code.

4.12    To the extent that Secured Party receives any payment on account from Debtor's liabilities, or any proceeds of Collateral are applied on account of Debtor's liabilities, and any such payment(s) and/or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, subordinated and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common or equitable cause, then, to the extent of such payment(s) or proceeds received, Debtor's liabilities to Secured Party or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment(s) and/or proceeds had not been received by Secured Party and applied on account of Debtor's liabilities and indebtedness.

4.13    All costs, fees and expenses incurred by Secured Party, or for which Secured Party becomes obligated, in connection with the inspection of the Collateral or any related records (collectively, the "Inspection Costs") shall be paid by Secured Party unless an Event of Default has occurred, in which case all Inspection Costs shall be paid by Debtor.

4.14    In the event that Debtor shall contest Secured Party's right to possession in any action relating to the Collateral, Debtor shall post a bond in the amount of two times the sales price or value (whichever is greater) of the Collateral to protect Secured Party's interest therein. Secured Party shall not be required to post any bond or other forms of security in connection with any action for the repossession or replevin of, or otherwise relating to, the Collateral.

4.15    Debtor waives any and all claims for punitive damages relating to the Collateral, the Documents, this Agreement, the relationship of the parties and any other matters related thereto.

4.16    To the extent that any security interest granted hereby is valid as a purchase money security interest, the same shall take effect according to the terms of this Agreement as a purchase money security interest. To the extent that any obligation secured hereby cannot validly be secured by a purchase money security interest, it shall nevertheless be secured by the security interest provided herein as a non-purchase money security interest.

4.17    This Agreement shall take effect upon signature/authentication and shall remain in full force and effect for so long as Debtor remains in any way indebted or obligated to Secured Party. This Agreement may be terminated only by written agreement signed/authenticated by Secured Party. Any filing(s) undertaken by Secured Party relative hereto may only be terminated/released by the filing by Secured Party of a termination/release statement with the Secretary of State (or other appropriate filing office) of the state(s) where Secured Party has previously filed any such financing statements. No other party, including Debtor, shall have the right to file such termination statement, and any such filing by any third party is not authorized by Secured Party and shall be null, void, and of no force or effect whatsoever. Any termination statement filed relative hereto shall not have any effect upon any other agreement or filing between the parties hereto.

4.18    All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

4.19     All terms not specifically defined herein shall have the definitions and meanings set forth in the Uniform Commercial Code, as presently in effect, and as hereafter amended from time to time.  To the extent that any defined term used herein is more restrictive than the same term as used in the Uniform Commercial Code, the scope and definition of such defined term shall be expanded and enlarged to encompass the definition set forth in the Uniform Commercial Code, it being the intent of the parties that the rights and remedies granted to Secured Party shall be as broad and as comprehensive as allowed by applicable law.

**IN WITNESS WHEREOF,** this Agreement has been duly executed as of the day and year specified at the beginning hereof.

**DEBTOR:**                                    **SECURED PARTY:**
**ASAP GRAPHICS, INC.**                        **MAC FUNDING CORPORATION**

By: _____               By: _____
        Ames Friedman
Position:  President                           Position:  EVP

Accepted as of the 18th day of June, 2007.

N:\AGMT\ASAP Blanket.doc

- 11 -

JUDGE DER-YEGHIAYAN

MAGISTRATE JUDGE KEYS

TG

# GROUP EXHIBIT "3"

| Beneficiary: | | | | Obligor: | | | |
|---|---|---|---|---|---|---|---|
| Name | MAC FUNDING CORPORATION | | | Name | ASAP GRAPHICS, INC. | | |
| Address | 1500 Michael Drive | | | Address | 500 Southwest 21st Terrace, Suite B102 | | |
| City | Wood Dale | | | City | Fort Lauderdale | | |
| State | IL | Zip | 60191 | State | FL | Zip | 33312 |
| Contact | Mr. B. Krawulski | Phone | 630-238-5605 | Contact | Mr. Ames Freidman | Phone | 954-792-8155 |

To induce MAC Funding Corporation ("MAC") to enter into the Equipment Lease Agreement dated December 4, 2003 by and between MAC and Obligor (the "Agreement"), and as part of the consideration for the execution thereof, we, the undersigned ("Guarantor"), do hereby, jointly and severally and unconditionally guarantee to MAC the financial responsibility of Obligor at all times and the full and prompt payment and performance by Obligor of all obligations which Obligor presently or hereafter has or may have to MAC under the Agreement, and under any other agreement by and between MAC and Obligor, (regardless of any invalidity or unenforceability thereof) and the payment when due of all rent or installment(s) and all other sums and indebtedness presently or hereafter owing by Obligor to MAC thereunder. This is a guaranty of payment and performance and not of collection only. Guarantor further agrees to indemnify MAC against any losses MAC may sustain and expenses it may incur, including, but not limited to, any administrative or legal costs, fees, or expenses, as a result of any default by Obligor under the Agreement and/or as a result of the enforcement by MAC of any of its rights against Guarantor hereunder. Guarantor hereby expressly waives all defenses which might constitute a legal or equitable discharge of a surety or guarantor, and agrees that this Guaranty shall be valid and unconditionally binding upon Guarantor in any event and under all circumstances. This Guaranty shall continue to be effective or reinstated, as the case may be, if at any time any payment of any indebtedness by Obligor to MAC is rescinded or must otherwise be returned by MAC upon the insolvency, bankruptcy or reorganization of Obligor or otherwise, all as though such payment had not been made.

Guarantor hereby waives notice of any default or nonpayment or nonperformance by Obligor under the Agreement, and waives notice of presentment, protest, and demand, and of all other matters to which Guarantor might otherwise be entitled to be notified. Guarantor further agrees that this Guaranty shall remain and continue in full force and effect, notwithstanding any renewal, modification, or extension of the Agreement or the term thereof. Guarantor agrees that its liability under this Guaranty shall be absolute, primary and direct, joint and several, and that MAC shall not be required to pursue any right or remedy it may have against Obligor under the Agreement or the Equipment (as defined therein) or otherwise before enforcing this Guaranty against Guarantor.

Guarantor hereby agrees that the failure of MAC either to insist in any one or ore instances upon a strict performance or observance of any of the terms, provisions, or covenants of the Agreement or any other agreements, or to exercise any of its rights thereunder, shall not be construed or deemed to be a waiver or relinquishment for the future of any such terms, provisions, covenants, or rights, but such terms, provisions, covenants, and rights shall continue and remain in full force and effect. Receipt by MAC of any rent or other sums payable under the Agreement with knowledge that Obligor has breached any of the terms, provisions, or covenants of the Agreement shall not be deemed to be a waiver by MAC of such breach.

No assignment or other transfer by MAC or Obligor of any interest, right, or obligation under the Agreement, or assumption by any third party of the obligations of Obligor under the Agreement, shall extinguish or diminish the unconditional, absolute, primary, and direct liability of Guarantor under this Guaranty. This Guaranty may be assigned by MAC without notice to Guarantor, but may not be assigned by Guarantor. Any assignee of MAC shall have all of the rights of MAC hereunder and may enforce this Guaranty against Guarantor with the same force and effect as if this Guaranty were given to each assignee in the first instance. This Guaranty shall be construed liberally in MAC's favor, shall inure to the benefit of MAC, and its successors and assigns, and shall be binding upon Guarantor and its heirs, executors, administrators, personal representatives, successors, and assigns. MAC shall have a right of set-off against, and Guarantor hereby grants a security interest in, all moneys, securities, and other property of Guarantor now or hereafter in the possession of MAC.

The Guaranty set forth in and created by this Guaranty is a continuing guaranty and the liability and duty of Guarantor hereunder shall continue for so long as Obligor shall be or remain indebted to MAC under the Agreement or otherwise.
THE GUARANTY SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF ILLINOIS, AND SHALL BE GOVERNED AND CONSTRUED IN ALL RESPECTS BY THE INTERNAL LAWS AND DECISIONS, OTHER THAN CONFLICTS OF LAWS PROVISIONS, OF THE STATE OF ILLINOIS, INCLUDING, WITHOUT LIMITATION, ALL MATTERS OF CONSTRUCTION, VALIDITY, ENFORCEABILITY AND PERFORMANCE. GUARANTOR (a) CONSENTS AT LESSOR'S ELECTION AND WITHOUT LIMITING LESSOR'S RIGHTS TO FILE AN ACTION IN ANY OTHER STATE, TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY COURT OF GENERAL JURISDICTION (FEDERAL, STATE OR LOCAL) LOCATED IN THE COUNTY OF COOK, STATE OF ILLINOIS WITH RESPECT TO ANY LEGAL PROCEEDINGS ARISING OUT OF THIS GUARANTY, AND (b) WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, THE DEFENSE OR OBJECTION OF IMPROPER VENUE AND FORUM NON-CONVENIENS TO THE MAINTENANCE OF ANY SUCH LEGAL PROCEEDINGS. GUARANTOR HEREBY WAIVES TRIAL BY JURY. GUARANTOR IRREVOCABLY AGREES THAT IT SHALL BRING ANY LEGAL PROCEEDING ARISING OUT OF THE GUARANTY ONLY IN THE FEDERAL OR STATE COURTS LOCATED IN THE COUNTY OF COOK, STATE OF ILLINOIS. IN THE EVENT GUARANTOR INSTITUTES ANY LEGAL PROCEEDING IN ANY COURT OTHER THAN A COURT LOCATED IN THE COUNTY OF COOK, STATE OF ILLINOIS, GUARANTOR SHALL ASSUME AND PAY ALL OF MAC'S COSTS IN TRANSFERRING SAID PROCEEDINGS TO A COURT LOCATED IN THE COUNTY OF COOK, STATE OF ILLINOIS, INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES.

IN WITNESS WHEREOF, the undersigned have (has) executed this Guaranty this 9 day of DEC, 200 3.

| PERSONAL GUARANTOR: | PERSONAL GUARANTOR: |
|---|---|
| (Signature of Individual) | (Signature of Individual) |
| (Print or Type Name of Individual) Mr. Ames Freidman | (Print or Type Name of Individual) |
| Social Security No.: 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 | Social Security No.: |
| Home Address: 7022 S.W. 25 Terrace | Home Address: |
| City, State, Zip: Fort Lauderdale, FL. 33312 | City, State, Zip: |
| Home Phone No.: 954-792-2688 | Home Phone No.: |

## NOTE

U.S.$180,340.20

Wood Dale, Illinois
Made:  September 16, 2005
Due:  October 14, 2008

FOR VALUE RECEIVED, the undersigned, ASAP Graphics, Inc, a corporation organized and existing under the laws of the state of Florida whose present address is 500 Southwest 21st Terrace, Fort Lauderdale, Florida 33312, promises to pay to the order of MAC Funding Corporation ("Lender"), the principal sum of One Hundred Eighty Thousand Three Hundred Forty and 20/100 U.S. DOLLARS (U.S.$180,340.20), together with interest thereon (computed as set forth in paragraph 1 below) at the rate of six point seven nine percent (6.79%) per annum, such principal sum and interest to be payable in thirty-six (36) consecutive monthly installments as follows: (i) an initial payment of U.S.$5,009.45 on November 14, 2005 and (ii) the sum of U.S.$5,009.45  on the fourteenth day of each month thereafter through and including October 14, 2008.

All principal and interest due and owing hereunder shall be paid in full to Lender no later than October 14, 2008.

All payments of principal and interest shall be payable in U.S. dollars to Lender and delivered to MAC Funding Corporation, 1500 Michael Drive, Wood Dale, Illinois 60191, Attention:  Accounts Receivable. This Note shall be subject to the following provisions, to wit:

1.       Interest shall accrue on the principal balance remaining due and unpaid from time to time under this Note from and after the date of this Note until paid in full.

2.       The undersigned may, at any time and if not in default, prepay the unpaid balance of the principal sum of this Note and all other amounts then due and owing to Lender hereunder, without penalty.  No partial payment shall postpone the due date of this Note. All payments on account of the indebtedness herein set forth shall be first applied to costs and expenses incurred by Lender with respect to this Note, accrued interest, and then to the balance of the principal sum and the remainder to all other indebtedness, if any, owed by the undersigned to Lender.

3.       If any payment of principal or interest due under this Note is not properly paid when due or any default shall occur under the terms of this Note or under the terms of any other agreements between Lender and the undersigned, the entire balance of the principal sum of this Note, plus, accrued interest hereon and all other indebtedness owed by the undersigned pursuant to this Note to Lender shall be accelerated and become immediately due and payable. Immediately upon any event of default, including specifically, but not limited to, non-payment of principal and interest when due hereunder, interest shall begin to accrue on the entire amount, including principal and interest, owed hereunder, at the rate of eighteen percent (18%) per annum or the highest rate then permitted by law, whichever is lower, until fully paid. The undersigned shall pay to Lender all costs and expenses of collection hereunder including, but not limited to, reasonable attorneys' fees. In addition to the foregoing, the undersigned agrees to pay upon demand by Lender, to the extent not prohibited by law, a collection service charge of Ten ($10.00) Dollars or Five (5.00%) percent of the delinquent payment, whichever is greater.

4.       Presentment, notice of dishonor and protest are hereby waived by the undersigned and all makers, sureties, guarantors and endorsers hereof. The undersigned and all makers, sureties, guarantors and endorsers of this Note also waive the benefit of any exemption, valuation or appraisement laws as to this indebtedness.

5.       The undersigned warrants and represents that it is a corporation or other registered organization (as set forth above) duly organized and existing under the laws of its state of organization set forth in the first paragraph of this Note and that it has the right, power and authority to execute this Note and that the same is and shall be and remain binding upon the undersigned pursuant to its terms.

6.    At any time and from time to time, without notice to or consent of the undersigned, and without affecting the undersigned's liability hereunder, Lender may accept additional makers, endorsers, guarantors and sureties and may release any party liable upon or in respect to this Note, accept additional security for this Note, release, exchange, surrender or otherwise deal with any property, personal or real, securing this Note.

7.    No waiver by Lender of any default hereunder shall operate as a waiver of any other default or of the same default on future occasions. All rights of Lender shall inure to the benefit of its successors and assigns and all obligations of the undersigned shall bind its successors and assigns. Lender's remedies under this Note shall be considered cumulative and not exclusive. Any failure by Lender to enforce at any time any term or condition under this Note shall not be construed as a waiver by Lender of this Note or the right thereafter to enforce each and every provision of this Note.

8.    The provisions of this Note shall be deemed to be several and the invalidity of any provision hereof shall not affect the validity of the remaining provisions hereof. A judicial or administrative declaration in any jurisdiction of the invalidity of any one or more of the provisions hereof shall not invalidate the remaining provisions of this Note in such jurisdiction, nor shall such declaration have any effect on the validity or interpretation of this Note outside of that jurisdiction.

9.    Governing Law, Jurisdiction, Venue and Waiver of Trial by Jury: This Note shall be governed and construed in all respects by the internal laws and decisions of the State of Illinois (without reference to conflicts of laws principles), including, without limitation, all matters of construction, validity, enforceability, and performance. **THE UNDERSIGNED (I) CONSENTS AT LENDER'S ELECTION AND WITHOUT LIMITING LENDER'S RIGHT TO COMMENCE AN ACTION IN ANY OTHER JURISDICTION, TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY COURT (FEDERAL, STATE OR LOCAL) SITUATED IN THE COUNTY OF COOK, STATE OF ILLINOIS; (II) WAIVES ANY OBJECTION TO IMPROPER VENUE AND FORUM NON CONVENIENS; AND (III) CONSENTS TO SERVICE OF PROCESS BY CERTIFIED MAIL, POSTAGE PREPAID, ADDRESSED TO THE UNDERSIGNED AT ITS ADDRESS AS SET FORTH HEREIN. THE UNDERSIGNED HEREBY WAIVES TRIAL BY JURY.** The undersigned shall bring any action arising out of this Note only in the federal or state courts in the County of Cook, State of Illinois. In the event the undersigned institutes any action in any court other than a court located in the County of Cook, State of Illinois, the undersigned shall assume all of Lender's costs in transferring said proceeding to a court located in the County of Cook, State of Illinois, including, without limitation, reasonable attorneys' fees.

10.    The undersigned and Lender intend in this Note to expressly and legally agree upon the interest rate and manner of payment stated herein; provided, however, that if the interest rate or manner of payment exceeds the maximum allowable under applicable law, then the undersigned shall be liable only for the payment of such maximum as is allowed by law, and payments previously received from the undersigned in excess of such legal maximum shall be considered as prepayments of the undersigned's obligations hereunder and applied in accordance with paragraph 2 hereof. This Note is subject to the express condition that at no time shall the undersigned be obligated or required to pay interest at a rate which could subject Lender or the holder of this Note to either civil or criminal liability as a result of the interest rate being in excess of the maximum interest rate which the undersigned is permitted by law to contract or agree to pay. If by the terms of this Note, the undersigned is at any time required or obligated to pay interest at a rate in excess of such maximum rate, the interest rate of this Note shall be deemed to be immediately reduced to such maximum rate.

11.    **THE UNDERSIGNED'S PAYMENT OBLIGATIONS TO LENDER UNDER THIS NOTE SHALL BE IRREVOCABLE, ABSOLUTE AND UNCONDITIONAL, AND WILL NOT BE SUBJECT TO ANY ABATEMENT, DEFENSE, SETOFF, COUNTERCLAIM OR RECOUPMENT WHATSOEVER FOR ANY REASON.** In addition, the undersigned shall be responsible for and will promptly pay, when due, and indemnify Lender against (without any deduction against or reduction of any payments due under this Note) all federal, state, provincial, county, city, municipal and/or other gov-

ernmental taxes, levies, assessments, charges, liens, claims or encumbrances of any nature whatsoever relating to this Note, including, but not limited to, all license and registration fees, assessments, imposts, charges, filing or recording fees, documentary stamp taxes, sales/use taxes, personal property taxes, gross receipts taxes, excise taxes, value added taxes, withholding taxes, and all other taxes which may now or hereafter be imposed or any payments to be made hereunder, whether assessed the undersigned or Lender.

**ASAP GRAPHICS, INC.**

By: _____

Position: _____*President*_____

**ATTEST:**

By: _____

Position: Secretary

## PERSONAL GUARANTY OF AMES FRIEDMAN

As additional consideration to Lender, this Personal Guaranty is given by Ames Friedman ("Guarantor"), an individual with a residence at 2022 S.W. 25 Terr, Ft. Lad. FL , Florida to induce Lender to enter into the Note.  Guarantor hereby unconditionally guarantees to Lender the full and prompt payment and performance by ASAP Graphics, Inc. ("Debtor") of all obligations of Debtor under the foregoing Note. This Personal Guaranty is a guaranty of payment and not a guaranty of collection.  Guarantor hereby expressly waives all defenses which might constitute a legal or equitable discharge of a surety or guarantor, and agrees that this Personal Guaranty shall be valid and unconditionally binding upon Guarantor in any event and under all circumstances.  This Personal Guaranty shall continue to be effective or reinstated, as the case may be, if at any time any payment of any indebtedness by Debtor to Lender is rescinded or must otherwise be returned by Lender upon the insolvency, bankruptcy or reorganization of Debtor or otherwise, all as though such payment had not been made.  In evidence of his Personal Guaranty, Guarantor hereby adopts (and acknowledges that he is bound by) the Note all to the same extent and with the same force and effect as if Guarantor executed the Note and all references to Debtor were references to Guarantor.

**AMES FRIEDMAN**

_____

In his individual capacity

N:\AGMT\6309002A.doc

# GUARANTY AGREEMENT
## MAC FUNDING CORPORATION
### ("Beneficiary")
### Address: 1500 Michael Drive,
### Wood Dale, Illinois 60191

**"GUARANTOR":**

**AMES FRIEDMAN**

Address: 2022 Southwest 25th
      Fort Lauderdale, Florida 33312

**"PRIMARY DEBTOR":**

**ASAP GRAPHICS, INC.**

Address: 500 Southwest 21st Terrace
      Fort Lauderdale, Florida 33312
      Attn: Mr. Ames Friedman

State of Incorporation: Florida

Effective Date of Execution: June 18, 2007

WHEREAS, GUARANTOR is a shareholder of, or is otherwise related or affiliated with PRIMARY DEBTOR named above and/or GUARANTOR has otherwise represented to BENEFICIARY that GUARANTOR has an interest in BENEFICIARY's transactions with PRIMARY DEBTOR; and

WHEREAS, BENEFICIARY has extended or may extend credit and/or other financial accommodations to PRIMARY DEBTOR from time to time; and GUARANTOR and PRIMARY DEBTOR have requested that BENEFICIARY re-schedule certain indebtedness due and owing to BENEFICIARY from PRIMARY DEBTOR under a certain Equipment Lease Agreement dated December 4, 2003;

WHEREAS, in order to induce BENEFICIARY to extend credit and financial accommodations (including the aforesaid re-scheduling) to PRIMARY DEBTOR from time to time in the future at BENEFICIARY's discretion, GUARANTOR has agreed to execute this Guaranty;

NOW, THEREFORE, for and in consideration of the extension of credit and other financial accommodations by the BENEFICIARY to PRIMARY DEBTOR, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by GUARANTOR, GUARANTOR hereby agrees as follows:

    1.    **Guaranty**. GUARANTOR hereby unconditionally and irrevocably guarantees to BENEFICIARY the financial responsibility of PRIMARY DEBTOR at all times hereafter and the full and faithful payment of any and all indebtedness and obligations of any nature whatsoever due and owing from PRIMARY DEBTOR to BENEFICIARY from time to time, whether now existing or hereafter arising, as and when due. In the event that PRIMARY DEBTOR shall fail to pay any indebtedness and obligations owing by PRIMARY DEBTOR to BENEFICIARY, GUARANTOR promises to pay such indebtedness and obligations to

BENEFICIARY upon demand. This Guaranty shall be in addition and supplemental to (and not in lieu of) any other guarantees executed by GUARANTOR or any other third parties in favor of BENEFICIARY.

2. **Joint and Several**. The obligations of GUARANTOR hereunder shall be joint and several with the obligations of PRIMARY DEBTOR.

3. **Validity**. The validity of this Guaranty and the obligations of GUARANTOR hereunder shall in no way be terminated, affected or impaired by reason of (a) the assertion by PRIMARY DEBTOR against BENEFICIARY of any claims, rights, set offs or remedies reserved or arising in favor of PRIMARY DEBTOR under existing or future agreements or otherwise; (b) the waiver or failure on the part of BENEFICIARY to enforce against PRIMARY DEBTOR any debts, covenants or obligations now existing or hereafter arising; (c) the granting by BENEFICIARY to PRIMARY DEBTOR of any indulgences or extensions of time, all of which may be given or granted without the consent of or notice to GUARANTOR; and (d) the taking, release, exchange, modification or subordination of security in the assets of PRIMARY DEBTOR or related entities.

4. **Waiver of Notice**. GUARANTOR hereby waives notice of acceptance of this Guaranty by BENEFICIARY and notice of breach, default or non-performance of PRIMARY DEBTOR of any covenants, duties or obligations under existing or future contracts. GUARANTOR further waives presentment, demand, protest, notice of protest, and notice of default under any note, indebtedness or obligation guaranteed hereby. GUARANTOR further waives notice of all sales made to or indebtedness incurred by PRIMARY DEBTOR, and notice of all disputes between PRIMARY DEBTOR and BENEFICIARY. Without affecting the liability of GUARANTOR hereunder, GUARANTOR further waives notice of, and consents to, each of the following: renewal of indebtedness; modification of the terms of payment; the withdrawal or extension of credit; release in whole or in part of an obligation of PRIMARY DEBTOR; settlement or compromise of claims between PRIMARY DEBTOR and BENEFICIARY; the release in whole or in part of any indebtedness or security of PRIMARY DEBTOR or the substitution of security; and the acceptance of notes or other forms of obligation from PRIMARY DEBTOR.

5. **Primary Liability/Continuing Guaranty**. GUARANTOR agrees that its liability under this Guaranty shall be primary, direct, absolute and unconditional and not contingent upon any other event, including the passing of time, and that in any right of action which shall accrue to the BENEFICIARY, BENEFICIARY may, at its option, proceed against GUARANTOR and against PRIMARY DEBTOR jointly and severally, or BENEFICIARY may first proceed against GUARANTOR without having commenced any action or having obtained any judgment against PRIMARY DEBTOR. This Guaranty shall continue in full force and effect until the express written termination and release of this Guaranty by BENEFICIARY; provided, however, in the event that if for any reason and at any time thereafter BENEFICIARY is required to disgorge, refund remit, repay or return any payments to BENEFICIARY from GUARANTOR or PRIMARY DEBTOR, GUARANTOR's obligations hereunder shall be revived and shall thereafter continue in full force and effect as to such disgorgement, refund, remittance, repayment or return. No change in any circumstances between BENEFICIARY, GUARANTOR or PRIMARY DEBTOR shall in any manner affect this Guaranty.

6. **Assignment**. BENEFICIARY shall have the right and privilege to assign this Guaranty. No assignment or other transfer of this Guaranty, or of the underlying indebtedness or obligations of PRIMARY DEBTOR in conjunction with which this Guaranty has been given, shall operate to extinguish or diminish the liability of GUARANTOR hereunder.

7. **Obligations of Guarantor in Event of Default**. GUARANTOR agrees that in the event of the default of PRIMARY DEBTOR in any of its indebtedness or obligations to BENEFICIARY, or in the event that PRIMARY DEBTOR shall become insolvent or shall be adjudicated bankrupt, or shall file a petition for relief under the Bankruptcy Act, GUARANTOR shall immediately pay to BENEFICIARY an amount equal to the aggregate of all indebtedness and obligations then owing by PRIMARY DEBTOR to BENEFICIARY, whether due or not. Further, and without in any way limiting the foregoing, upon the happening of any one of said events of default, GUARANTOR shall perform each and every covenant and obligation of PRIMARY DEBTOR under its agreements with BENEFICIARY, and GUARANTOR shall be fully responsible to BENEFICIARY for all damages that may be incurred or sustained by BENEFICIARY by reason of the breach of any existing or future agreements between PRIMARY DEBTOR and BENEFICIARY. AS MATERIAL INDUCEMENT TO BENEFICIARY, GUARANTOR HEREBY UNCONDITIONALLY AND IRREVOCABLY AGREES THAT GUARANTOR WILL NOT AT ANY TIME ASSERT, OR PERMIT TO BE ASSERTED, AGAINST PRIMARY DEBTOR (OR PRIMARY DEBTOR'S ESTATE) ANY RIGHT OR CLAIM TO INDEMNIFICATION, REIMBURSEMENT, CONTRIBUTION OR PAYMENT FOR OR WITH RESPECT TO ANY AND ALL AMOUNTS GUARANTOR MAY PAY OR BE OBLIGATED TO PAY TO BENEFICIARY, INCLUDING, WITHOUT LIMITATION, ANY INDEBTEDNESS AND ANY ENFORCEMENT COSTS, AND ANY AND ALL OBLIGATIONS WHICH GUARANTOR MAY PERFORM, SATISFY, OR DISCHARGE, UNDER OR WITH RESPECT TO THIS GUARANTY. GUARANTOR FURTHER UNCONDITIONALLY AND IRREVOCABLY AGREES THAT GUARANTOR SHALL HAVE NO RIGHT OF SUBROGATION AND WAIVES ANY RIGHT TO ENFORCE ANY REMEDY WHICH BENEFICIARY NOW HAS OR MAY HEREAFTER HAVE AGAINST PRIMARY DEBTOR, AND ANY SECURITY NOW OR AFTER HELD BY THE BENEFICIARY.

8. **Impairment of Remedies**. Neither GUARANTOR's obligation to make payment in accordance with the terms of this Guaranty nor any remedy for the enforcement thereof shall be impaired, modified, released or limited in any manner whatsoever by any impairment, modification, release or limitation of the liability of PRIMARY DEBTOR or its estate in bankruptcy or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the Bankruptcy Act or other statute or the decision of any court.

9. **Costs and Expenses**. GUARANTOR agrees to pay to BENEFICIARY, its successors and assigns, all costs and expenses, including but not limited to reasonable attorney's and paralegal fees, incurred in enforcing any of the provisions of this Guaranty against GUARANTOR.

10. **Distribution, Division or Application**. In the event of any distribution, division, payment or application, partial or complete, voluntary or involuntary, by operation of law or otherwise (collectively a "Payment"), of all or any part of the assets of PRIMARY DEBTOR, or

- 3 -

the proceeds thereof, in whatever form, occurring by reason of the liquidation, dissolution or other winding up of PRIMARY DEBTOR or by reason of any execution, sale, receivership, insolvency or bankruptcy proceeding or assignment for the benefit of creditors or proceeding for reorganization, or readjustment of PRIMARY DEBTOR, or PRIMARY DEBTOR's properties, the obligations owing to BENEFICIARY shall first be paid in full before any Payment is made on any rights or claims of GUARANTOR, or any one of them, against DEBTOR and such rights or claims shall be subject to the provisions hereof. Any Payment received by Guarantor shall be received and held in trust by Guarantor for Beneficiary and shall be immediately paid over by Guarantor to Beneficiary without necessity of any demand by or notice from Beneficiary.

11.    **Miscellaneous.**  This Guaranty shall be deemed to have been made and accepted in the State of Illinois, where BENEFICIARY is engaged in business, and it shall be governed by and interpreted, and the rights and liabilities of the parties hereto shall be determined, in accordance with the laws of the State of Illinois without reference to conflicts of laws principles. GUARANTOR hereby consents and submits to the jurisdiction of any federal or state court located within Illinois for the purpose of any suit hereunder. GUARANTOR further agrees that the service of any summons or process in any such proceedings upon GUARANTOR by mail (or in any other manner allowed by applicable court rules or law) shall be and constitute good and valid service upon GUARANTOR for all purposes. This Guaranty shall be binding upon the heirs, devisees, executors, administrators, successors and assigns of GUARANTOR. The paragraph headings are for reference purposes only and shall not affect in any way the meaning or interpretation of this Guaranty. No agreement exists between GUARANTOR and BENEFICIARY that the obligations of GUARANTOR under this Guaranty are, or will be, other than set out herein. The rights and remedies of BENEFICIARY under this Guaranty or otherwise created are cumulative and may be exercised singly or concurrently, and the exercise of any one or more of them shall not be a waiver of any other.  No act, delay, omission or course of dealing between BENEFICIARY, PRIMARY DEBTOR or GUARANTOR, or any of them, will be or constitute a waiver of any of BENEFICIARY's rights or remedies under this Guaranty, and no waiver, change, modification or discharge of this Guaranty or any obligation created hereby will be effective unless in writing signed by BENEFICIARY. The provisions of this Guaranty shall be deemed to be several, and any invalidity of any provisions shall not affect the validity of the remaining provisions hereof. GUARANTOR hereby represents and warrants that if PRIMARY DEBTOR is a corporation, limited liability company or limited partnership, it is properly existing/organized in the state indicated above, not in default in the payment of any franchise taxes or any other obligations, and is otherwise in good standing in such state.

EXECUTED this 18th day of June, 2007.

GUARANTOR:

AMES FRIEDMAN

ASAP GUARANTY-FREIDMAN.doc

- 4 -